**Jane DOE, Plaintiff,**

v.

**Father Gerald HARTZ, Bishop Lawrence Soens, St. Lawrence Church, and Roman Catholic Diocese of Sioux City, Iowa, Defendants.**

**No. C 96–4091–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

June 23, 1997.

James W. Radig, Shull, Cosgrove, Hellige & Lundberg, Sioux City, IA, for Bishop Soens, St. Lawrence Church, and the Roman Catholic Diocese of Sioux City, Iowa.

Anjali A. Ashley, Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, Willis A. Buell, Asst. U.S. Atty., Northern District of Iowa, Sioux City, IA, for U.S.

Andrea Williams, NOW Legal Defense and Education Fund, New York City, for amicus curiae NOW Legal Defense and Education Fund.

Victoria L. Herring, Des Moines, IA (Cleary, Gottlieb, Steen & Hamilton, New York City, Judith Resnik, Orrin B. Evans, University of Southern California Law School, New York University School of Law, and Frank Michelman, Robert Walmsley, Harvard University Law School, of counsel); Reva Siegel, Yale Law School (on the brief), for amici curiae Law Professors.

Roxanne Barton Conlin, Roxanne Conlin and Associates, P.C., Des Moines, IA, for Jane Doe.

Joseph L. Fitzgibbons, Fitzgibbons Brothers Attorneys at Law, Estherville, IA, for Father Hartz.

**MEMORANDUM OPINION AND ORDER REGARDING MOTION TO DISMISS, ABSTAIN, OR CERTIFY QUESTIONS**

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ....................................1381
 A. The Parties And The Central Incidents ..................................1381
 B. The Complaint .................................................1381
 C. The Response ..................................................1383

II. LEGAL ANALYSIS ..........................................1385
 A. Standards For Defendants' Motion To Dismiss ........................1385
 1. Failure to state a claim .........................................1385
 2. Lack of subject matter jurisdiction ...............................1386
 B. The Challenges To The VAWA Claim ................................1390
 1. Has Doe stated a claim under the VAWA? ..........................1391
 a. Elements of Doe's § 13981 claim ..............................1392
 i. Rules of statutory interpretation ...........................1392
 ii. The plain meaning of the VAWA civil remedies statute .........1393
 b. Elements of the predicate offense ..............................1397
 i. The statute defining the predicate offense ....................1397
 ii. Predicate felonies .......................................1399
 c. Predicate "crime of violence" under the VAWA ....................1400
 i. "Categorical" determination ................................1400
 ii. "Crime of violence" test ..................................1402
 iii. Application of the test ...................................1403
 d. Adequate pleading of a predicate offense .........................1404

 e. Remaining elements of the VAWA claim .........................1405
 2. Is the VAWA constitutional? ......................................1409
 a. The split in authority .........................................1409
 b. Commerce Clause analysis ....................................1413
 i. Substantial effect on interstate commerce ......................1415
 ii. Deference to congressional findings ..........................1419
 iii. Congressional findings ....................................1421
 iv. Reasonable adaptation of means to goal.......................1423
 C. Supplemental Jurisdiction ...........................................1423
 1. Novelty and complexity.........................................1424
 2. Predomination ................................................1425
 D. Challenges To State–Law Claims.....................................1426
 1. Negligent hiring, training, and supervision ...........................1426
 a. Recognition of the tort as alleged ..............................1427
 b. Constitutionality of the tort as against religious institutions..........1428
 i. The "entanglement" test....................................1428
 ii. Federal decisions ........................................1430
 iii. State court decisions .....................................1431
 2. Other state-law claims.........................................1432
 E. Certification For Interlocutory Appeal ................................1433

III. CONCLUSION ...............................................................1434

APPENDIX ........................................................................1435
 A. Amici Appearing Through NOW Legal Defense And Education Fund ........1435
 B. Amici "Law Professors" ...........................................1436

Violence against women prompted Congress to pass the civil remedies provision of the Violence Against Women Act (VAWA), 42 U.S.C. § 13981, on September 13, 1994, as a new, federal weapon to combat gender-based violence. Yet, whatever the need for or merits of the VAWA, was its passage a constitutional exercise of congressional power? The only two courts to consider the question have split on the answer.[1] The defendants here, a parish priest accused by a parishioner of sexually exploiting her, as well as the church, bishop, and diocese also called to account for the priest's allegedly wrongful conduct, assert that the VAWA cannot be sustained on the basis of either the Congress' Commerce Clause or Fourteenth Amendment enforcement powers. The plaintiff, the United States as a plaintiff/intervenor, and various *amici curiae* have rallied to defend the constitutionality of the VAWA.

However much the parties and interested persons press their arguments concerning the constitutionality of the enactment of the VAWA, the court must heed the directive of the Supreme Court, and first consider non-constitutional challenges to the plaintiff's VAWA claim, and must only reach the constitutional issue if it is "unavoidable."[2] A non-constitutional challenge is not lacking here, because the defendants also contend that the plaintiff's VAWA claim, the only federal claim in the complaint, is inadequately pleaded. Furthermore, if the VAWA claim is dismissed, on constitutional or nonconstitutional grounds, the court may be deprived of subject matter jurisdiction over any of the plaintiff's thirteen state-law claims, and the

---

**1.** The court finds that only two decisions have considered the constitutionality of the civil remedies provision of the VAWA. They are *Brzonkala v. Virginia Polytechnic & State Univ.*, 935 F.Supp. 779 (W.D.Va.1996), which found the statute unconstitutional, and *Doe v. Doe*, 929 F.Supp. 608 (D.Conn.1996), which upheld it. Very recently, the Fourth Circuit Court of Appeals considered the constitutionality of the *criminal* provisions of the VAWA prohibiting interstate domestic violence, 18 U.S.C. § 2261, in *United States v. Bailey*, 112 F.3d 758 (4th Cir.1997), and upheld the

statute as within the Congress's Commerce Clause powers. Similarly, the United States District Court for the Southern District of New York has upheld the portion of the VAWA prohibiting interstate domestic violence as a valid exercise of Commerce Clause power. *United States v. Gluzman*, 953 F.Supp. 84 (S.D.N.Y.1997).

**2.** *See Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2996–97, 86 L.Ed.2d 664 (1985).

defendants contend that the court should decline to exercise supplemental jurisdiction over those claims in any event. Finally, the defendants also challenge the plaintiff's many state-law claims, again on constitutional grounds—this time, pursuant to the religion clauses of the First Amendment—as well as a plethora of nonconstitutional grounds.

This tangle of constitutional and nonconstitutional issues, federal and state claims, a federal claim dependent upon a predicate offense defined by state law, and supplemental jurisdiction questions, creates a veritable Gordian Knot.[3] Alexander the Great could only loosen the Gordian Knot by slicing through it with his sword, an approach that is appealing, but unavailable here.[4] This court's resolution of defendants' motion must be more patient and reasoned.

## I. INTRODUCTION AND BACKGROUND

### A. The Parties And The Central Incidents

Plaintiff Jane Doe[5] filed her complaint in this action on August 29, 1996, naming as defendants Father Gerald A. Hartz, who is a priest at St. Lawrence Church, in Carroll, Iowa, St. Lawrence Church itself, the Roman Catholic Diocese of Sioux City, Iowa, and Bishop Lawrence Soens, the bishop of the defendant Diocese. The gravamen of Doe's complaint is that, on December 3, 1994, when she arrived at the Church to sing during evening mass, Father Hartz "came up behind her, grabbed her with both of his hands and pulled her back into his body, held her tightly and kissed her neck." Complaint, ¶ 11. Later that same evening, after mass, "Defendant Hartz rubbed Plaintiff's back up and down with his hand." *Id.* at ¶ 14. Plaintiff alleges thirteen claims, based on state and federal law, as a result of these incidents or related events.

### B. The Complaint

Count 1 of Doe's complaint is the only one stating a federal claim, and thus is the count upon which federal jurisdiction depends.[6] In Count 1, Doe asserts a civil claim against Father Hartz for violation of the civil remedies provision of the VAWA, 42 U.S.C. § 13981. Doe alleges that Father Hartz's conduct constituted sexual exploitation by a counselor or therapist within the meaning of Iowa Code § 709.15, establishing a predicate felony crime of violence under the federal statute. As relief, she seeks a declaration that Father Hartz's conduct violated the VAWA; an injunction, apparently against all defendants, enjoining any conduct violating the rights of the plaintiff and others secured by the VAWA;[7] an order that Father Hartz

3. Gordius, King of Phrygia, tied his chariot to a hitching post before the temple of an oracle with an intricate knot, which, it was prophesied, none but the future ruler of all Asia could untie. *See, e.g., Funk and Wagnalls Standard Dictionary of Folklore, Mythology, and Legend* 460 (Maria Leach, ed., Funk & Wagnalls, 1972); *Bulfinch's Mythology* 44 (Richard P. Martin, ed. 1991).

4. In the course of his conquests, Alexander the Great came to Phrygia, and, frustrated with his inability to untangle the "Gordian Knot," simply sliced through it with his sword. His subsequent success in his Asian campaign has been taken to mean that his solution to the "Gordian knot" fulfilled the prophesy. *See, e.g., Funk and Wagnalls Standard Dictionary of Folklore, Mythology, and Legend* 460 (Maria Leach, ed., Funk & Wagnalls, 1972); *Bulfinch's Mythology* 44 (Richard P. Martin, ed. 1991).

5. This court considered extensively the standards for prosecution of a claim under a pseudonym in *Heather K. v. City of Mallard, IA,* 887 F.Supp. 1249, 1255–56 (N.D.Iowa 1995). Although plaintiff Jane Doe has not specifically moved for leave to prosecute this action under a pseudo-

nym, no other party has challenged that procedure. Furthermore, Doe appears to meet the requirements for prosecution of a lawsuit under a pseudonym. *See id.* (citing *Doe v. Frank,* 951 F.2d 320, 323 (11th Cir.1992), and *Doe v. Stegall,* 653 F.2d 180, 186 (5th Cir.1981), as recognizing that a substantial privacy right may outweigh the customary and constitutionally-embedded presumption of openness in judicial proceedings where the plaintiff may be required to disclose information of the utmost intimacy, thus making prosecution under a pseudonym appropriate).

6. Doe asserts jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights), on the basis of a claim arising under the civil remedies provision of the federal Violence Against Women Act, 42 U.S.C. § 13981. Doe invokes the court's supplemental jurisdiction over her state-law claims pursuant to 28 U.S.C. § 1367(a).

7. Indeed, in almost the entirety of Count 1, the allegations stated and relief sought are against only Father Hartz. *See, e.g.,* Complaint, ¶ 37 (detailing claimed injuries as the result of Father Hartz's conduct); Complaint ¶ 38 (asserting that

receive psychological evaluation and treatment; an injunction against Father Hartz from performing his duties and responsibilities until such time as a neutral professional certifies that he can do so without sexually exploiting females; compensatory and punitive damages; attorneys fees; costs; and such other relief as the court deems just and proper.

The remaining counts assert state-law claims against the various defendants. Count 2 alleges sexual abuse by Father Hartz. As relief on this count, Doe seeks an order requiring Father Hartz to receive professional counseling within the meaning of Iowa Code § 611.23, and compensatory and punitive damages. Count 3 alleges fraud by Father Hartz arising from a special relationship of trust, and confidence between the plaintiff and Father Hartz and Father Hartz's misrepresentation, based on his holding himself out as celibate and as a personal fiduciary, that he could be trusted not to fondle or kiss the plaintiff in a sexual manner. This fraud count is apparently also directed at the other defendants as well, because Doe asserts that the other defendants had knowledge of the falsity of Father Hartz's representations and that they intended to deceive the plaintiff to "save themselves, the church, and the congregation the embarrassment of admitting there was a priest in St. Lawrence Church that had a problem with sexual abuse." Complaint, ¶¶ 50–51. This count also asserts that the fraudulent acts of the defendants constituted part of the pattern, practice, or scheme of conduct by a counselor or therapist within the meaning of Iowa Code § 709.15(1)(f)(1), which appears to be intended to bolster the VAWA claim as well. As relief on the fraud count, Doe seeks compensatory and punitive damages, interest, and costs.

Count 4 alleges breach of fiduciary duty by the defendant Diocese and Bishop Soens. Specifically, it alleges a fiduciary duty on the part of these defendants to Doe, and breach of that duty by failure to notify Doe that she was in danger of being a victim of sexual abuse at Father Hartz's hands and by failure to provide Father Hartz with professional counseling services to protect Doe from being sexually abused by Father Hartz. On this count, Doe seeks compensatory and punitive damages, as well as interest, and costs. Count 5 is a companion claim of breach of fiduciary duty against Father Hartz. It alleges Father Hartz had a fiduciary duty to Doe and breached it by fondling and kissing her for the purposes of arousing and/or satisfying his sexual desires. On this count, Doe seeks compensatory and punitive damages against Father Hartz, as well as interest and costs.

Counts 6, 7, 8, and 9 are against only Father Hartz. Count 6 alleges assault by Father Hartz by placing Doe in fear of offensive physical contact after the incident in which Father Hartz is alleged to have actually engaged in such conduct. The relief sought on this count is, again, compensatory and punitive damages, interest, and costs.[8] Count 7 is a claim of tortious infliction of emotional distress based on the alleged out-

---

Father Hartz "acted willfully and recklessly and with intentional and willful disregard for the rights of Plaintiff," thus entitling Doe to punitive damages). However, in subsection (b) of the prayer for relief on this claim, Doe asks that the court "permanently enjoin *Defendants* from any conduct violating Plaintiff's rights or the rights of other women and girls as secured by the [VAWA]." Complaint, Prayer of Count 1, subsection (b) (emphasis added). Although this claim is not a model of "short and plain" pleading, *Fed. R.Civ.P.* 8(a), it appears to the court that the claim, or at least the relief sought, is against *all* defendants, not just Father Hartz. The uncertainty about the proper defendant or defendants on this claim has serious repercussions: It raises questions about whether a civil claim under the VAWA can be asserted against anyone but the individual actor, whether *respondeat superior* lia-

bility attaches to an employer for an employee's violation of the VAWA, and whether the defendants other than Father Hartz have standing to challenge the constitutionality of the VAWA if no claim under that Act is or can be asserted against them. The court assumes that the VAWA claim has been asserted against all of the defendants. However, because Father Hartz has joined in the motion to dismiss this claim, at least one of the movants has standing to challenge the constitutionality of the VAWA.

8. Although the relief sought on this count was against "Defendants, and all of them," Complaint, prayer to Count 6, in her response to the defendants' motion to dismiss, Doe agrees to dismiss Count 6 as to Bishop Soens, the Church, and the Diocese. Therefore, this count is now asserted against only defendant Hartz.

rageousness of Father Hartz's conduct on December 3, 1994. The relief sought on this count is also compensatory and punitive damages, interest, and costs. Counts 8 and 9 are negligence claims as alternatives to the intentional torts alleged in the prior counts. Count 8 alleges that Father Hartz suffers from a mental disease or defect that renders him unable to control his conduct in connection with sexual behavior toward females and that Father Hartz's conduct as a result of his disease or defect, although not intentional, was negligent. Count 9 alleges that Father Hartz negligently breached his duty to restrain himself from sexually abusing the plaintiff as a result of his mental disease or defect and also breached his duty to obtain professional help to treat his mental disease or defect so that he could refrain from sexually abusing the plaintiff. Doe seeks compensatory and punitive damages, interest, and costs as relief on both of her negligence claims against Father Hartz.

Counts 10, 11, 12, and 13 seek to hold the other defendants liable for Father Hartz's conduct on various theories. Count 10 is denominated a negligent hiring, training, and supervision claim and is directed against defendants Church, Diocese, and Bishop.[9] The specific failings alleged are failure to provide professional help to an agent or employee known or suspected to have tendencies toward sexual abuse and exploitation; failure to prevent Father Hartz from engaging in sexual abuse; failure to reprimand or take punitive action against Father Hartz; failure to supervise and/or control Father Hartz to ensure that sexual abuse did not occur; and failure to respond to previous allegations of inappropriate behavior by Father Hartz. On this claim, Doe seeks from the Church, Diocese, and Bishop compensatory and punitive damages, interest, and costs. Count 11 is a negligence claim directed at defendants Church and Diocese. It alleges breach of a

duty on the part of these defendants to protect the plaintiff from abuse imposed on her by Father Hartz. As relief on this claim, Doe seeks only compensatory damages, interest, and costs. Count 12 alleges a claim of premises liability against only the defendant Church, based on the Church's knowledge that Father Hartz was present on the premises and posed an unreasonable risk of injury to a person in Doe's position against which Doe would be unable to protect herself. Doe alleges that the Church failed to protect Doe from her abuser, with consequent injuries to Doe. Doe seeks against the Church compensatory damages, interest, and costs. Finally, in Count 13, Doe asserts a claim of *respondeat superior* liability of the defendant Church for Father Hartz's conduct while acting within the scope of his employment. Furthermore, the count alleges that the Church[10] requires Father Hartz to dispose of all worldly goods, thereby rendering him judgment proof and unable personally to respond in damages for his intentional and negligent conduct. Doe therefore seeks compensatory damages, interest, and costs against the Church for Father Hartz's conduct.

Doe has demanded a jury trial on all of the counts of her complaint.

### C. The Response

Defendants Church, Diocese, and Bishop waived service of the complaint on September 13, 1996, and, on September 30, 1996, moved to dismiss the complaint in whole or in part, or, in the alternative, for an order of abstention and certification of issues to the Iowa Supreme Court. After various extensions, these defendants filed a brief in support of their motion to dismiss, abstain, or certify questions on October 22, 1996. Doe resisted the motion, also after various extensions, on February 21, 1997.[11] Father Hartz answered the complaint on January 21, 1997, also demanded a jury trial, and, on February

---

9. Incidentally, this count alleges that defendants caused the alleged injuries to "the Decedent" by failing properly to hire, retain, and supervise Father Hartz. Complaint, ¶ 84. Nowhere else in the complaint is it suggested that plaintiff Doe has died.

10. The complaint actually makes this specific allegation against "Defendants," but the relief

sought on this count is "against Defendant St. Lawrence Church." Complaint, ¶ 100. Therefore, the court construes this claim to have been brought only against the Church.

11. In the interim between the filing of the motion to dismiss, abstain, or certify questions, a magistrate judge of this district suspended discovery in this action.

3, 1997, joined in the motion to dismiss, abstain, or certify questions filed by the other defendants.[12] Defendants filed a reply to Doe's resistance on March 14, 1997.

On February 24, 1997, the court certified the fact of the defendants' challenge to the constitutionality of 42 U.S.C. § 13981 to the attorney general of the United States and granted the United States forty-five days from the date of the order to intervene pursuant to 28 U.S.C. § 2403 and *Fed.R.Civ.P.* 24(c). On February 28, 1997, the court also directed that *amici curiae* interested in participating in the proceedings seek leave to present briefs and arguments by April 11, 1997, and directed that any *amicus curiae* brief be filed by April 25, 1997. On April 10, 1997, the United States sought leave to intervene as a party plaintiff to defend the constitutionality of the VAWA, which leave was granted on April 14, 1997. On April 11, 1997, the NOW Legal Defense and Education Fund sought leave to file an *amicus curiae* brief and, on April 23, 1997, that organization also sought leave to participate in oral arguments.[13] Also on April 11, 1997, a group consisting of more than sixty eminent law professors in the fields of constitutional law and civil rights, known herein as the "Law Professors," sought leave to file a brief as *amici curiae.*[14] On April 24, 1997, the court granted the requests of *amici* to file briefs and present arguments, extended their deadline to file briefs to April 30, 1997, and gave defendants permission to file a brief in reply to arguments of *amici* and the intervenor post-hearing. However, because the hearing was subsequently rescheduled, the court then set a deadline of May 14, 1997, for the briefs of intervenor and *amici,* and a deadline of May 28, 1997, for defendants to reply. *Amici* Law Professors filed their brief on April 28, 1997. The plaintiff/intervenor United States filed its brief on May 13, 1997, and

*amicus* NOW filed its brief on May 14, 1997. Defendants filed a reply to *amici curiae* on May 29, 1997.

The court has found the briefing of all of the parties and *amici* to be of remarkable thoroughness and informativeness, and, consequently, to be of unusual assistance to the court in addressing the serious and complicated issues presented. The court believes that the advocacy demonstrated has served the interests of justice well and the court will strive to meet the high standards of the interested parties with comparably cogent and conscientious consideration of all essential issues.

The court heard oral arguments on June 9, 1997. As the court expected from the briefing, the arguments were spirited and informative, but also conducted with the highest degree of professionalism. Plaintiff Jane Doe was represented at oral arguments by counsel Roxanne Barton Conlin of Roxanne Conlin and Associates, P.C., in Des Moines, Iowa. Defendant Father Hartz was represented by counsel Joseph L. Fitzgibbons of Fitzgibbons Brothers Attorneys at Law in Estherville, Iowa. Defendants Bishop Soens, St. Lawrence Church, and the Roman Catholic Diocese of Sioux City, Iowa, were represented by counsel James W. Radig of Shull, Cosgrove, Hellige & Lundberg in Sioux City, Iowa. Plaintiff/intervenor United States of America was represented by counsel Anjali A. Ashley of the Department of Justice, Civil Division, Federal Programs Branch in Washington, D.C., and Willis A. Buell, Assistant United States Attorney for the Northern District of Iowa. *Amicus curiae* NOW Legal Defense and Education Fund was represented by counsel Andrea Williams of the NOW Legal Defense and Education Fund in New York, New York.[15]

---

**12.** Because Father Hartz has only joined in the motion to dismiss filed by the other defendants, but has not filed his own motion to dismiss nor an independent brief, there is no motion before the court to dismiss the counts pleaded only against Father Hartz.

**13.** NOW Legal Defense and Education Fund is actually appearing on behalf of several organizations, but, for the sake of simplicity, this group of interested persons or organizations will be treat-

ed as singular and identified as *"amicus* NOW." The organizations on whose behalf NOW Legal Defense and Education Fund is appearing are listed in the appendix to this opinion.

**14.** The members of the "Law Professors" group are listed in the appendix to this opinion.

**15.** *Amici curiae* Law Professors, who did not participate in oral arguments, were represented by counsel Victoria L. Herring of Des Moines,

After the oral arguments, the government was granted leave to supplement the record with the briefs from the appeal of the *Brzonkala* decision to the Fourth Circuit Court of Appeals. Those briefs were received by the court on June 13, 1997. Also, prior to and during oral arguments, the parties supplemented the citations of authority found in their briefs, particularly with reference to the First Amendment barriers to a negligent hiring or supervision claim against a religious institution.

The court will detail the pertinent arguments of the interested parties as it considers each of the essential issues the court finds must (or can) be resolved in disposition of defendants' motion.

## II. LEGAL ANALYSIS

The defendants assert that various portions of Doe's complaint must be dismissed, because she fails to state claims upon which relief can be granted. They contend further that the complaint must be dismissed in its entirety, because the court lacks subject matter jurisdiction over Doe's federal claim, and hence lacks supplemental jurisdiction over her state-law claims. The standards for dismissal on each of these grounds are similar, to some extent interrelated, but not identical.

### A. Standards For Defendants' Motion To Dismiss

#### 1. Failure to state a claim

■ A motion to dismiss may be made, *inter alia*, for "failure to state a claim upon which relief can be granted." *Fed.R.Civ.P.* 12(b)(6). A motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(6) requires the court to review only the pleadings to determine whether the pleadings state a claim upon which relief can be granted. *Fed.R.Civ.P.* 12(b).[16] Such motions "can serve a useful purpose in disposing of legal issues with the minimum of time and expense to the interested parties." *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 973 (8th Cir.1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969). The issue is not whether a plaintiff will ultimately prevail, but rather whether the plaintiff is entitled to offer evidence in support of the plaintiff's claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1376 (8th Cir.1989).

In considering a motion to dismiss under Rule 12(b)(6), the court must assume that all

Iowa. The firm of Cleary, Gottlieb, Steen & Hamilton in New York, New York, is "of counsel" for the *amici* Law Professors, as are Professor Judith Resnik, Orrin B. Evans Professor of Law, University of Southern California Law School, Visiting Professor of Law, New York University School of Law, and Professor Frank Michelman, Robert Walmsley University Professor of Law, Harvard University Law School. Assistance in the preparation of the brief of *amici* Law Professors was also provided by Professor Reva Siegel, Yale Law School, and New York University School of Law students Alys Behio (1998), Chris Gottlieb (1997), Valerie Leipheimer (1998), and Jennifer Rakstad (1998).

16. However, where on a Rule 12(b)(6) motion to dismiss "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Fed.R.Civ.P.* 12(b)(6); *see also Buck v. FDIC*, 75 F.3d 1285, 1288 & n. 3 (8th Cir. 1996) (because the district court relied on matters outside the complaint in ruling on a Rule 12(b)(6) motion, "the district court had to treat the [defendant's] motion to dismiss as a motion for summary judgment and apply the relevant

standards for summary judgment," and further noting that "[t]he standards for dismissing a complaint under Rule 12(b)(6) are substantially different" from those applicable to a Rule 56 summary judgment motion; therefore it was inappropriate for the district court to fail to specify whether it was disposing of an issue according to summary judgment or Rule 12(b)(6) standards). Even where matters outside of the pleadings are presented to the court, however, a motion to dismiss is not converted into a motion for summary judgment "where the district court's order makes clear that the judge ruled only on the motion to dismiss." *Skyberg v. United Food and Commercial Workers Int'l Union, AFL–CIO*, 5 F.3d 297, 302 n. 2 (8th Cir. 1993). Where the district court has made the posture of its disposition clear, the appellate court will "treat the case as being in that posture." *Id.* The only materials outside of the pleadings offered here in support of or resistance to the motion to dismiss are documentation of hearings and reports before Congress on the VAWA and authorities not readily available to the court, rather than documentary or other evidence. Therefore, the motion to dismiss will not be disposed of as provided in Rule 56, but only according to the standards stated herein.

facts alleged in the plaintiff's complaint are true, and must liberally construe those allegations. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Doe v. Norwest Bank Minn., N.A.,* 107 F.3d 1297, 1303–04 (8th Cir.1997) ("In considering a motion to dismiss, we assume all facts in the complaint are true, construe the complaint in the light most favorable to the plaintiff, and affirm the dismissal only if 'it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief,'" quoting *Coleman v. Watt,* 40 F.3d 255, 258 (8th Cir.1994)); *WMX Techs., Inc. v. Gasconade County, Mo.,* 105 F.3d 1195, 1198 (8th Cir.1997) ("In considering a motion to dismiss, the court must construe the complaint liberally and assume all factual allegations to be true."); *First Commercial Trust v. Colt's Mfg. Co.,* 77 F.3d 1081, 1083 (8th Cir.1996) (same).

The court is mindful that in treating the factual allegations of a complaint as true pursuant to Rule 12(b)(6), the court must "reject conclusory allegations of law and unwarranted inferences." *Silver v. H & R Block, Inc.,* 105 F.3d 394, 397 (8th Cir.1997) (citing *In re Syntex Corp. Securities Lit.,* 95 F.3d 922, 926 (9th Cir.1996)); *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990) (the court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts," citing *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987), and 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, at 595–97 (1969)); *see also LRL Properties v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1103 (6th Cir.1995) (the court "need not accept as true legal conclusions or unwarranted factual inferences," quoting *Morgan,* 829 F.2d at 12). Conclusory allegations need not and will not be taken as true; rather, the court will consider whether the *facts* alleged in the complaint, accepted as true, are sufficient to state a claim upon which relief can be granted. *Silver,* 105 F.3d at 397; *Westcott,* 901 F.2d at 1488.

■ The United States Supreme Court and the Eighth Circuit Court of Appeals have both observed that "a court should grant the motion and dismiss the action 'only

if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Handeen v. Lemaire,* 112 F.3d 1339, 1347–48 (8th Cir. 1997) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984)); *accord Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief."); *Doe,* 107 F.3d at 1304 (dismissal is appropriate only if " 'it appears beyond doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief,' " quoting *Coleman,* 40 F.3d at 258); *WMX Techs., Inc.,* 105 F.3d at 1198 ("Dismissal should not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts that would entitle relief," citing *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02). The Rule does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations. *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 1832–33, 104 L.Ed.2d 338 (1989). Thus, "[a] motion to dismiss should be granted as a practical matter only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995) (internal quotation marks and ellipses omitted).

### 2. *Lack of subject matter jurisdiction*

Interwoven with defendants' challenge to Doe's complaint on the ground that it fails to state claims upon which relief can be granted pursuant to Rule 12(b)(6) is defendants' challenge, on another Rule 12 ground, this time Rule 12(b)(1), to the subject matter jurisdiction of the court. Defendants contend that Doe cannot state a federal claim upon which to assert federal jurisdiction, first, because Doe's federal claim under the VAWA is based on an unconstitutional statute, and, second, because Doe has not alleged a predicate offense upon which a VAWA claim would depend on either the face of the complaint or as a matter of fact.

The federal district courts have always been courts of limited jurisdiction. *See* U.S. CONST., Art. III, § 1.[17] Because jurisdiction is a threshold issue for the court, the district court has "broader power to decide its own right to hear the case than it has when the merits of the case are reached." *Bellecourt v. United States,* 994 F.2d 427, 430 (8th Cir.1993) (quoting *Osborn v. United States,* 918 F.2d 724, 729 (8th Cir.1990), which in turn quotes *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981)), *cert. denied,* 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 371 (1994).

■■■ For the court to dismiss for lack of subject matter jurisdiction under *Fed. R. Civ. P.* 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments. *Titus v. Sullivan,* 4 F.3d 590, 593 (8th Cir.1993).

The court in *Titus* distinguished between the two kinds of challenges:

> In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction. *Eaton v. Dorchester Dev., Inc.,* 692 F.2d 727, 731–32 (11th Cir. 1982)....
>
> If the [defendant] wants to make a *factual* attack on the jurisdictional allegations of the complaint, the court may receive competent evidence such as affidavits, deposition testimony, and the like in order to determine the factual dispute. *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947) [footnote omitted]. The proper course is for the defendant to request an evidentiary hearing on the issue. *Osborn [v. United States],* 918 F.2d [724,] 730 (citing *Craw-*

17. The Eighth Circuit Court of Appeals has explained further: "Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Marine Equip. Management Co. v. United States,* 4 F.3d 643, 646 (8th Cir.1993) (citing *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501, *reh'g denied,* 476 U.S. 1132, 106 S.Ct. 2003, 90 L.Ed.2d 682 (1986), citing in turn *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803); *see also Neighborhood Transp. Network, Inc. v. Pena,* 42 F.3d 1169, 1171 (8th Cir.1994) (federal court jurisdiction is limited by Article III of the Constitution). A federal court therefore has a duty to assure itself that the threshold requirement of subject matter jurisdiction has been met in every case. *Bradley v. American Postal Workers Union, AFL–CIO,* 962 F.2d 800, 802 n. 3 (8th Cir.1992) (citing *Sanders, infra*); *Thomas v. Basham,* 931 F.2d 521, 523 (8th Cir.1991); *Jader v. Principal Mut. Life Ins. Co.,* 925 F.2d 1075, 1077 (8th Cir.1991); *Barclay Square Properties v. Midwest Fed. Sav. & Loan Ass'n,* 893 F.2d 968, 969 (8th Cir.1990); *Sanders v. Clemco Indus.,* 823 F.2d 214, 216 (8th Cir. 1987).

"The parties ... may not confer subject matter jurisdiction upon the federal courts by stipulation, and lack of subject matter jurisdiction cannot be waived by the parties or ignored by the court." *Pacific Nat'l Ins. Co. v. Transport Ins. Co.,* 341 F.2d 514, 516 (8th Cir.), *cert. denied,* 381 U.S. 912, 85 S.Ct. 1536, 14 L.Ed.2d 434 (1965); *see also Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 25, 109 S.Ct. 2273, 2287, 105 L.Ed.2d 1 (1989) (Stevens, J., concurring) ("[T]he cases are legion

holding that a party may not waive a defect in subject-matter jurisdiction or invoke federal jurisdiction simply by consent," citing *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 377 n. 21, 98 S.Ct. 2396, 2404 n. 21, 57 L.Ed.2d 274 (1978); *Sosna v. Iowa,* 419 U.S. 393, 398, 95 S.Ct. 553, 556–57, 42 L.Ed.2d 532 (1975); *California v. LaRue,* 409 U.S. 109, 112 n. 3, 93 S.Ct. 390, 394 n. 3, 34 L.Ed.2d 342 (1972); *American Fire & Cas. Co. v. Finn,* 341 U.S. 6, 17–18 & n. 17, 71 S.Ct. 534, 542 & n. 17, 95 L.Ed. 702 (1951); *Mitchell v. Maurer,* 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934); *Jackson v. Ashton,* 8 Pet. (33 U.S.) 148, 149, 8 L.Ed. 898 (1834)); *Lawrence County v. South Dakota,* 668 F.2d 27, 29 (8th Cir.1982) ("[F]ederal courts operate within jurisdictional constraints and ... parties by their consent cannot confer subject matter Jurisdiction upon the federal courts."). Even where " 'the parties did not raise any jurisdictional issues[, t]his court is obligated to raise such jurisdictional issues if it perceives any.' " *White v. Nix,* 43 F.3d 374, 376 (8th Cir.1994) (quoting *Lewis v. United States Farmers Home Admin.,* 992 F.2d 767, 771 (8th Cir.1993)). The federal courts have a duty to examine the substantiality of the federal claim throughout the litigation, and must dismiss all claims if the federal claim proves patently meritless even after the trial begins. *Pioneer Hi–Bred Int'l v. Holden Found. Seeds, Inc.,* 35 F.3d 1226, 1242 (8th Cir. 1994); *Sanders,* 823 F.2d at 216. However, the Eighth Circuit Court of Appeals has cautioned that "subject matter jurisdiction should not be used to dismiss a case containing even a remotely plausible federal claim if the parties and the courts have already made [a] vast expenditure of resources." *Id.*

*ford v. United States,* 796 F.2d 924, 928 (7th Cir.1986)).

*Id.*[18]

In *Osborn v. United States,* 918 F.2d 724 (8th Cir.1990), the Eighth Circuit Court of Appeals presented its most exhaustive discussion of the procedures and requirements for determination of a 12(b)(1) motion to dismiss.

The district court was correct in recognizing the critical differences between Rule 12(b)(1), which governs challenges to subject matter jurisdiction, and Rule 56, which governs summary judgment. Rule 12 requires that Rule 56 standards be applied to motions to dismiss for failure to state a claim under Rule 12(b)(6) when the court considers matters outside the pleadings. [Citations omitted.] Rule 12 does not prescribe, however, summary judgment treatment for challenges under 12(b)(1) to subject matter jurisdiction where a factual record is developed. Nonetheless, some courts have held that Rule 56 governs a 12(b)(1) motion when the court looks beyond the complaint. We agree, however, with the majority of circuits that have held to the contrary.... [Citations omitted.]

The reason for treating a 12(b)(1) motion differently than a 12(b)(6) motion, which is governed by Rule 56 when matters outside the pleadings are considered, "is rooted in the unique nature of the jurisdictional question." *Williamson [v. Tucker],* 645 F.2d [404,] 413 [ (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) ]. It is "elementary," the Fourth [sic] Circuit stated, that a district court has "broader power to decide its own right to hear the case than it has when the merits of the case are reached." *Id.* Jurisdictional issues, whether they involve questions of law or of fact, are for the court to decide. *Id.* Moreover, because jurisdiction is a threshold question, judicial economy demands that the issue be decided at the outset rather than deferring it until trial, as would occur with denial of a summary judgment motion.

*Osborn,* 918 F.2d at 729.

The *Osborn* court found the distinction between facial and factual attacks on the complaint under 12(b)(1) to be critical. *Id.* (citing *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217

**18.** The district court has the authority to consider matters outside the pleadings on a motion challenging subject matter jurisdiction under *Fed.R.Civ.P.* 12(b)(1). *Drevlow v. Lutheran Church, Missouri Synod,* 991 F.2d 468, 470 (8th Cir.1993). If material facts are adjudicated by the court in determining its jurisdiction, the appellate court will review the findings of fact for clear error. *Id.* Where the material facts are not in dispute, the appellate court will review the court's determination that it lacks jurisdiction de novo. *Id.; see also Southern Council of Indus. Workers v. Ford,* 83 F.3d 966, 968 (8th Cir.1996) (citing *Osborn v. United States,* 918 F.2d 724, 730 (8th Cir.1990)); *Thompson v. Covington,* 47 F.3d 974, 975 (8th Cir.1995) (citing *Drevlow,* 991 F.2d at 470); *Christopher Lake Dev. Co. v. St. Louis County,* 35 F.3d 1269, 1273 (8th Cir.1994) (citing *Osborn,* 918 F.2d at 730). If the court considers matters outside of the pleadings, however, it may not, without notice to the parties, convert a motion to dismiss for lack of subject matter jurisdiction under *Fed.R.Civ.P.* 12(b)(1) into a motion to dismiss for failure to state a claim under *Fed. R.Civ.P.* 12(b)(6), which is subject to summary judgment disposition, because to do so would not allow the parties to respond to the issue the court is weighing for summary judgment. *Layton v. United States,* 919 F.2d 1333, 1334–35 (8th Cir. 1990).

In *Layton,* the court noted that a Rule 12(b)(1) motion is distinguishable from a 12(b)(6) motion on the ground that the Rules expressly provide that the latter is subject to conversion into a summary judgment motion, while no such provision exists for a Rule 12(b)(1) motion. *Layton,* 919 F.2d at 1335. However, courts have approved such a conversion of a Rule 12(b)(1) motion when appropriate. *Id.* (citing *Less v. Lurie,* 789 F.2d 624, 625 n. 1 (8th Cir.1986)). There is, however, an exception to the notice requirement before the court makes a conversion into a summary judgment motion articulated in *Van Leeuwen v. United States Postal Serv.,* 628 F.2d 1093, 1095 (8th Cir.1980), which requires that if both parties have submitted affidavits and exhibits outside the pleadings which they understand the district court has accepted for consideration, then the non-moving party has notice of the court's intention to treat the motion to dismiss as one for summary judgment. *Id.* (concluding that the court could not invoke the *Van Leeuwen* exception on the basis of a unilateral submission of exhibits by the moving party). The court will explain in the body of this ruling which standards are applicable to the motion to dismiss pursuant to Rule 12(b)(1) in this case.

(1980), and *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)). The court stated that

> [i]n the first instance, the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6). The general rule is that a complaint should not be dismissed " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " In a factual attack, the court considers matters outside the pleadings, and the nonmoving party does not have the benefit of 12(b)(6) safeguards.

*Id.* at 729 n. 6 (citations omitted).[19] A factual challenge to jurisdiction under 12(b)(1) is unique:

> [H]ere the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*Id.* at 730 (quoting *Mortensen,* 549 F.2d at 891). The *Osborn* court stated that the proper course is for the defendant to request an evidentiary hearing on the issue, and, since no statute or rule prescribes the format of such a hearing, "any rational mode of inquiry will do." *Id.* (quoting *Crawford,* 796 F.2d at 929).

> Once the evidence is submitted, the district court must decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue. *[Crawford,* 796 F.2d at 929.] The

only exception is in instances when the jurisdictional issue is "so bound up with the merits that a full trial on the merits may be necessary to resolve the issue." *Id.*

*Id.*

Defendants here originally asserted only a facial challenge to subject matter jurisdiction, contending that Doe had failed to allege essential elements of the predicate offense, an alleged violation of Iowa Code § 709.15. However, while their motion to dismiss was pending, the defendants apparently recognized that their challenge to subject matter jurisdiction was or could also be factual. They sought and initially obtained from plaintiff a factual stipulation concerning whether Doe received mental health services from Father Hartz, but plaintiff has now withdrawn her consent to that stipulation. The defendants then, belatedly, requested an evidentiary hearing on June 4, 1997, just days before the oral arguments, in support of a factual challenge to subject matter jurisdiction.[20] By order dated June 5, 1997, the court denied defendants' request for an evidentiary hearing as both untimely and impractical under the circumstances. *See Titus,* 4 F.3d at 593.

Thus, the challenge to subject matter jurisdiction mounted here is construed to be only a *facial* one, subject to the same protections afforded the non-moving party as that party would have in defending against a motion brought under Rule 12(b)(6). *Osborn,* 918 F.2d at 729 n. 6; *see also Titus,* 4 F.3d at 593 ("In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction."). To the extent that the defendants assert a factual challenge to subject matter jurisdiction, the court finds that their factual issue—whether or not Doe received mental health services from Father Hartz as required by one element of the predicate offense Doe has alleged in her VAWA claim—

---

**19.** The standards for dismissal under Rule 12(b)(6) are, of course, described in some detail in the preceding section.

**20.** The oral arguments had been scheduled for months and for this specific date for several weeks.

is inextricably "bound up with the merits" of the VAWA claim, such that a full trial, or at least a complete summary judgment record, on the merits of the claim is necessary to resolve the issue. *Osborn,* 918 F.2d at 730. For now, therefore, in resolving defendants' motion to dismiss for lack of subject matter jurisdiction, the court will assess the adequacy of Doe's facial pleading *or prima facie* factual showing of elements necessary to sustain her federal claim, but will not "decide the jurisdictional issue." *Id.* Instead, the court will rule only on whether there is or is not enough evidence for the question of subject matter jurisdiction to await resolution at a later stage in these proceedings. *Id.*

With these standards in mind, the court turns to the defendants' specific challenges to the adequacy of Doe's claims as alleged.

### B. The Challenges To The VAWA Claim

Defendants assert that there are two insuperable bars to Doe's claim under the civil remedies provision of the VAWA, 42 U.S.C. § 13981. First, they contend that the civil remedies provision of the VAWA is unconstitutional, because it is not a proper exercise of congressional power under either the Commerce Clause or section five of the Fourteenth Amendment. Second, they contend that Doe has failed to state a claim that comes within the scope of the Act, because Doe has failed to allege satisfactorily each element of such a claim. Furthermore, defendants argue that the court lacks subject matter jurisdiction over the complaint, because this sole federal claim is based on an unconstitutional statute, and/or Doe has failed to allege an element necessary for subject matter jurisdiction.[21]

■ The court will consider these questions in reverse order, however, only reaching the argument that the statute is unconstitutional if that part of defendants' motion to dismiss based on failure to allege the necessary elements of the claim is defeated. Such a procedure is mandated by the United States Supreme Court:

"Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981); *Mobile v. Bolden,* 446 U.S. 55, 60, 100 S.Ct. 1490, 1495–96, 64 L.Ed.2d 47 (1980); *Kolender v. Lawson,* 461 U.S. 352, 361, n. 10, 103 S.Ct. 1855, 1860, n. 10, 75 L.Ed.2d 903 (1983), citing *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). This is a "fundamental rule of judicial restraint." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,* 467 U.S. 138, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984). Of course, the fact that courts should not decide constitutional issues unnecessarily does not permit a court to press statutory construction "to the point of disingenuous evasion" to avoid a constitutional question. *United States v. Locke,* 471 U.S. 84, 96, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985). As the Court stressed in *Spector Motor Service v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944), "[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *See also United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 737, 70 S.Ct. 955, 961–62, 94 L.Ed. 1231 (1950); *Larson v. Valente,* 456 U.S. 228, 257, 102 S.Ct. 1673, 1690, 72 L.Ed.2d 33 (1982) (Stevens, J., concurring).

*Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985). The Court in *Jean* found that the Eleventh Circuit Court of Appeals, *en banc,* had failed to follow this rule, because that court first examined the constitutionality of parole considerations employed by the INS that were established in former statutes and regulations instead of examining whether current statutes provided nondiscriminatory considerations. *Id.* Because current statutes and regulations provided the petitioners with nondiscriminatory parole considerations,

---

**21.** Again, the court will not reach the question pertinent to a factual challenge to subject matter jurisdiction, which is whether all essential elements necessary for subject matter jurisdiction can be proved.

which was all petitioners sought to obtain by virtue of their constitutional arguments, "there was no need to address the constitutional issue" as to the former statutes and regulations. *Id.* at 854–55, 105 S.Ct. at 2997.

Here, the situation is somewhat different, but this "fundamental rule of judicial restraint" is nonetheless applicable: If Doe has not stated a claim under the VAWA, a non-constitutional ground for dismissal of the claim,[22] this court certainly need not consider whether the VAWA is constitutional. *Id.* at 854, 105 S.Ct. at 2997. If the court can render defendants all they seek, dismissal of the VAWA claim, because the allegations are simply insufficient, without addressing the constitutionality of the VAWA, it must consider that assertion first, before considering constitutionality of the statute. *Id.* at 854–55, 105 S.Ct. at 2996–97; *see also Schanou v. Lancaster County Sch. Dist. No. 160,* 62 F.3d 1040, 1046 n. 4 (8th Cir.1995) (noting that the court would express no opinion on the constitutionality of a policy of a school district, because the court had disposed of the case without reaching the merits of the constitutional challenge). To put it another way, only if Doe has adequately pleaded a claim within the scope of the VAWA will adjudication of the constitutionality of the Act be "unavoidable." *Id.* at 854, 105 S.Ct. at 2997.

### 1. Has Doe stated a claim under the VAWA? [23]

The defendants contend that Count 1 of Doe's complaint simply does not allege, or does not allege adequately, each essential element of a § 13981 claim. After setting forth the language of § 13981 and the Iowa statute establishing the predicate offense Doe asserts Father Hartz committed, Iowa Code § 709.15, the defendants contend that the essential elements of Doe's VAWA claim are the following:

(1) Father Hartz provided or purported to provide "mental health services";

(2) at the time of the events in question, Doe had a relationship with Father Hartz in which she was receiving from him "mental health services," or she had terminated such a relationship within the previous year;

(3) Father Hartz's acts constituted

(a) a pattern or practice or scheme of conduct

(b) to engage in sexual conduct of the kind prohibited by § 709.15(1)(f)(2) or (3), and

(c) that conduct was for the purpose of arousing or satisfying his sexual desires;

(4) Father Hartz's conduct constituted a "crime of violence" within the meaning of 18 U.S.C. § 16;

(5) the acts were committed because of Doe's gender;

(6) Father Hartz committed the acts because of an animus on his part against women; and

(7) Doe suffered damage.

The defendants assert that Doe's § 13981 claim is deficiently pleaded as to each of these elements. Although Doe does not appear to challenge the defendants' statement of the elements of her VAWA claim, she resists this part of the defendants' motion to dismiss on the ground that she has adequately alleged every essential element of that claim. In their reply brief, the defendants focus on the adequacy of the pleading that Doe received "mental health services" from Father Hartz.

The court's task, therefore, is to determine, in the first instance, the elements of Doe's VAWA claim, and then to assess whether she has pleaded, in more than conclusory fashion, *facts* that, accepted as true, are sufficient to state a claim under the VAWA upon which relief can be granted. *Silver,* 105 F.3d at 397; *Westcott,* 901 F.2d at 1488. "[O]nly if it is clear that no relief could

---

**22.** Such a conclusion might also require dismissal of the entire complaint, which depends upon a viable federal question for this court to exercise jurisdiction, because the challenge to the only federal claim comes so early in the proceedings. *See* 28 U.S.C. § 1367(c)(3).

**23.** Plaintiff/intervenor the United States and *amici* necessarily took no part in the arguments concerning this part of defendants' motion to dismiss, being concerned solely with the constitutionality of the VAWA.

be granted under any set of facts that could be proved consistent with the allegations" will the court grant the defendants' motion to dismiss the VAWA claim on this nonconstitutional ground. *Handeen*, 112 F.3d at 1347–48 (internal quotation marks omitted).

### a. Elements of Doe's § 13981 claim

■ **i. Rules of statutory interpretation.** Identifying or determining the elements of a statutory cause of action is essentially a matter of statutory interpretation. "The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Chevron U.S.A. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *United States v. Union Elec. Co.*, 64 F.3d 1152, 1165 (8th Cir.1995) (citing *Ron Pair); United States ex rel. Harlan v. Bacon*, 21 F.3d 209, 210 (8th Cir.1994) ("When construing a statute, we are obliged to look first to the plain meaning of the words employed by the legislature ...," citing *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82); *United States v. Manthei*, 979 F.2d 124, 126 (8th Cir.1992) ("When interpreting statutory language, the court must first look to the plain meaning of the language," citing *North Dakota v. United States*, 460 U.S. 300, 312–13, 103 S.Ct. 1095, 1102–03, 75 L.Ed.2d 77 (1983)). The Supreme Court describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Thus, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing *Ron Pair*, 489 U.S. at 241–42, 109 S.Ct. at 1030–31; *United States v. Goldenberg*, 168 U.S. 95, 102–03, 18 S.Ct. 3, 4, 42 L.Ed. 394 (1897); *Oneale v. Thornton*, 6 Cranch 53, 68, 3 L.Ed. 150 (1810)).

■ When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair*, 489 U.S. at 241, 109 S.Ct. at 1030 (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)); *Union Elec.*, 64 F.3d at 1165 (quoting *Ron Pair*); *Melahn v. Pennock Ins., Inc.*, 965 F.2d 1497, 1502 (8th Cir.1992) (plain meaning of a statute governs over ambiguous legislative history, citing *Ron Pair Enterprises*). The plain meaning of a statute is decisive, "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 452, 107 S.Ct. 1207, 1223–24, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring in judgment) (ordinary meaning governs unless implementing it would be "patent absurdity"); *Waugh v. Internal Revenue Serv.*, 109 F.3d 489, 493 (8th Cir.1997) (quoting *Ron Pair*); *Missouri v. L.J. O'Neill Shoe Co.*, 64 F.3d 1146, 1150 (8th Cir.1995); *Union Elec.*, 64 F.3d at 1165.

■ "[p]lain meaning, like beauty, is sometimes in the eye of the beholder," *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 737, 105 S.Ct. 1598, 1603–04, 84 L.Ed.2d 643 (1985). Thus, the court must not reach its decision about the meaning of a statute

> by a strict construction of the words of the Act, nor by application of artificial canons of construction. On the contrary, we are to read the statutory language in its ordinary and natural sense, and if doubts remain, resolve them in the light, not only of the policy intended to be served by the enactment, but, as well, by all other available aids to construction. But it is not our function to engraft on a statute additions which we think the legislature logically might or should have made.

*Bacon*, 21 F.3d at 210–11 (quoting *United States v. Cooper Corp.*, 312 U.S. 600, 605, 61 S.Ct. 742, 743–44, 85 L.Ed. 1071 (1941)). Thus, the court must assume that the words of a statute, construed in their ordinary meaning, accurately express the legislative purpose, and the court should decline to frustrate the plain meaning of the words chosen

by the legislature. *United States v. Talley*, 16 F.3d 972, 976 (8th Cir.1994).

*ii. The plain meaning of the VAWA civil remedies statute.* The civil remedies provision of the VAWA is codified at 42 U.S.C. § 13981. Subsection (b) of § 13981 establishes the right upon which a civil claim can be founded:

All persons within the United States shall have the right to be free from crimes of violence motivated by gender (as defined in subsection (d) of this section).

42 U.S.C. § 13981(b). Subsection (c) authorizes a cause of action for violation of this right as follows:

A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of· the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate.

42 U.S.C. § 13981(c). The essential elements of a VAWA claim are readily apparent from the subsection authorizing the cause of action. Those elements are as follows: (1) the defendant committed a "crime of violence"; (2) that crime of violence was "motivated by gender"; and (3) commission of the crime deprived the victim of the right to be free from crimes of violence motivated by gender. *Id.* Although these elements may be readily apparent, determining the constituent prongs of these elements requires further analysis.

The court finds that it must consider first the meaning of the third element extracted from the language of subsection (c). At first reading, this element appears tautologous: If one commits a crime of violence, element one, that is motivated by gender, the second element, one has necessarily deprived another of the right to be free of crimes of violence motivated by gender, the third element. However, it is precisely this statement that rebuts defendants' argument that an essential element of Doe's case is that she prove she suffered damage. Instead, the statute plainly states that deprivation of the right *is sufficient injury to sustain the cause of action;* no further physical, emotional, economic, or non-economic injury is required.[24]

One practical effect of this interpretation is that the trier of fact is not required to make any additional finding to satisfy the third element drawn from the statute. Proof of the first two elements necessarily establishes the third element, and the plaintiff's entitlement to the relief stated in the statute, which is "compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate." 42 U.S.C. § 13981(c). Another practical effect of this interpretation is that the court need not consider further here the third statutory element identified above in its efforts to determine what elements must be adequately alleged to establish Doe's right to pursue a VAWA claim.[25]

---

24. Consequently, as in actions pursuant to 42 U.S.C. § 1983 for violations of constitutional rights, if the plaintiff shows a violation of the right established by the statute, but has no damages of any monetary value, it would follow that the plaintiff is entitled to nominal damages, which can support a punitive damages award. *See Muhammad v. Lockhart*, 104 F.3d 1069, 1070 (8th Cir.1997) (an award of nominal damages to a person deprived of the right recognizes the importance of the civil right in an organized society); *Williams v. Soligo*, 104 F.3d 1060, 1062 (8th Cir.1997) (a plaintiff deprived of a civil right, such as procedural due process, is entitled to nominal damages); *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 658–61 (8th Cir.1995) (holding that punitive damages were available where the plaintiff was awarded only nominal damages on his claim of invasion of privacy, but that the amount of punitive damages awarded violated due process); *Cowans v. Wyrick*, 862 F.2d 697 (8th Cir. 1988) (nominal damages were appropriate in a § 1983 civil rights action where the jury was unable to place a monetary value on the plaintiff's harm from deprivation of civil rights); *Goodwin v. Circuit Court of St. Louis County*, 729 F.2d 541, 548 (8th Cir.1984) (holding that an award of nominal damages in a § 1983 action will support an award of punitive damages).

25. Doe has specifically alleged that she has the right established by § 13981(b), and that Father Hartz's conduct deprived her of that right and caused various specific kinds of emotional and other injuries. Complaint, Count 1, ¶¶ 35, 37.

■ Subsection (d) of the statute, to which the court will return below, contains essential definitions, but for now, the court will focus on some limitations or clarifications of the elements of a civil claim under the VAWA found in subsection (e). Subdivisions (e)(1) and (e)(2) clarify the reach of the civil cause of action. Subdivision (e)(1) clarifies or narrows the second element of the offense by excluding from the definition of "crimes of violence motivated by gender" those crimes that are merely "random acts of violence unrelated to gender or ... acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender." 42 U.S.C. § 13981(e)(1). The civil cause of action under the VAWA is therefore plainly aimed at conduct motivated by the victim's gender, not merely crimes in which the victim is a woman. *See* S.Rep. No. 103–195, at 49–50 (1993) ("The committee is not asserting that all crimes against women are gender-motivated. As discussed below, title III requires subjective proof on a case-by-case basis that the criminal conduct was motivated by a bias against the victim's gender."); S.Rep. No. 103–138, at 49–50 (1993) (same). Furthermore, although the Act was entitled the Violence Against Women Act, the statute is cast in gender-neutral terms, and thus would also be applicable to a crime against a man that was gender motivated.

■ While subdivision (e)(1) narrows the scope of the civil remedy, subdivision (e)(2) explains the breadth of the civil cause of action. It specifies that "[n]othing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action under subsection (c) of this section." 42 U.S.C. § 13981(e)(2). Thus, although there must be a predicate "crime of violence," the first element of the civil cause of action under the VAWA, the civil remedy stands alone, without the necessity of a prior criminal complaint, prosecution, or conviction to address or establish the predicate offense. *Id.; see also Doe v. Doe*, 929 F.Supp. 608, 611–12 (D.Conn.1996) (also observing that "[t]he statute does not require a prior criminal complaint, prosecution, or conviction to establish the elements of the cause of action,"

citing § 13981(e)(2)). Thus far, the statute is clear enough.

But what kinds of crimes of violence motivated by gender can constitute the necessary predicate offenses? To answer this question, the court turns to the definitions found in subsection (d) of the statute. The meaning of this subsection, the court finds, is not immediately apparent. Subsection (d) provides as follows:

For purposes of this section—

(1) the term "crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender; and

(2) the term "crime of violence" means—

(A) an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States; and

(B) includes an act or series of acts that would constitute a felony described in subparagraphs (A) but for the relationship between the person who takes such action and the individual against whom such action is taken.

42 U.S.C. § 13981(d). Subdivision (d)(1) explains that, to satisfy the second element of the claim, which requires that the predicate crime be one "motivated by gender," a two-prong test must be satisfied: First, the predicate crime must be "because of" or "on the basis of" the victim's gender, *and*, second, the predicate crime must be "due, at least in part, to an *animus* based on the victim's gender." 42 U.S.C. § 13981(d)(1) (emphasis added). The court will return to the meaning of "animus" in this context below.

Subdivision (d)(2) in turn explains the specific requirements of, or prongs of inquiry under, the first element of the civil claim, the requirement of a predicate "crime of violence." 42 U.S.C. § 13981(d)(2). Subdivision (d)(2) states the intention of Congress, subsequently reiterated in subdivision (e)(2), that the predicate offense need not have resulted in criminal charges, prosecution, or conviction, and further eliminates certain territorial limitations. 42 U.S.C. § 13981(d)(2)(A). However, it is other portions of subdivision (d)(2) that the court finds establish the significant prongs of inquiry. Unfortunately, the court finds the drafting of those particular portions somewhat opaque.

Paragraph (A) of subdivision (d)(2) appears to establish requirements for a predicate "crime of violence," although the relationship among those requirements is, at first blush, rather obscure. 42 U.S.C. § 13981(d)(2)(A). What the court finds to be uncertain is the relationship among the phrases "an act or series of acts," "that would constitute a felony against the person," "that would constitute a felony against property," "if the conduct presents a serious risk of physical injury to another," and "that would come within the meaning of State or Federal offenses de-

scribed in section 16 of Title 18," coupled with the placement of the conjunctions "and" and "or," as well as the presence or absence of commas.[26]

Nonetheless, to clarify the meaning of the statute, the court need only resort to ordinary meanings. *Bacon*, 21 F.3d at 210; *Talley*, 16 F.3d at 976. Attachment of the condition that "the conduct presents a serious risk of physical injury to another" to a felony against the person is largely superfluous, whereas attachment of that condition to crimes against property significantly narrows the range of property crimes that would come within the scope of the statute. Furthermore, the phrases pertaining to "felony against the person" and "felony against property" each begin with "that would constitute," and they are separated by the word "or." This construction of the paragraph plainly suggests that the phrase before the "or," that is, "that would constitute a felony against the person," is one alternative for a predicate crime of violence, while the phrase after the "or," that is, "that would constitute a felony against property if the conduct presents a serious risk of physical injury to another," is a second alternative for this prong of the inquiry.

**26.** Perhaps the simplest way to explain the court's quandary in deciphering the meaning of this subdivision is to list some alternative readings. For example, the paragraph can be read to create, first, two alternative requirements, then another, mandatory requirement, as follows:

> The term "crime of violence" means an act or series of acts (1)(a) that would constitute a felony against the person *or* (b) that would constitute a felony against property *if* the conduct presents a serious risk of physical injury to another, *and* (2) that would come within the meaning of State or Federal Offenses described in section 16 of Title 18 . . . .

However, it might seem just as reasonable to read the statute as follows:

> [T]he term "crime of violence" means an act or series of acts (1)(a) that would constitute a felony against the person *if* the conduct presents a serious risk of physical injury to another *or* (b) that would constitute a felony against property *if* the conduct presents a serious risk of physical injury to another, *and* (2) that would come within the meaning of State or Federal Offenses described in section 16 of Title 18 . . . .

This reading relates the condition that the conduct present a serious risk of physical injury to another to both the felony against the person and

the felony against property. A third alternative, dramatically changing the relationship among the phrases, and hence the requirements of the statute, without doing violence to the original word order would be the following:

> [T]he term "crime of violence" means an act or series of acts (1) that would constitute a felony against the person *or* (2) that would constitute a felony against property *if* the conduct presents a serious risk of physical injury to another, *and* that would come within the meaning of State or Federal Offenses described in section 16 of Title 18 . . . .

This reading creates two alternative requirements, rather than two alternatives for a first requirement coupled with a second, mandatory requirement. Furthermore, it couples the requirement that the crime come within the meaning of 18 U.S.C. § 16 only to the alternative of a felony against property. In short, under this reading, *any* felony against the person (that also satisfies the gender motivation tests of subdivision (d)(1)) would constitute a predicate offense for a VAWA civil action, but only a felony against property (again, that satisfies the gender motivation tests of subdivision (d)(1)) that both presents a serious risk of physical injury to another *and* that comes within the meaning of 18 U.S.C. § 16 would constitute the necessary predicate offense.

■ Resort to ordinary meanings also establishes that the requirement that the predicate felony come within the meaning of 18 U.S.C. § 16 is a mandatory requirement conjoined to either alternative, a felony against the person or a felony against property. This requirement is set off from the phrase pertaining to a felony against property by a comma, whereas no such comma would be required if this requirement were conjoined only to a felony against property, but not against the person. Furthermore, this requirement also shares with the first two alternatives the restrictive phrase "that would," suggesting it is a further, mandatory requirement for the predicate crime of violence consisting of an act or series of acts meeting certain requirements. Thus, the court concludes that the plain meaning of paragraph (A) of subdivision (d)(2) is that the predicate offense must meet the following requirements:

The term "crime of violence" means an act or series of acts

(1)(a) that would constitute a felony against the person

*or*

(b) that would constitute a felony against property *if* the conduct presents a serious risk of physical injury to another, *and*

(2) that would come within the meaning of State or Federal Offenses described in section 16 of Title 18. . . .

This reading conforms most nearly to the word order and punctuation of the paragraph, and hence to the ordinary and natural sense of the paragraph. *Bacon,* 21 F.3d at 210; *Talley,* 16 F.3d at 976.[27]

The plain meaning of paragraph (B) of subdivision (d)(2) is that it adds to the available predicate offenses those acts fitting the requirements of paragraph (A), but which are not defined as felonies under applicable state or federal law only because of the rela-

tionship between the actor and the victim. 42 U.S.C. § 13981(d)(2)(B). The effect of this section is that it prevents certain crimes from falling outside the scope of the VAWA simply because the crime is not defined as a felony under state or federal law, because, for example, the crime is committed by one domestic partner against another.

■ The court concluded above that the elements of a civil VAWA claim requiring proof to the satisfaction of a trier of fact are as follows: (1) the defendant committed a "crime of violence"; and (2) that crime of violence was "motivated by gender." Engrafting the requirements from definitional portions of § 13981 into the elements of a civil VAWA cause of action stated in subsection (b) of the statute, the court finds that the elements of such a claim are as follows:

(1) The defendant committed a "crime of violence" within the meaning of the VAWA.

An offense is a "crime of violence" within the meaning of the VAWA if it is, or would be but for the relationship between the defendant and the victim,

(a) either—

(i) a felony against the person of the victim, or

(ii) a felony against property that presents a serious risk of physical injury to another; and

(b) comes within the meaning of 18 U.S.C. § 16.

(2) The defendant's offense was "motivated by gender."

An offense is "motivated by gender" within the meaning of the VAWA if it is *both*

(a) committed "because of" or "on the basis of" the victim's gender, *and*

---

**27.** The court notes that the second alternative for the first prong requires a felony against property to "present[ ] a *serious* risk of physical *injury,*" while 18 U.S.C. § 16 defines a crime of violence as either involving the "use, attempted use, or threatened use of physical force against the person or property of another" or "a *substantial* risk that physical *force*" may be used. *See, e.g., Unit-*

*ed States v. Shannon,* 110 F.3d 382, 384–85 (7th Cir.1997) (*en banc*) (distinguishing between a risk of injury and a risk of use of physical force). However, the court need not be concerned here with this difference, because the court is not presented in this case with any allegation of a predicate offense that is a felony against property.

(b) due, at least in part, to an animus based on the victim's gender.

*See* 42 U.S.C. § 13981(c), (d), and (e).

▮ Before moving on to the elements of the predicate offense, however, the court must also consider what is meant by a "felony" within the meaning of § 13981. The civil action portion of the VAWA does not identify the applicable definition of "felony" as a felony under state law, federal law, or either state or federal law. 42 U.S.C. § 13981(d). Instead, it merely defines a predicate offense, in pertinent part, as "an act or series of acts that would constitute a felony." *Id.* Hence, the court concludes that the act or acts must constitute a felony under *either* state or federal law. Furthermore, a crime classified only as some degree of misdemeanor under state law is nonetheless a felony under federal law if it is punishable by a term of imprisonment exceeding one year. *See, e.g., United States v. Haggerty,* 85 F.3d 403, 406 (8th Cir.1996) ("Under federal law, an offense is a felony if the maximum term authorized for the offense is 'more than one year,'" citing 18 U.S.C. § 3559(a)). Under Iowa law, an aggravated misdemeanor is punishable by "imprisonment not to exceed two years." Iowa Code § 903.1(2). Thus, aggravated misdemeanors under Iowa law would qualify as felonies under federal law. *See* 18 U.S.C. § 3559(a); *Haggerty,* 85 F.3d at 406.

### b. Elements of the predicate offense

Because a civil claim under the VAWA is dependent upon a predicate offense, the court's task of determining the elements of Doe's VAWA claim is not yet finished. The court must still determine the elements of the predicate offense Doe alleges Father Hartz has committed, a violation of Iowa Code § 709.15, then determine whether the predicate offense alleged is a qualifying predicate offense under the VAWA. Only then, and only if the offense alleged qualifies as a predicate offense under the VAWA, can the court turn to the question of whether Doe has adequately alleged the elements of that predicate offense, as well as the other essential elements of a VAWA claim.

▮ *i. The statute defining the predicate offense.* The predicate felony offense that Doe alleges Father Hartz committed is defined by Iowa Code § 709.15.[28] That statute states, in pertinent part, as follows:

---

**28.** Although neither the parties nor the court has found any decision of Iowa state courts interpreting Iowa Code § 709.15, the rules of statutory interpretation employed by the Iowa Supreme Court are not significantly different from those employed by the federal courts in interpreting federal statutes. In *Olympus Aluminum Prods., Inc. v. Kehm Enters., Ltd.,* 930 F.Supp. 1295 (N.D.Iowa 1996), this court reviewed extensively the rules of statutory interpretation applied by the Iowa Supreme Court. Suffice it to say here that the touchstone of statutory interpretation under Iowa law, as under federal law, is legislative intent. *City of West Branch v. Miller,* 546 N.W.2d 598, 602 (Iowa 1996) ("In interpreting statutes, our ultimate goal is to determine legislative intent," citing *Peffers v. City of Des Moines,* 299 N.W.2d 675, 678 (Iowa 1980)). When the language of a statute is plain and its meaning is clear, Iowa courts "should not reach for meaning beyond [the statute's] express terms.... Nor should we resort to statutory rules of construction to determine legislative intent." *Id.* (internal citation omitted). Where reasonable minds differ as to the meaning of a statute,

[o]ne ... rule [of construction] provides that we are bound by what the legislature said, rather than what it should or might have said. *State v. Jones,* 464 N.W.2d 241, 242 (Iowa 1990); Iowa R.App. P. 14(f)(13). We may not, under the guise of statutory construction, enlarge or otherwise change the terms of a statute. *Jones,* 464 N.W.2d at 242. Finally, "[w]e may consider the language used in the statute, the objects sought to be accomplished, the evils and mischiefs sought to be remedied and place a reasonable construction on the statute which will best effect its purpose rather than one which will defeat it." *Peffers,* 299 N.W.2d at 678.

*Miller,* 546 N.W.2d at 602. Legislative intent is "'expressed by omission as well as by inclusion.'" *Wiebenga v. Iowa Dep't of Transp.,* 530 N.W.2d 732, 735 (Iowa 1995) (quoting *Barnes v. Iowa Dept. of Transp.,* 385 N.W.2d 260, 263 (Iowa 1986)). Thus, if the legislature had intended a statute to include a prohibition on certain conduct, the Iowa Supreme Court believes the legislature would have specifically mentioned that conduct, but where it did not, the statutory provision is deemed not to apply to that conduct. *Id.* The court finds that the meaning of the Iowa statute Doe asserts defines a predicate offense is plain and unambiguous. Therefore, the court need look no further than the plain meaning of the statute. *Miller,* 546 N.W.2d at 602.

709.15. Sexual exploitation by a counselor or therapist

1. As used in this section:

\* \* \* \* \* \*

f. "Sexual exploitation by a counselor or therapist" occurs when any of the following are found:

(1) A pattern or practice or scheme of conduct to engage in any of the conduct described in subparagraph (2) or (3).

(2) Any sexual conduct, with an emotionally dependent patient or client or emotionally dependent former patient or client for the purpose of arousing or satisfying the sexual desires of the counselor or therapist or the emotionally dependent patient or client or emotionally dependent former patient or client, which includes but is not limited to the following: kissing; touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals; or a sex act as defined in section 702.17.

(3) Any sexual conduct with a patient or client or former patient or client within one year of the termination of the provision of mental health services by the counselor or therapist for the purpose of arousing or satisfying the sexual desires of the counselor or therapist or the patient or client or former patient or client which includes but is not limited to the following: kissing; touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals; or a sex act as defined in section 702.17.

"Sexual exploitation by a counselor or therapist" does not include touching which is part of a necessary examination or treatment provided a patient or client by a counselor or therapist acting within the scope of the practice or employment in which the counselor or therapist is engaged.

2. A counselor or therapist who commits sexual exploitation in violation of subsection 1, paragraph "f", subparagraph (1), commits a class "D" felony.

3. A counselor or therapist who commits sexual exploitation in violation of subsection 1, paragraph "f", subparagraph (2) commits an aggravated misdemeanor.

Iowa Code § 709.15(1)(f).[29]

The differences between the offenses described in subdivisions (f)(2) and (f)(3) of § 709.15(1) involve the status of the victim and the time within which sexual conduct between the defendant and the victim is defined as an offense. Subdivision (f)(2) defines an offense with an "emotionally dependent" patient or client or "emotionally dependent" former patient or client, Iowa Code § 709.15(1)(f)(2), while subdivision (f)(3) refers only to a "patient or client or former patient or client." Iowa Code § 709.15(1)(f)(3). Under subdivision (f)(2), there is no time limit placed on when the offense occurs, except that, by implication, the victim must have been emotionally dependent at the time of the offense. Iowa Code § 709.15(1)(f)(2). Under subdivision (f)(3), however, when emotional dependency is not involved, the offense must occur either during or within one year after the conclusion of the provision of mental health services. Iowa Code § 709.15(1)(f)(3). "Emotionally dependent" is thus a critical term, because it distinguishes between kinds of offenses. That term is defined in § 709.15(1)(b) as follows:

b. "Emotionally dependent" means that the nature of the patient's or client's or former patient's or client's emotional condition or the nature of the treatment provided by the counselor or therapist is such that the counselor or therapist knows or has reason to know that the patient or client or former patient or client is significantly impaired in the ability to withhold

---

**29.** The reference to Iowa Code § 702.17 incorporates into the definition of prohibited sexual conduct by a counselor or therapist with a patient or client the following acts: "sexual contact between two or more persons by: penetration of the penis into the vagina or anus; contact between the mouth and genitalia or by contact between the genitalia of one person and the genitalia or anus of another person; contact between the finger or hand of one person and the genitalia or anus of another person, except in the course of examination or treatment by a person licensed pursuant to [specified chapters of the Iowa Code]; or by use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus." Iowa Code § 702.17.

consent to sexual conduct, as described in paragraph "f", by the counselor or therapist.

For the purposes of paragraph "f", a former patient or client is presumed to be emotionally dependent for one year following the termination of the provision of mental health services.

Iowa Code § 709.15(1)(b). Although, under this definition, any patient or client who has received mental health services is presumed to be emotionally dependent for one year after the termination of services, the plain meaning of the statute is that, if the victim is proved to be emotionally dependent outside of the time period specified, the defendant could be charged under § 709.15(1)(f)(2), whereas if the victim is proved never to have been emotionally dependent, the defendant could still be charged under § 709.15(1)(f)(3) for sexual conduct that occurred up to one year after the termination of mental health services to the victim.

Other provisions of subsection (1) of § 709.15 provide definitions of other essential terms. Thus, subdivision (1)(a) defines "counselor or therapist" as "a physician, psychologist, nurse, professional counselor, social worker, marriage or family therapist, alcohol or drug counselor, member of the clergy, or any other person, whether or not licensed or registered by the state who provides or purports to provide mental health services." Iowa Code § 709.15(1)(a). "Mental health services" are defined as "the treatment, assessment, or counseling of another person for a cognitive, behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction." Iowa Code § 709.15(1)(d). "Patient or client" and "former patient or client" are defined as a person who receives or received mental health services from the counselor or therapist. Iowa Code § 709.15(1)(c) & (e).

*ii. Predicate "felonies".* Forms of the offense not involving the pattern, practice, or scheme identified in subdivision (f)(1) are

classified as misdemeanors under Iowa law. Iowa Code § 709.15(3) & (4). The offense defined in § 709.15(1)(f)(2) is classified in § 709.15(4) as only a serious misdemeanor, punishable by imprisonment of less than one year, and hence cannot stand as predicate offense for a VAWA civil action. 42 U.S.C. § 13981(d)(2) (defining predicate offenses as including only felonies or offenses that would be felonies but for the relationship of the parties). However, the offense defined in § 709.15(1)(f)(2) is classified in § 709.15(3) as an aggravated misdemeanor, which is punishable by imprisonment of up to two years, and consequently is a "felony" under federal law. 18 U.S.C. § 3559; *Haggerty,* 85 F.3d at 406.[30]

From the statutory definitions of offenses and key terms, the court finds that the statute describes two distinct offenses, with slightly different elements, that are classified as felonies by the statute itself. The offense described in § 709.15(1)(f)(1) and (2), an offense classified as a felony in § 709.15(2), has the following elements: (1) the defendant provides or purports to provide mental health services, § 709.15(1)(a), as "mental health service" is defined in § 709.15(1)(d); (2) the victim receives or received mental health services from the defendant, as "mental health service" is defined in § 709.15(1)(d); (3) the victim was emotionally dependent, as "emotionally dependent" is defined in § 709.15(1)(b); and (4) the defendant engaged in a pattern, practice, or scheme of conduct to engage in sexual conduct with the victim, as sexual conduct is defined in § 709.15(1)(f)(2), or a sex act as defined in Iowa Code § 702.17.

The offense described in subdivisions § 709.15(1)(f)(1) and (3), and offense classified as a felony in § 709.15(2), has the following elements: (1) the defendant provides or purports to provide mental health services, § 709.15(1)(a), as "mental health service" is defined in § 709.15(1)(d); (2) the victim receives or received mental health services from the defendant, as "mental health ser-

---

**30.** The court has perused other provisions of the Iowa Code defining sexual offenses, Iowa Code Ch. 709, and does not find that the conduct defined as a misdemeanor, when between a counselor or therapist and a patient, client, for-

mer patient, or former client, would be a felony (or aggravated misdemeanor under Iowa law) but for the relationship between the parties. *See* 42 U.S.C. § 13981(d)(2)(B).

vice" is defined in § 709.15(1)(d); and (3) within one year of the termination of the provision of mental health services by the defendant, the defendant engaged in a pattern, practice, or scheme of conduct to engage in sexual conduct with the victim, as sexual conduct is defined in § 709.15(1)(f)(2), or a sex act as defined in Iowa Code § 702.17. This offense has no emotional dependence element, but does require that the offense have been committed within one year of the termination of the provision of mental health services.

The offense defined in § 709.15(1)(f)(2), which is classified in § 709.15(3) as an aggravated misdemeanor, but which is a felony under federal law, 18 U.S.C. § 3559, has the following elements: (1) the defendant provides or purports to provide mental health services, § 709.15(1)(a), as "mental health service" is defined in § 709.15(1)(d); (2) the victim receives or received mental health services from the defendant, as "mental health service" is defined in § 709.15(1)(d); (3) the victim was emotionally dependent, as "emotionally dependent" is defined in § 709.15(1)(b); and (4) the defendant engaged in sexual conduct with the victim, as sexual conduct is defined in § 709.15(1)(f)(2), or a sex act as defined in Iowa Code § 702.17. This predicate offense has no "pattern or practice or scheme" element.

### c. Predicate "crime of violence" under the VAWA

The next question before the court is whether the predicate offense Doe has alleged is a qualifying "crime of violence" under the VAWA. Putting aside for a moment the question of which of the three forms of the offense defined by Iowa Code § 709.15 described above Doe has actually alleged as her predicate offense, the court notes that all three constitute "felonies" under federal law. However, whether an offense is a "felony," the court finds, is only one part of one prong of the inquiry into what is a "crime of violence" under the VAWA.

**■ i. "Categorical" determination.** Although the court lacks the guidance of other interpretations of the VAWA, by analogy with other situations in which a predicate offense is required to establish a

claim or offense, the court concludes that it must decide *as a matter of law* whether the asserted predicate offense is a crime of violence within the meaning of the VAWA. Furthermore, that determination, the court finds, must be made on the basis of how the offense is defined by applicable law and not on the basis of how the offense was allegedly committed, thus taking a so-called "categorical approach" to the definition of the crime. The jury, on the other hand, will decide *as a matter of fact* whether the offense has been committed, and whether it was motivated by gender as required by the VAWA.

For example, the Eighth Circuit Court of Appeals, applying a definition of "crime of violence" under 18 U.S.C. § 924(c) that is nearly identical to the definition in 18 U.S.C. § 16, observed that "the question is not whether the particular facts constitute a crime of violence, but whether the crime . . . as defined by [state law] is a crime of violence." *United States v. Moore,* 38 F.3d 977, 980 (8th Cir.1994). Quoting from a prior decision specifically considering § 16, the court reiterated the "categorical approach" the court is to take to determine whether a crime is a "crime of violence" within the meaning of § 16:

> "All crimes which by their nature involve a substantial risk of physical force share the *risk* of harm. It matters not one whit whether the risk ultimately causes actual harm. Our scrutiny ends upon a finding that the risk of violence is present." *[United States v.] Rodriguez,* 979 F.2d [138,] 141 [ (8th Cir.1992) ]; *accord United States v. Reyes–Castro,* 13 F.3d 377, 379 (10th Cir.1993); *see United States v. Bauer,* 990 F.2d 373 (8th Cir.1993) (per curiam) (holding that statutory rape is a crime of violence for sentence enhancement purposes).

*Moore,* 38 F.3d at 980–81 (emphasis in the original). In the earlier decision from which the court in *Moore* drew this quotation, the Eighth Circuit Court of Appeals addressed the determination of whether an offense was a "crime of violence" within the meaning of 18 U.S.C. § 16, for purposes of U.S.S.G. § 2L1.2(b)(2). *Rodriguez,* 979 F.2d at 140. The application notes to that sentencing

guideline define an "aggravated felony" as any "crime of violence" as defined in 18 U.S.C. § 16. *Id.* The court observed that "[a] sentencing court is not required to consider the underlying circumstances at the time of the crime in determining that a defendant has been convicted of a 'crime of violence.' ... Indeed, the term 'by its nature' would be rendered superfluous if the sentencing courts were saddled with the task of examining each individual offense committed to determine whether it actually involved substantial risk of physical force." *Id.* at 140–41 (citation omitted). The court went one step further, holding that, whatever the requirements of 18 U.S.C. § 16(a),

> the elements of the underlying offense need not include use, attempted use, or threatened use of force to be considered a "crime of violence" for purposes of 18 U.S.C. § 16(b). Again, it is the *nature* of the crime upon which we must focus our attention.... [T]he statutory language "may" and "substantial risk" must not be ignored.

*Rodriguez,* 979 F.2d at 141 (citation omitted).

Similarly, in *United States v. Aragon,* 983 F.2d 1306 (4th Cir.1993), the Fourth Circuit Court of Appeals rejected a defendant's argument that the jury, rather than the court, should decide whether an offense is a "crime of violence" under 18 U.S.C. § 1952(a)(2) and 18 U.S.C. § 16. *Aragon,* 983 F.2d at 1311–12. Instead, the court held that whether an offense is a "crime of violence" "is a question of law for the court to decide." *Id.* at 1311. The court noted that the definition in § 16 frames the question in terms of whether the crime "by its nature" presents a substantial risk of use of physical force, not in terms of the "facts," "circumstances," or "conduct." *Id.* at 1312–13. The court in *Aragon* determined whether the crime of attempting to instigate or assist in the escape or rescue of a federal prisoner was a crime of violence in terms of whether the offense "intrinsically" involved the risk identified in § 16, not whether the facts of the case before it indicated such a risk had actually existed. *Aragon,* 983 F.2d at 1313. Such a risk, the court found, would intrinsically arise, even if the particular escape was intended to be effected

by stealth, because of the risk of physical force being used if the crime was discovered in progress. *Id.* Although the court noted that it had "cautioned against looking to the facts of a case in determining whether a crime qualifies as a 'crime of violence,' " the court found that the case before it demonstrated the potential for an escalation into violence of a crime of the kind in question, even though the defendants had planned to effect the escape by stealth, because of the weapons the defendants had brought along. *Id.* at 1313 & n. 5.

Another analogy is the determination under deportation statutes of whether a predicate crime, as defined, is a crime involving "moral turpitude" or an "aggravated felony" under 8 U.S.C. § 1251(a)(2)(A)(i) or (iii), thus justifying deportation. In such a case, the Eighth Circuit Court of Appeals observed that "we look to state law to determine the elements of the crime ... [, but] we do not examine the factual circumstances surrounding [the defendant's] crime." *Franklin v. INS,* 72 F.3d 571, 572 (8th Cir.1995) (citing *Cabral v. INS,* 15 F.3d 193, 196 n. 5 (1st Cir.1994), and *Castle v. INS,* 541 F.2d 1064, 1066 (4th Cir.1976) (per curiam)), *cert. denied,* —— U.S. ——, 117 S.Ct. 105, 136 L.Ed.2d 59 (1996); *see also Ramsey v. INS,* 55 F.3d 580, 583 (11th Cir.1995) (under 8 U.S.C. § 1251(a)(2)(A)(iii), to determine if a crime is an "aggravated felony," the court looks only at the definition of the crime under state law, and not at the underlying facts and circumstances of the alien's particular offense); *Rodriguez–Herrera v. INS,* 52 F.3d 238, 239–40 (9th Cir.1995) (interpreting "moral turpitude"); *Gonzalez–Alvarado v. INS,* 39 F.3d 245, 246 (9th Cir.1994) (interpreting "moral turpitude"); *United States v. Lomas,* 30 F.3d 1191, 1193 (9th Cir.1994) ("To determine whether [the defendant's] 1990 conviction for the sale or transportation of cocaine constitutes an aggravated felony, we look only at the statutory definition of section 11352(a) of the California Health and Safety Code, not the underlying factual circumstances of his crime."), *cert. denied,* 513 U.S. 1176, 115 S.Ct. 1158, 130 L.Ed.2d 1114 (1995); *United States v. Reyes–Castro,* 13 F.3d 377, 379 (10th Cir.1993) (interpreting "aggravated felony"); *Goldeshtein v. INS,* 8

F.3d 645, 647 (9th Cir.1993) (interpreting "moral turpitude"). In such cases, courts look only at the record of conviction, which includes the crime as described in the indictment or information, the plea, the verdict or judgment, and the sentence, but not any evidence offered in the case or other facts or circumstances involved. *Cabral,* 15 F.3d at 196 & n. 6.

The VAWA definition of a "crime of violence," as construed above, incorporates as one prong of the definition found in 18 U.S.C. § 16. *See* 42 U.S.C. § 13981(c)(2)(A). Therefore, that element must certainly be determined as a matter of law. *Aragon,* 983 F.2d at 1311. Nor does the other element of the VAWA definition of a "crime of violence" make the question one for a jury or one that turns on the particular facts of the case. That element states that the offense must be "an act or series of acts that would constitute a felony against the person." 42 U.S.C. § 13981(d)(2)(A).[31] A factual element is the usual distinction between a felony and a misdemeanor offense—the amount of cocaine, the age of the victim of sexual abuse, for example. However, the question of whether a crime is a "crime of violence" under the VAWA turns on whether a felony, defined in terms of certain elements, the first prong of the inquiry, by its nature possesses the requisite *risk* of use of physical force under 18 U.S.C. § 16, the second prong of the inquiry. *Id.* If the court finds as a matter of law that the crime thus defined constitutes a "crime of violence" within the meaning of the VAWA, then the jury will decide as a matter of *fact* whether the elements constituting a felony have in fact been proved in the particular case.[32]

*ii. "Crime of violence" test.* Thus, the questions for the court to decide as a matter of law in this case are whether the offenses defined by Iowa Code § 709.15(1)(f) are felonies against the person (or against property that present a serious risk of physical injury to another), as required by the first prong of the VAWA "crime of violence" element, 42 U.S.C. § 13981(d)(2)(A), and whether they are also "crimes of violence" within the meaning of 18 U.S.C. § 16, as required by the second prong of the VAWA "crime of violence" element. *Id.* The crimes defined by Iowa Code § 709.15(1)(f)(1) and (2), § 709.15(1)(f)(1) and (3), and § 709.15(1)(f)(2), respectively, are all indisputably "felon[ies] against the person" of the victim. *Id.* Therefore, the first prong of the VAWA "crimes of violence" element is satisfied. The more difficult question is whether these felonies are "crimes of violence" within the meaning of 18 U.S.C. § 16.

Section 16 of Title 18 provides as follows: The term "crime of violence" means—

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing an offense.

18 U.S.C. § 16.

As to the alternative stated in § 16(b), this court must respectfully point out that, while part of the *Rodriguez* decision speaks in terms of a "risk of harm," finding that all crimes that "by their nature involve a sub-

---

**31.** The court may safely disregard the alternative of a felony against property that presents a serious risk of physical injury to another, first, because no such felony is alleged here as the predicate offense, and second, because the incorporation of the language *"risk"* of physical injury" suggests, as does 18 U.S.C. § 16, that the question is whether the crime intrinsically, and not as actually alleged to have been committed, involves physical injury. *Cf. Rodriguez,* 979 F.2d at 141; *Aragon,* 983 F.2d at 1312.

**32.** By way of contrast, the Eighth Circuit Court of Appeals has held that, in determining whether a prior conviction is either a violent felony or

serious drug offense for purposes of sentence enhancement under 18 U.S.C. § 924(e), "the sentencing court is not restricted to looking solely at the fact of conviction and the statutory definition of the offense but may also consider the charging paper and jury instructions." *United States v. Maddix,* 96 F.3d 311, 314 (8th Cir.1996) (citing *Taylor v. United States,* 495 U.S. 575, 602, 110 S.Ct. 2143, 2160, 109 L.Ed.2d 607 (1990)). The court also examined the actual conduct of the defendant to determine whether the offenses in question were "crimes of violence" for sentencing purposes under U.S.S.G. § 4B1.2(1)(i). *Id.* at 315.

stantial risk of physical force share the *risk of harm*," *Rodriguez,* 979 F.2d at 141 (emphasis in the original), the statute does not speak in terms of a "risk of harm," but in terms of a "risk that *physical force* " may be used. 18 U.S.C. § 16 (emphasis added). While the court accepts that any use of physical force necessarily involves a risk of harm, as the *Rodriguez* court stated, the converse is not correct: a risk of harm does not necessarily involve a risk of use of physical force, because a risk of harm can arise from many sources unrelated to use of physical force.

For example, the Seventh Circuit Court of Appeals, in an *en banc* decision, recently considered extensively the risk of *harm* or *injury* to a victim of a statutory rape, even if no physical force was involved. *See United States v. Shannon,* 110 F.3d 382 (7th Cir. 1997) (*en banc* ). The court was considering the meaning of "crime of violence" under U.S.S.G. § 4B1.2(1), which, in one alternative defines "crime of violence" as an offense that "has as an element the use, attempted use, or threatened use of *physical force* against the person of another," while in another alternative, refers to an offense that "is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious risk of *physical injury* to another." U.S.S.G. § 4B1.2(1) (emphasis added); *see also Shannon,* 110 F.3d at 384. The court found that statutory rape, as defined by Wisconsin law, was not a forcible felony. *Shannon,* 110 F.3d at 384. The court also rejected the argument that any unconsented-to touching involved force or a risk of injury:

> An inference of violence from mere unconsented-to physical contact, the government's first reason for arguing that every felonious sexual act with a minor is per se a crime of violence, would not wash in this circuit. It would transform any unconsented-to touching that the law made a felony into a crime of violence, including picking a person's pocket, a crime that we have held is not a crime of violence.

*Shannon,* 110 F.3d at 385. Although the court found that an argument that any felonious sexual act with a minor creates a "serious potential risk of physical injury," that

suggestion was undermined by the government's concession that statutory rape laws were not necessarily passed to protect minors from a serious risk of physical injury. *Id.* at 386. The court agreed that a risk of injury could not be "read off" or automatically inferred from the statute. *Id.* However, the court then made an extensive analysis of the risks to the victim of statutory rape of physical injury arising from sexually transmitted disease or pregnancy. *Id.* at 387–89. Consequently, the court concluded that statutory rape, as defamed by Wisconsin law, was a "crime of violence" where the definition of "crime of violence" depended not upon use of physical force, but upon a risk of physical injury. *Id.* at 389.

The predicate offense alleged in this case may be another example. All of the risks of physical *injury,* described by the Seventh Circuit Court of Appeals in the context of statutory rape, such as injuries from sexually transmitted disease or pregnancy to a person presumed to be incapable of giving proper consent to sexual contact, apply with equal vigor to the offenses defined by Iowa Code § 709.15(1)(f). Yet, that does not suggest that use of physical force was necessarily part of the offense. *Cf. Shannon,* 110 F.3d at 383 (finding that the risk of use of physical force did not necessarily arise with the crime of statutory rape, although a risk of physical injury did).

***iii. Application of the test.*** Again, the crimes defined by Iowa Code § 709.15(1)(f)(1) and (2), § 709.15(1)(f)(1) and (3), and § 709.15(1)(f)(2), respectively, are all indisputably "felon[ies] against the person" of the victim. *Id.* They therefore satisfy the first prong of the "crime of violence" inquiry under the VAWA. 42 U.S.C. § 13981(d)(2).

Turning to the second prong of the inquiry, whether the predicate offenses are "crimes of violence" under either alternative defined by 18 U.S.C. § 16, however, the court concludes none of the § 709.15 offenses has *as an element* the use, attempted use, or threatened use of physical force against the person or property of another. 18 U.S.C. § 16(a). Thus, none is a "crime of violence" under the alternative stated in § 16(a).

In determining whether the offenses defined in Iowa Code § 709.15 necessarily involve *a substantial risk* of the use of physical force, as required to fit the alternative definition of "crime of violence" under § 16(b), the court finds that two decisions of the Eighth Circuit Court of Appeals guide, or perhaps even dictate, the court's conclusion. The earlier of these decisions is the *Rodriguez* decision already mentioned. In *Rodriguez*, the defendant was convicted of lascivious acts with a child, which was defined as committing certain acts "with or without the child's consent." *Rodriguez*, 979 F.2d at 140. The court held that "[t]here is no question that the crime to which Rodriguez admitted, lascivious acts with children of the tender age of ten, is by its nature a crime of violence" within the meaning of § 16(b) and U.S.S.G. § 2L1.2(b)(2). *Id.* at 141. In the second decision, *United States v. Bauer,* 990 F.2d 373 (8th Cir.1993) (per curiam), the court rejected the defendant's argument that his conviction for statutory rape under Iowa law could not be a crime of violence on the basis that it involved a substantial risk of use of physical force, because the sexual intercourse had been consensual. *Bauer,* 990 F.2d at 374. Looking at the nature of the offense, the court concluded that the defendant had been convicted of a crime of violence, because the conviction was one "that presented a serious potential risk of physical force," regardless of the victim's consent. *Id.* at 375. By analogy, Iowa Code § 709.15, which defines sexual offenses on the basis that the victim cannot give proper consent, also defines "crimes of violence" involving a substantial risk of the use of physical force within the meaning of 18 U.S.C. § 16(b), and hence within the meaning of the VAWA.

### d. Adequate pleading of a predicate offense

Next, the court turns to whether one of the predicate offenses under § 709.15 has been adequately pleaded. The court recalls that, to defeat a motion to dismiss pursuant to Rule 12(b)(6), factual elements and legal conclusions must be pleaded in more than a conclusory manner, *Silver,* 105 F.3d at 397; *Westcott,* 901 F.2d at 1488, but that the court must assume that all facts alleged in the plaintiff's complaint are true, and must liberally construe those allegations. *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *Doe,* 107 F.3d at 1303–04; *WMX Techs., Inc.,* 105 F.3d at 1198; *First Commercial Trust,* 77 F.3d at 1083. Similarly, because the defendants' subject matter jurisdiction challenge pursuant to Rule 12(b)(1) must be treated here as only a facial challenge, Doe is entitled to these Rule 12(b)(6) protections even against the subject matter jurisdiction challenge. *Titus,* 4 F.3d at 593; *Osborn,* 918 F.2d at 729 n. 6.

The first element of each of the possible predicate offenses defined by Iowa Code § 709.15, as identified by the court above, is that the defendant provides or purports to provide mental health services, § 709.15(1)(a), as "mental health service" is defined in § 709.15(1)(d), and the second element of each of these offenses is that the victim receives or received mental health services from the defendant. The complaint also alleges, at least in conclusory fashion, that Father Hartz "served as a counselor to Plaintiff [and] as a member of the clergy … is a 'counselor or therapist' within the meaning of Iowa Code § 709.15(1)(a)." Complaint, Count 1, ¶ 30. Father Hartz is plainly a member of the class of possible "counselors or therapists" to which this element refers, because he is a "member of the clergy." Iowa Code § 709.15(1)(a). However, more is required: Father Hartz must also be alleged to be a member of the clergy who "provides or purports to provide mental health services." *Id.* Doe does allege that Father Hartz "served as a counselor to Plaintiff," although she does not allege any specific meetings for such counseling or that the counseling involved the "treatment, assessment, or counseling … for a cognitive, behavioral, emotional, mental, or social dysfunction, [either] intrapersonal or interpersonal." Iowa Code § 709.15(1)(d) (defining "mental health service"). Although the pleading is sketchy at best on this element, the court cannot say that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Handeen,* 112 F.3d at 1347–48; *accord Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *Doe,* 107 F.3d

at 1304; *WMX Techs., Inc.,* 105 F.3d at 1198. The provision of mental health services by Father Hartz, and Doe's receipt of those services from Father Hartz, is instead consistent with Doe's allegations that Father Hartz was a member of the clergy and he counseled her.

Another element of each of the possible predicate offenses is that Father Hartz engaged in or engaged in a pattern, practice, or scheme of incidents to engage in sexual conduct as defined in the statute. Iowa Code § 709.15(1)(f)(2) and (3). "Kissing" is specified as one of the prohibited kinds of sexual conduct, and "kissing" is the central incident in Doe's complaint. However, the court is much less sanguine that Doe has alleged a "pattern, practice, or scheme" to engage in sexual conduct as required by either of the offenses classified as felonies under Iowa Code § 709.15. *See* Iowa Code § 709.15(2) (classifying as felonies only sexual exploitation as defined in paragraph (1)(f)(1), which involves "a pattern practice or scheme of conduct to engage in any of the conduct described in paragraph (2) or (3)"). Doe alleges that the back-rubbing incident after mass on December 3, 1994, and the alleged fraudulent misrepresentations that Father Hartz would not engage in sexually exploitative conduct establish the requisite "pattern or practice or scheme" for the offenses classified as felonies under the Iowa statute. She also argues that Father Hartz's improper conduct towards other women is part of such a "pattern or practice or scheme." The court believes that it is only conduct toward this victim that can constitute part of the predicate offense, but considering only the incidents allegedly directed at Doe herself, and mindful of the liberality with which the court is to construe the allegations, the court finds that this element has also been adequately alleged, if just barely. However, even failing adequate allegations of a "pattern or practice or scheme," the court has found that a single incident of sexual conduct as defined in Iowa Code § 709.15(1)(f)(2), an aggravated misdemeanor under Iowa law, Iowa Code § 709.15(3), would still constitute a predicate felony under federal law. Thus the "conduct" element of at least one predicate offense has been adequately alleged.

This leaves only the question of whether Doe has adequately alleged that she was an "emotionally dependent patient or client" for either the predicate offense defined by Iowa Code § 709.15(1)(f)(2), standing alone, or the predicate offense defined by Iowa Code § 709.15(1)(f)(1) and (2). Doe has alleged, again in merely conclusory fashion, that she "was emotionally dependent upon Defendant Hartz as her counselor and priest." Complaint, Count 1, ¶ 31. Although the allegation is again conclusory, the court cannot say that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Handeen,* 112 F.3d at 1347–48; *accord Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *Doe,* 107 F.3d at 1304; *WMX Techs., Inc.,* 105 F.3d at 1198. Doe's emotional dependence is consistent with the allegations that she needed and received counseling from Father Hartz.

### e. Remaining elements of the VAWA claim

Finally, the court must consider whether Doe has adequately pleaded that Father Hartz's conduct toward her was "motivated by gender" as required for a civil claim under the VAWA. 42 U.S.C. § 13981(c). Again, subdivision (e)(1) of § 13981 clarifies or narrows this element of the VAWA claim by excluding from the definition of "crimes of violence motivated by gender" those crimes that are merely "random acts of violence unrelated to gender or ... acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender." 42 U.S.C. § 13981(e)(1). The civil cause of action under the VAWA is therefore plainly aimed at conduct motivated by the victim's gender, not merely crimes in which the victim is a woman. *See also* S.Rep. No. 103–195, at 49–50 (1993) ("The committee is not asserting that all crimes against women are gender-motivated. As discussed below, title III requires subjective proof on a case-by-case basis that the criminal conduct was motivated by a bias against the victim's gender."); S.Rep. No. 103–138, at 49–50 (1993) (same). As construed above, to allege that a crime was "motivated by gender" within the meaning of the VAWA, it must be alleged to be *both* (1) committed "because of" or "on the

basis of" the victim's gender, and (2) due, at least in part, to an animus based on the victim's gender. *See* 42 U.S.C. § 13981(d)(1).

Although there might be some difficulty in determining whether other crimes, even crimes against the person, were "because of" or "on the basis of" the victim's gender, the court has little doubt that allegations of sexual assault or sexual exploitation crimes are allegations of crimes committed "because of" or "on the basis of" the victim's gender. Defendants concede as much. *See* Brief In Support Of Motion To Dismiss, Motion For Abstention, And Motion For Certification Of Issues By Defendants Soens, St. Lawrence Church, And Diocese Of Sioux City ("Defendants' Brief In Support Of Motion To Dismiss"), p. 20. Furthermore, there are adequate factual allegations of sexual conduct to support a claim of sexual exploitation. Thus, the first prong of the "motivated by gender" element is adequately alleged here. However, a sexual assault alone is not enough to establish that the crime was gender-motivated within the meaning of the VAWA. *See* 42 U.S.C. § 13981(d). As legislative history clarifies,

> Discriminatory motivation is clearly required by title III of the Violence Against Women Act, and the plaintiff bears the burden of proving that motivation. For a cause of action to arise under title III, a plaintiff must prove that the crime of violence—whether an assault, a kidnapping, or a rape—was motivated by gender.

S.Rep. No. 103–138, at 51 (1993).

Defendants contend that there are inadequate allegations pertaining to the second prong of the inquiry, that is, allegations that Father Hartz committed an offense due, at least in part, to his *animus* based on Doe's gender. They contend that there are no allegations of "animus," because the complaint reflects that Father Hartz and Doe were on friendly terms and that "[a] kiss is typically viewed as a signal of affection." Defendants' Brief In Support Of Motion To Dismiss, p. 20.[33] Defendants construe "animus" to mean "dislike." *Id.* Plaintiff vehe-

mently disagrees with the assertion that an unwanted kiss on the neck is a "signal of affection," arguing strenuously that such conduct is instead illustrative of an on-going gender-motivated animus toward women, because forcing physical intimacy on a woman, whether it be a kiss or rape, is illustrative of a lack of respect for women.

As Justice Stevens has observed, "The term[ ] 'animus' . . . [is] susceptible to different interpretations." *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 320, 113 S.Ct. 753, 785, 122 L.Ed.2d 34 (1993) (Stevens, J., dissenting). The court finds that "animus" is certainly ambiguous in the context of the VAWA. The court may therefore resort to the legislative history of the VAWA to find an explanation of the meaning of "due, at least in part, to an animus based on the victim's gender" under 42 U.S.C. § 13981(d). *See Barnhill v. Johnson,* 503 U.S. 393, 401, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39 (1992) (noting that "appeals to legislative history are well taken only to resolve 'statutory ambiguity'"). Fortunately, there are portions of the legislative history that are instructive on this issue.

A report to the Senate Judiciary Committee on the civil remedies provision of the VAWA states that "[t]he committee is not asserting that all crimes against women are gender-motivated." S.Rep. No. 103–138, at 49 (1993). Rather, the civil remedies provision of the VAWA "requires subjective proof on a case-by-case basis that the criminal was motivated by a bias against the victim's gender," which is a question of fact. *Id.* at 50. After identifying the elements of the statutory definition of crimes "motivated by gender," the report explains that "[a] cause of action cannot be established by saying, 'I am a woman; I have an injury; ergo, I have a civil rights claim.'" *Id.*

> To satisfy the burden of establishing a civil rights cause of action, the plaintiff must prove that the defendant's act was motivated by gender bias. *This civil rights cause of action is no different than the cause of action an African-American*

---

**33.** This argument is consistent with Father Hartz's defense that his actions were simply mis-

understood by Doe.

*might use.* For example, an African–American man or woman who is the victim of an assault, cannot under our present laws say, "My civil rights were violated because I am an African–American and someone that wasn't African–American did me harm." *He or she must prove racial animus.*

Similarly, *a woman who is attacked and seeks relief under title III must demonstrate that the defendant attacked her because she is a woman and that the attacker was motivated, at least in part, by her gender.* For example, she might offer proof that a defendant entered a department store carrying a gun, picked out women in the store and shot her while screaming anti-women epithets, and leaving the many nearby men unharmed. *The fact that the attacker in this example verbally expressed his bias against women is helpful, but not mandatory.* The fact that the attacker segregated the men from the women and then shot only the women might be evidence enough of his gender-based motivation.

*Id.* at 50–51 (emphasis added). Turning to the mechanics of proof, the committee report states that "motivation" will be proved from "the totality of the circumstances" surrounding the event. *Id.* at 52. The report explains further:

Gender-motivated crimes should be viewed in precisely the same way [as race-motivated crimes]. Consider the case of a serial rapist who shouts misogynist slurs as he attacks his victims. A victim's lawyer would prove exactly the same type of evidence that the lawyer in the "race" case proved: that the victim was of a particular sex; that the attacker had a long history of attacking persons of that sex, but not those of the opposite sex; and that the attacker shouted antiwoman (or man) epithets during the assault. Bias, in short, can be proven by circumstantial as well as indirect evidence. Again, the jury might not be convinced by any one of these circumstances individually—but could conclude that, taken together, they show gender bias.

*Id.* The committee pointed out that the definition of gender-motivated crimes under the VAWA is based on Title VII. *Id.*

Hence, title III defines crimes motivated by gender to be crimes committed "because * * * of gender." The phraseology "motivated by," "because of," "on the basis of," or "based on" sex or gender is used interchangeably in case law discussion of title VII. This body of case law will provide substantial guidance to the trier of fact in assessing whether the requisite discrimination was present.

*Id.* at 52–53.[34] Finally, in a section-by-section analysis, the committee explained that

Even assuming *arguendo* that Congress intended section 1985(3) to cover activities motivated by a gender-based animus, the record in this case does not support a finding of this kind of animus. As the district court found, defendants' animus targeted the "practice of abortion," 772 F.Supp. at 1205 n. 37, and therefore motivated actions designed to prevent others from engaging in that practice. While the participation of women in the practice of abortion hardly is incidental, the record in this case supports the finding that defendants' actions nevertheless were motivated by an animus not primarily directed at members of the female gender, but at a practice. On the record of this case, it further would not have been clearly erroneous to find that the make-up of, and particularly the participation of women in, the group of persons engaging in that practice did not arouse the animus motivating defendants to stage their so-called rescues.

*Lucero,* 954 F.2d at 628–29. The court remarked further that the presence of men in the targeted

**34.** This portion of legislative history is in accord with an explanation of "actions motivated by a gender-based animus" in a case, pursuant to 42 U.S.C. § 1985(3), concerning actions of abortion protesters. *See Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624 (11th Cir.1992).

[W]e find that the record in the present case does not support a finding that defendants' actions were motivated by a gender-based animus. Instead, the record amply supports a finding that defendants' actions were motivated by a disapproval of a certain activity, namely the abortion of a fetus, and therefore were designed to prevent individuals, women and men alike, from engaging in that activity. Nothing in the record suggests that defendants' efforts to "depriv[e], directly or indirectly, a class of women who seek abortions of the constitutional right that they have to secure abortions," [*Lucero v. Operation Rescue of Birmingham,*] 772 F.Supp. [1193,] 1198 [(N.D.Ala.1991)] (footnote omitted), sprang from an animus directed at women *qua* members of the female gender.

**1408**

the amendment adding the language that the predicate offense must be "due, at least in part, to an animus based on the victim's gender" was added to "elucidate[ ] the committee's intent that a victim alleging a violation under this section must have been targeted on the basis of his or her gender. The defendant must have had a specific intent or purpose, based on the victim's gender, to injure the victim." *Id.* at 64.

■ Allegations of unwanted or unwelcome sexual advances, the court finds, are sufficient to meet the requirement to allege that the defendant "targeted [the victim] on the basis of his or her gender" and "had a specific intent or purpose, based on the victim's gender, to injure the victim." *Id.* Casting an unwanted kiss as merely a "signal of affection" is suggestive of the sort of "romantic paternalism" the Supreme Court has described as "put[ting] women, not on a pedestal, but in a cage," something the Equal Protection clause did not condone, *Frontiero v. Richardson,* 411 U.S. 677, 684, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583 (1973), while such unwanted conduct gives rise to an inference that the actor relegates women as a group to an inferior status without regard to their individual qualities. *Id.* at 687, 93 S.Ct. at 1770–71. As the Ninth Circuit Court of Appeals explained in a Title VII case,

> Individuals who engage in sexual harassment may have different motives. Sometimes, an employer or supervisor may use his power within the company's hierarchy in order to gratify his sexual desires. When an employee becomes the victim of her boss' unwanted sexual attention, she may be forced to tolerate his sexually harassing conduct for fear that her job or her advancement in the company are at risk. A woman in this circumstance may reasonably feel subordinated and belittled even though the harasser's primary purpose is to seduce her rather than to demean her or cause her anguish and distress.... In other circumstances, however, sexual

harassment may be symptomatic of gender-based hostility, the employer or supervisor using sexual harassment primarily to subordinate women, to remind them of their lower status in the workplace, and to demean them. In this latter circumstance, the "sexual" element of the harassment is only secondary.

*EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 897–98 (9th Cir.1994) (citations omitted). Also, with Title VII cases for guidance, *see* S.Rep. No. 103–138, at 52–53 (1993), it is readily apparent that allegations of unwanted or unwelcome sexual advances are sufficient to support a claim that requires a showing of gender-motivated animus. *See, e.g., Kinman v. Omaha Pub. Sch. Dist.,* 94 F.3d 463, 467 (8th Cir.1996) ("Hostile environment sexual harassment occurs when unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct have the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive environment."); *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1377 (8th Cir.1996) (one element of a sexual harassment claim is that the plaintiff is subjected to unwelcome sexual conduct). To meet the requirements of the VAWA, the conduct need be due only *in part* to gender animus. 42 U.S.C. § 13981(d). Again, because unwanted or unwelcome sexual advances may be demeaning and belittling, and may reasonably be inferred to be intended to have that purpose or to relegate another to an inferior status, even if the advances were also intended to satisfy the actor's sexual desires, the allegations of the "animus" element here are sufficient.

■ There are, therefore, reasonable inferences from the allegations that Father Hartz's conduct was due, at least in part, to an animus based on Doe's gender, as required by § 13981. *Handeen,* 112 F.3d at 1347–48; *accord Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *Doe,* 107 F.3d at 1304; *WMX Techs., Inc.,* 105 F.3d at 1198. Defen-

group did not necessarily remove the activities from the class of actions motivated by a gender-based animus, because gender-based animus extends to those who champion the cause of the group toward which such an animus would be directed. *Id.* at 629 n. 7 (citing *United Bhd. of*

*Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 836, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983)). However, "[w]hat is missing is any indication that the gender of the pregnant women represents the source of defendants' animus." *Id.*

dants' motion to dismiss is denied as to failure to state the "animus" element of a VAWA claim. This conclusion pursuant to Rule 12(b)(1) also suffices to defeat defendants' facial challenge to the court's subject matter jurisdiction over the VAWA claim, and hence over the entire complaint, on the ground that Doe has failed to allege an essential element of her claim. *Titus,* 4 F.3d at 593; *Osborn,* 918 F.2d at 729 n. 6.

### 2. Is the VAWA constitutional?

The court may now turn to what was really the focus of the briefing and oral arguments, the question of the constitutionality of the VAWA as an exercise of congressional power under either the Commerce Clause or section five of the Fourteenth Amendment. The civil remedies provision of the VAWA itself explicitly states that these are the sources of congressional power for enactment of the provision:

(a) Purpose

Pursuant to the affirmative power of Congress to enact this part under section 5 of the Fourteenth Amendment to the Constitution, as well as under section 8 of Article I of the Constitution [the Commerce Clause], it is the purpose of this part to protect the civil rights of victims of gender motivated violence and to promote public safety, health, and activities affecting interstate commerce by establishing a Federal civil rights cause of action for victims of crimes of violence motivated by gender.

42 U.S.C. § 13981(a). However, the two courts to consider the question have split on the constitutionality of the statute under either the Commerce Clause of the Fourteenth Amendment.

### a. The split in authority

On one side of the split in authority is the decision of the United States District Court for the District of Connecticut in *Doe v. Doe,* 929 F.Supp. 608 (D.Conn.1996). In *Doe,* the court upheld the civil remedies provision of the VAWA as a valid exercise of Commerce Clause power, and therefore did not reach the question of constitutionality under section five of the Fourteenth Amendment.

*Doe,* 929 F.Supp. at 612 n. 5. Defendants in that case, as here, argued that this portion of the VAWA exceeds Commerce Clause power, because it creates a "plenary federal police power" beyond the enumerated powers of the federal government, trespassing on the states' Tenth Amendment powers, including the states' traditional police powers. *Id.* at 612.

The court in *Doe* was unpersuaded. The court found that the question of the validity of the VAWA must be determined under the third category of Commerce Clause powers identified in *United States v. Lopez,* 514 U.S. 549, 558–59, 115 S.Ct. 1624, 1629–30, 131 L.Ed.2d 626 (1995), *i.e.,* "those activities that substantially affect interstate commerce." *Doe,* 929 F.Supp. at 612. The test of validity in this category, the court found, remained "whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce," and, if it did, "whether the means chosen by Congress are ' "reasonably adapted to the end permitted by the Constitution." ' " *Id.* (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981), in turn quoting *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964)). The court rejected the defendants' arguments, also similar to ones asserted here, that *Lopez* had somehow overruled this "rationality test." *Id.* at 613, 115 S.Ct. at 1656–57. The court observed,

*Lopez* does warn that the Commerce Clause has limits, and that "the scope of the interstate commerce power 'must be considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote....' " *Lopez,* [514] U.S. at [557], 115 S.Ct. at 1628 (quoting *N.L.R.B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937)). Along with this warning, however, *Lopez* reaffirmed the rationality test of *Hodel:*

Since that time, the Court has heeded that warning and undertaken to decide whether a rational basis existed for con-

cluding that a regulated activity sufficiently affected interstate commerce.

*Id.* [514] U.S. at [557], 115 S.Ct. at 1629 (citing *Hodel,* 452 U.S. at 276–80, 101 S.Ct. at 2360–2362); *See Perez v. United States,* 402 U.S. 146, 155–56, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971); *Katzenbach v. McClung,* 379 U.S. 294, 299–301, 85 S.Ct. 377, 381–82, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, Inc.,* 379 U.S. at 252–253, 85 S.Ct. at 354–55.

*Doe,* 929 F.Supp. at 613.

The court in *Doe* rejected as relying on *dicta* in *Lopez* arguments that "cost of crime" and "national productivity" arguments were insufficient to establish a nexus to interstate commerce. *Id.* Instead, the court noted that "[t]he Congressional findings and reports qualitatively and quantitatively demonstrate the substantial effect on interstate commerce of gender-based violence," which the court found was "in marked distinction" to the Gun Free School Zone Act struck down in *Lopez. Id.* After reviewing some of the congressional findings based on four years of hearings, the court found that "because of the extensive compilation of data, testimony, and reports on which Congress based its findings, this Court is not left to speculate or ' "pile inference upon inference" to perceive an explicit connection between the regulated activity and interstate commerce.' " *Id.* at 614, 115 S.Ct. at 1656–57 (quoting *United States v. Sage,* 906 F.Supp. 84, 92 (D.Conn.1995), *aff'd,* 92 F.3d 101 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 784, 136 L.Ed.2d 727 (1997), which upheld the constitutionality of the Child Support Recovery Act under the Commerce Clause).

Applying standards established in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the court examined the "outer limits" of Commerce Clause authority to regulate private intrastate conduct, and found the interstate impact of violence against women to be comparable to that of the wheat grower growing wheat for home consumption in *Wickard. Id.* at 614, 115 S.Ct. at 1656–57. Noting further the numerous instances in which courts throughout the country after *Lopez* had upheld federal crimi-

nal and civil rights statutes under the Commerce Clause, the court "conclude[d] that the statistical, medical, and economic data before the Congress adequately demonstrated the rational basis for Congress' findings that gender-based violence has a substantial effect on interstate commerce," despite the fact that states retain the primary authority to define and enforce criminal law. *Id.* at 615, 115 S.Ct. at 1657. The court found no impermissible federal encroachment upon traditional state powers over criminal law, family law, and state tort law, largely because of the care with which Congress crafted the civil remedies of the VAWA to complement rather than supplant state laws. *Id.* at 615–16, 115 S.Ct. at 1657–58. Furthermore, the court found that the Act was based upon the federal government's traditional power to recognize civil rights and provide for their enforcement. *Id.* at 616, 115 S.Ct. at 1657–58.

The court in *Doe* much more briefly disposed of the second prong of the analysis, the question of whether the civil remedies portions of the VAWA were reasonably adapted to the intended end of the Act. *Id.* The court wrote,

> Given the important nature of the conduct sought to be prevented and the previously-approved private attorney general method of remedy, this court concludes that the statutory scheme which creates a federal civil rights remedy for gender-motivated violence is reasonably adapted to an end permitted by the Constitution. This conclusion is consistent with prior precedent related to other federal civil rights remedies enacted by Congress and upheld by courts as constitutional under the Commerce Clause.

*Doe,* 929 F.Supp. at 617. Thus, the *Doe* decision upheld that civil remedies portion of the VAWA as a valid exercise of Commerce Clause power.

On the other side of the split in authority is the decision of the United States District Court for the Western District of Virginia in *Brzonkala v. Virginia Polytechnic & State Univ.,* 935 F.Supp. 779 (W.D.Va.1996). In *Brzonkala,* the court found that the civil remedies provision of the VAWA could not be upheld under either the Commerce Clause

or the enforcement provisions of the Fourteenth Amendment. In *Brzonkala*, the court began its analysis of the Commerce Clause basis for the civil remedies portion of VAWA in much the same way as did the court in *Doe*, by looking to the Supreme Court's decision in *Lopez*. *Brzonkala*, 935 F.Supp. at 786. However, the *Brzonkala* court took as its theme this warning from *Lopez*:

> [T]he Court considered important that "the scope of the interstate commerce power 'must be considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.'" [*Lopez*, 514 U.S.] at [557], 115 S.Ct. at 1628–1629 (*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 626, 81 L.Ed. 893 (1937)). The Court has "heeded that warning" and has "undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." *Id.* at [557], 115 S.Ct. at 1629 (citing among other cases *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 276–280, 101 S.Ct. 2352, 2360–2362, 69 L.Ed.2d 1 (1981)). The Supreme Court has not " 'declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities.' " *Id.* [at 558, 115 S.Ct. at 1629] (quoting *Maryland v. Wirtz*, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968)). "Rather, '[t]he Court has said only that where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.' " *Id.* (quoting *Wirtz*, 392 U.S. at 197 n. 27, 88 S.Ct. at 2024 n. 27).

*Brzonkala*, 935 F.Supp. at 786. Like the court in *Doe*, the court in *Brzonkala* concluded that the VAWA could only fall within the third category of activity the *Lopez* decision identified as reached by the Commerce Clause, activity that "substantially affect[s]" interstate commerce. *Id.* However, the court concluded that there was no substantial effect on interstate commerce at which the VAWA was targeted.

The court in *Brzonkala* drew from *Lopez* a four-part analysis of effects on interstate commerce:

> The effects-analysis of the majority decision in *Lopez* can be broken down into four parts. First, the Court noted the relevance of the nature of the regulated activity; the Court distinguished that case, dealing with the regulation of intrastate possession of guns, from cases dealing with the regulation of an intrastate activity which is economic in nature. Second, the Court considered whether [18 U.S.C.] § 922(q) had any jurisdictional element to ensure in individual cases that the firearm possession would affect interstate commerce. Third, the Court considered the importance of legislative history. And finally, the Court considered the practical implications of accepting the Government's argument that the economic impact of the regulated activity had sufficient effects on interstate commerce to sustain the regulation.

*Brzonkala*, 935 F.Supp. at 786–87. In applying this four-part analysis to the VAWA, the court took passing notice of Congress's conclusion that gender-based violent crimes meet the " 'modest threshold required by the Commerce Clause.' " *Id.* at 788 (quoting S.Rep. 103–138, at 54 (1993)). However, the court in *Brzonkala* found that, after Congress had made its findings, the "modest threshold required by the Commerce Clause" had "become less modest." *Id.* at 789. The court's view that the Commerce Clause threshold was no longer so modest was based on its reading of *Lopez*:

> Notably, the *Lopez* Court stated, " '[S]imply because Congress may conclude that a particular activity affects interstate commerce does not necessarily make it so.' " *Lopez*, [514] U.S. at [557] n. 2, 115 S.Ct. at 1629 n. 2 (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 311, 101 S.Ct. 2389, 2391, 69 L.Ed.2d 1 (1981) (Rehnquist, J., concurring)). " 'Whether particular operations

affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court.'" *Id.* (quoting *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 273, 85 S.Ct. 348, 366, 13 L.Ed.2d 258 (1964) [ (Black, J., concurring) ] ).

*Brzonkala,* 935 F.Supp. at 788–89. The court then summarized its own analysis of the VAWA in light of *Lopez:*

The differences between *Lopez* and the case at hand are insignificant, and the similarities are significant. Arguably the following three differences between the case at hand and *Lopez* render *Lopez*'s logic inapplicable to the case at hand: (1) that VAWA is civil, and the *Lopez* statute was criminal, (2) that there are legislative findings here but not in *Lopez,* and (3) that fewer steps of causation exist between the VAWA regulated activity and commerce than § 922(q)'s regulated activity and commerce. The similarities include (1) the criminal nature of both statutes, (2) the non-commercial nature of both statutes, (3) the lack of a jurisdictional requirement that some effect on interstate commerce is involved in each case, (4) the remoteness of any effect on commerce, and (5) the excessive congressional power that would logically follow from permitting both statutes based on the Commerce Clause.

*Brzonkala,* 935 F.Supp. at 789.

Looking at differences, the court in *Brzonkala* discounted the importance of congressional findings regarding the VAWA versus the lack of such findings in support of the Gun Free School Zone Act before the Court in *Lopez. Id.* at 789–90. The court found that the presence or lack of such findings concerning effects on interstate commerce was of little significance, because the Court "had a reasonable appreciation of the effects via reasonable inferences." *Id.* at 790. In short, the court concluded that, "[w]hile findings will often be helpful, findings are not necessary for a determination of whether a rational relation to interstate commerce exists." *Id.* Next, the court acknowledged that is was "technically correct" that the

VAWA was civil in nature, while the Gun Free School Zone Act was criminal. *Id.* However, the court rejected the significance of this distinction, asserting that "[o]ther than the economic nature of the activity to be regulated, the focus is not on the nature of the activity but on the related issue of the effects of the regulated activity on interstate commerce." *Id.* Finally, the court rejected as of any real significance the fact that the "chain of inferences" from the targeted activity under the VAWA to the effect on interstate commerce was one step shorter than in the *Lopez* case, because "[i]t is far from clear that the distance from the first to the last step is greater in the *Lopez* chain of causation than in the case at hand's chain." *Id.* at 790–91. "The bottom line," the court wrote, "is that both *Lopez* and the case at hand involve regulated activity that is too remote from interstate commerce." *Id.* at 791.

Unlike the differences between the VAWA and the act at issue in *Lopez,* the court found that the similarities were "real and significant." *Id.* First, the court found that both acts regulated activity that was "not commercial or even economic in nature." *Id.* Second, the court wrote,

[S]imilar to § 922(q), VAWA does not have a jurisdictional requirement limiting each individual case under VAWA to situations involving interstate commerce. Although it is unclear whether such a jurisdictional requirement is needed, indications exist that such a requirement may be necessary.

*Id.* at 792.

Third, the court found that, like the statute at issue in *Lopez,* the VAWA would have the practical result of excessively extending Congress's power and inappropriately tipping the balance away from the states. *Id.* Although the court acknowledged that a reasonable inference from the findings of Congress was that violence against women has a major effect on the national economy, the court concluded that it was wrong to use "effects on the national economy" interchangeably with "effects on interstate commerce." *Id.* The court concluded that accepting the chain of causation between an effect on the national economy and an effect on interstate commerce as sufficient would

extend the Commerce Clause power to an "unbounded extreme." *Id.* at 793. The court pointed out that the yearly costs of insomnia are much higher than the yearly costs of domestic abuse, but to allow the Commerce Clause to reach insomnia, even though insomniacs engage in interstate travel, would unreasonably tip the balance away from the states. *Id.* Continuing this line of reasoning, the court concluded that the limitations in the VAWA on federal jurisdiction over state law matters such as divorce, alimony, division of marital property, and child custody, "is utterly insignificant to the practical implications of accepting the regulated activity as having a substantial effect on interstate commerce." *Id.* The court continued,

> If the justification for VAWA under the Commerce Clause is constitutionally acceptable, then certainly Congress would have power to regulate much activity which should be left to state control. Similar to the situation in *Lopez,* if I accepted plaintiff's argument, I would be "hard pressed to posit any activity by an individual that Congress is without power to regulate." *Lopez,* [514] U.S. at [564], 115 S. Ct. at 1632. In essence, if VAWA is a permissible use of the commerce power because of the regulated activity's effect on the national economy, which in turn affects interstate commerce, then it would be inconsistent to deny the commerce power's extension into family law, most criminal laws, and even insomnia.

*Brzonkala,* 935 F.Supp. at 793. The court therefore rejected the VAWA as a valid exercise of Commerce Clause power, remarking that "[a]ny other conclusion would strain reason." *Id.* The court also rejected the VAWA as a valid exercise in Fourteenth Amendment power, but this court will survey the discussion concerning Fourteenth Amendment power in *Brzonkala* only if this court also reaches that issue.

Defendants, as the challengers to the constitutionality of the VAWA here, generally echo the analysis used in the *Brzonkala* decision, asserting that when non-economic activity is the target of legislation ostensibly based on the Commerce Clause, and when

there is no jurisdictional element required for each regulated incident, a higher standard than mere rationality is required under *Lopez.* The supporters of the constitutionality of the VAWA here—plaintiff, plaintiff/intervenor, and *amici*—on the other hand, criticize the *Brzonkala* decision as improperly disregarding Congress's findings of an interstate nexus with the targeted activity, distinguishing, without authority, between effects on the national economy and effects on interstate commerce, and failing to recognize that the VAWA is a civil rights statute, not a criminal statute, and thus falls well within a sphere traditionally subject to federal regulation.

#### b. *Commerce Clause analysis*

■ The provision of the United States Constitution that is generally known as the Commerce Clause grants to Congress the power "[t]o regulate Commerce ... among the several states...." U.S. CONST., Art. I, § 8, cl. 3; *United States v. Crawford,* 115 F.3d 1397, 1399 (8th Cir.1997); *United States v. Dinwiddie,* 76 F.3d 913, 919 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996). As the courts in both *Doe* and *Brzonkala* noted, the Supreme Court in *Lopez* recognized three categories of activity that come within the reach of the Commerce Clause: (1) regulation of the use of the channels of interstate commerce; (2) regulation and protection of the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though a threat may come only from intrastate activities; and (3) regulation of activities that substantially affect interstate commerce. *Lopez,* 514 U.S. at 558–59, 115 S.Ct. at 1629–30; *see also Crawford,* 115 F.3d at 1399–1400 (identifying these three categories of activity subject to Commerce Clause power from *Lopez* ); *United States v. McMasters,* 90 F.3d 1394, 1397 (8th Cir.1996) (identifying the same three categories); *United States v. Bates,* 77 F.3d 1101, 1104 (8th Cir.1996) (also citing *Lopez* for these three categories of situations in which the exercise of Commerce Clause power is permissible), *cert. denied,* —— U.S. ——, 117 S.Ct. 215, 136

L.Ed.2d 149 (1996); *Dinwiddie*, 76 F.3d at 919 (same).[35]

**35.** The decision in *Lopez* thus synthesizes over two centuries of Commerce Clause theory and practice. As Justice Stevens explained in a very recent decision, the need to repose authority over commerce in the central government was a major impetus to the drafting of the Constitution:

> During the first years of our history as an independent confederation, the National Government lacked the power to regulate commerce among the States. Because each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents, what Justice Johnson characterized as a "conflict of commercial regulations, destructive to the harmony of the States" ensued. *See Gibbons v. Ogden*, 9 Wheat. 1, 224, 6 L.Ed. 23 (1824) (opinion concurring in judgment). In his view, this "was the immediate cause that led to the forming of a [constitutional] convention." *Ibid.*

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, —— U.S. ——, —— – ——, 117 S.Ct. 1590, 1595–96, 137 L.Ed.2d 852 (1997). Justice Stevens also noted that the "negative" or "dormant" aspect of the Commerce Clause, which prohibits regulation that invidiously discriminates against interstate commerce, was at least as important to the framers as the affirmative exercise of congressional authority over commerce. *Id.* (citing *Gibbons*, 9 Wheat. at 231; *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 n. 9, 114 S.Ct. 2205, 2211 n. 9, 129 L.Ed.2d 157 (1994); *Hughes v. Oklahoma*, 441 U.S. 322, 325–26, 99 S.Ct. 1727, 1730–31, 60 L.Ed.2d 250 (1979); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 807 n. 16, 96 S.Ct. 2488, 2496–97 n. 16, 49 L.Ed.2d 220 (1976)).

In *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), the Supreme Court traced briefly the expansion of Congress's Commerce Clause power:

> Interstate commerce was an established feature of life in the late 18th century. *See, e.g.*, The Federalist No. 42, p. 267 (C. Rossiter ed. 1961) ("The defect of power in the existing Confederacy to regulate the commerce between its several members [has] been clearly pointed out by experience"). The volume of interstate commerce and the range of commonly accepted objects of government regulation have, however, expanded considerably in the last 200 years, and the regulatory authority of Congress has expanded along with them. As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power. *See, e.g.*, *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

*New York*, 505 U.S. at 158, 112 S.Ct. at 2418–19. In *Gibbons*, the Court recognized the limits of Commerce Clause power to reach "completely internal" or intrastate activity. *Gibbons*, 9 Wheat. at 194–95, 6 L.Ed. 23. For nearly a century after *Gibbons*, therefore, the focus of Commerce Clause decisions was the "dormant" or "negative" aspect of the clause, and the Court "dealt but rarely with the extent of the Congress' power." *Lopez*, 514 U.S. at 553, 115 S.Ct. at 1627.

The second century of the nation's existence saw expansion of Congress's Commerce Clause power to include "production," "manufacturing," and "mining," matters originally considered as entirely within the province of the states, where such activities were so mingled together with interstate matters that full regulation of interstate commerce required incidental regulation of intrastate commerce. *Id.* at 554, 115 S.Ct. at 1627 (citing *Shreveport R. Co., v. U.S.*, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914)). The next watershed was a departure from distinctions between "direct" and "indirect" effects on interstate commerce, formulated, for example, in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), with the recognition that Congress's Commerce Clause power extends to matters that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937). In *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the Court held that Congress's Commerce Clause power extended to the regulation of intrastate activity that, in aggregate, has a substantial effect on interstate commerce. *Wickard*, 317 U.S. at 127–28, 63 S.Ct. at 90–91. As Chief Justice Rehnquist explained,

> *Jones & Laughlin Steel*, *Darby*, and *Wickard* ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under that Clause. In part, this was a recognition of the great changes that had occurred in the way business was carried on in this country. Enterprises that had once been local or at most regional in nature had become national in scope. But the doctrinal change also reflected a view that earlier Commerce Clause cases artificially had constrained the authority of Congress to regulate interstate matters.

*Lopez*, 514 U.S. at 556, 115 S.Ct. at 1628.

In *Lopez*, however, the Supreme Court made a renewed search for the "outer limits" of Commerce Clause power. *Id.* at 557, 115 S.Ct. at 1628–29. Chief Justice Rehnquist reiterated that those limits " 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.' "

As to the third category, the category into which this court agrees the VAWA must fall, "[t]he Commerce Clause ... gives Congress the authority to regulate 'those activities that substantially affect interstate commerce.'" *Dinwiddie*, 76 F.3d at 920 (quoting *Lopez*, 514 U.S. at 559, 115 S.Ct. at 1629–30). The Eighth Circuit Court of Appeals has explained that, "[u]nder this power, Congress may regulate a class of purely intrastate activity if, in the aggregate, the activity has a substantial effect on interstate commerce." *Id.* Furthermore, the court observed, " '[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power "to excise, as trivial, individual instances" of the class.'" *Id.* (quoting *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 1361–62, 28 L.Ed.2d 686 (1971), in turn quoting *Maryland v. Wirtz*, 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968)). In determining whether a statute is a proper exercise of this category of Commerce Clause power, the court's task is to decide " 'whether a rational basis existed for concluding that [the] regulated activity sufficiently affected interstate commerce.'" *Id.* (quoting *Lopez*, 514 U.S. at 557, 115 S.Ct. at 1628–29). Where this requirement is satisfied, the only remaining question for the court is whether the means chosen by Congress are "reasonably adapted" to the asserted goals of the legislation. *Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360; *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964).

*i. Substantial effect on interstate commerce.* The Eighth Circuit Court of Appeals recently discussed the analysis in *Lopez* of the Gun Free School Zone Act as an exercise of the third kind of Commerce Clause power:

The *Lopez* Court concluded that the statute could not "be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." [*Lopez*, 514 U.S.] at [561], 115 S.Ct. at 1631. The Court noted that the statute contained "no jurisdiction-

*Id.* at 557, 115 S.Ct. at 1628–29 (quoting *Jones &*

al element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce," *id.* at [561], 115 S.Ct. at 1631, and that Congress had made no legislative findings that the activity so affected interstate commerce. *See id.* at [562–63], 115 S.Ct. at 1631–32. Without a more definite connection to interstate commerce, upholding the statute would allow Congress to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce," *id.* at [564], 115 S.Ct. at 1632, which exceeded the proper limits of the federal government's power.

*McMasters*, 90 F.3d at 1398. The court in *McMasters* found that there was a jurisdictional requirement in the statute in question, a requirement that the property be "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." *Id.* The court also looked to legislative history demonstrating Congress's concern that it not exceed its Commerce Clause authority further coupled with a determination that the statute was necessary to protect interstate commerce. *Id.*

To answer one concern raised by the *Brzonkala* court, *Brzonkala*, 935 F.Supp. at 792, it appears from *McMasters* that the Eighth Circuit Court of Appeals reads *Lopez* not as *requiring* that the statute contain a jurisdictional element ensuring that the activity in question affects interstate commerce, but as considering whether the statute contains such a jurisdictional element, or whether, in the alternative, "Congress had made ... legislative findings that the activity so affected interstate commerce." *Id.* (citing *Lopez*, 514 U.S. at 562–63, 115 S.Ct. at 1631–32). This point was made more explicitly by the Eighth Circuit Court of Appeals in another decision in which the court observed that, both before and after *Lopez*, courts had consistently determined that 21 U.S.C. § 841(a)(1) is a valid exercise of Commerce Clause power even though it does not require an interstate nexus as an element of conviction. *United States v. Bell*, 90 F.3d 318, 321 (8th Cir.1996) (citing as so holding *United*

*Laughlin Steel*, 301 U.S. at 37, 57 S.Ct. at 624).

**1416**

*States v. Weinrich,* 586 F.2d 481, 498 (5th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979), *and* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979), and *United States v. Leshuk,* 65 F.3d 1105, 1111–12 (4th Cir.1995)). Similarly, in *United States v. Monteleone,* 77 F.3d 1086 (8th Cir. 1996), the Eighth Circuit Court of Appeals explicitly held that 18 U.S.C. § 922(d), although it "does not contain any jurisdictional element which limits its scope to those offense affecting interstate commerce, and it could thus be applied to wholly intrastate transactions ... [s]till ... is [not] rendered unconstitutional by the Supreme Court's narrow holding in *Lopez.*" *Monteleone,* 77 F.3d at 1091. In so concluding, the court examined congressional findings of the effect on interstate commerce of widespread traffic in firearms. *Id.* at 1092; *see also Dinwiddie,* 76 F.3d at 920 (never examining the statute in question for a jurisdictional element, but instead examining congressional findings concerning the impact of the regulated activity on interstate commerce). Furthermore, the Eighth Circuit Court of Appeals reads *Lopez* to reaffirm that "[i]n cases challenging Congress' lawmaking power under the third category, ... 'the proper test requires an analysis of whether the regulated activity "substantially affects" interstate commerce,'" *Bates,* 77 F.3d at 1104 (quoting *Lopez,* 514 U.S. at 559, 115 S.Ct. at 1629–30), not as instituting a new test of statutes under the third category of Commerce Clause power based solely on whether the statutes include a jurisdictional element.

This court finds that the *Lopez* decision itself supports such a reading of "jurisdictional elements" and "congressional findings" of effect on interstate commerce as alternative ways in which a statute ostensibly founded on Commerce Clause power can meet the *requirement* of a substantial effect on interstate commerce. In *Lopez,* the Court began its analysis of whether there was a substantial effect upon interstate commerce from the activity targeted by the Gun Free School Zone Act by looking at whether the statute contained any "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez,* 514 U.S.

at 561, 115 S.Ct. at 1631. The Court cited its prior decision in *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), in which it had required that a felon not only possess a firearm, but that the possession in question showed "'the requisite nexus with interstate commerce.'" *Id.* at 562, 115 S.Ct. at 1631 (citing *Bass,* 404 U.S. at 349, 92 S.Ct. at 523). The court in *Lopez* found that, unlike the statute in *Bass,* the one then before it "has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* The Court then considered whether "legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce" established the required effect on interstate commerce. *Id.* In the case of the statute before the Court in *Lopez,* there were no such legislative findings to meet the requirement; thus, "to the extent that congressional findings would enable [the Court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye," they were lacking in the case of the Gun Free School Zone Act. *Id.* at 563, 115 S.Ct. at 1632.

Because the Court made alternative inquiries into whether the statute contained "jurisdictional elements" and whether it was supported by congressional findings establishing the substantial effect of the activity addressed on interstate commerce, it is incorrect to assert that the presence of "jurisdictional elements" in the statute is necessary to an exercise of Commerce Clause power. *Contra Brzonkala,* 935 F.Supp. at 792 (stating that "indications exist that [a 'jurisdictional elements'] requirement may be necessary"). To put it another way, the *requirement* is that the activity have a substantial effect on interstate commerce; factors to consider in determining whether there is such a substantial effect include whether there is a jurisdictional element in the statute establishing that the activity addressed on a case-by-case basis has the requisite nexus to interstate commerce, but also

include, in the alternative, whether legislative findings establish the nexus of the activity in question to interstate commerce. *See Lopez,* 514 U.S. at 561–63, 115 S.Ct. at 1630–32; *see also Bates,* 77 F.3d at 1104 (reading *Lopez* to state that the test of lawmaking power under the third category is whether the regulated activity substantially affects interstate commerce). This court's reading of *Lopez* is in accord with that of the District of Columbia Circuit Court of Appeals:

We do not view *Lopez* as holding that federal criminal statutes must contain jurisdictional elements. If a jurisdictional element were critical to a statute's constitutionality, the Court in *Lopez* would not have gone on to examine the Government's proffered rationales for the constitutionality of the gun possession statute. *See Lopez,* [514] U.S. [at 563–64], 115 S.Ct. at 1632–34.... Congress may [ensure that there is a substantial effect on interstate commerce] either through its own legislative findings or by including a jurisdictional element in the statute; *it need not do both.* Where, as here, detailed congressional findings support the conclusion that the activities prohibited by the Access Act substantially affect interstate commerce, the absence of a jurisdictional element is not fatal to the statute's constitutionality. *See [United States v.] Wilson,* 73 F.3d [675,] 685 [ (7th Cir.1995) ] ("In discussing the lack of a jurisdictional element in *Lopez,* the Court simply did not state or imply that all criminal statutes must have such an element, or that all statutes with such an element would be constitutional, or that any statute without such an element is per se unconstitutional.")[, *cert. denied,* —— U.S. ——, 117 S.Ct. 47, 136 L.Ed.2d 12 (1996)].

*Terry v. Reno,* 101 F.3d 1412, 1418 (D.C.Cir. 1996) (emphasis added), *cert. denied,* —— U.S. ——, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997). The court in *Brzonkala* confused alternative factors establishing a requirement with the requirement itself. "Jurisdictional elements" are not necessarily required to establish a valid exercise of Commerce Clause power.

The decision of the Eighth Circuit Court of Appeals in *Dinwiddie* is instructive on other aspects of the third category of Commerce Clause power. In *Dinwiddie,* the court concluded that, to be a valid exercise of Commerce Clause power, a statute does not have to regulate commercial entities. *Dinwiddie,* 76 F.3d at 920. Instead, the court noted that "[i]t is settled law that the Commerce Clause gives Congress the power to regulate activity that diminishes interstate commerce in a good or service." *Id.* (citing *Katzenbach v. McClung,* 379 U.S. 294, 299–300, 85 S.Ct. 377, 381–82, 13 L.Ed.2d 290 (1964), and *Wickard v. Filburn,* 317 U.S. 111, 128–29, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942)). Furthermore, the court clarified the meaning of *Lopez* with regard to distant relationships between the regulated activity and interstate commerce, finding that what *Lopez* rejects is the exercise of Commerce Clause power that requires the court to "pile inference upon inference" to conclude that the regulated activity has a substantial effect on interstate commerce. *Id.* at 921 (citing *Lopez,* 514 U.S. at 567, 115 S.Ct. at 1633–34). Again, the court looked at how directly the congressional findings establish an effect upon interstate commerce, such as an interference with business or a reduction in the availability of goods or services. *Id.*

Although *Dinwiddie* explains that statutes enacted pursuant to the Commerce Clause power do not have to regulate commercial entities, there seems to be a mounting uncertainty as to whether *Lopez* rejects Commerce Clause regulation of non-commercial or non-economic activity. Half of an equally-divided *en banc* court of the Fifth Circuit Court of Appeals observed, "*Lopez* sends a clear cautionary signal that federal criminalization of intrastate noneconomic activity, when such regulation is not essential to a broader regulation of commercial activity, will have difficulty satisfying the substantial effects basis for Commerce Clause regulation." *United States v. Kirk,* 105 F.3d 997, 1009 (5th Cir. 1997) (opinion of Jones, J., on behalf of judges who would reverse the district court on the constitutionality under the Commerce Clause of 18 U.S.C. § 922(*o*), which criminalizes the manufacture, transfer, and possession of machineguns), *petition for cert. filed,*

65 U.S.L.W. 3756 (May 5, 1997) (No. 96–1759). However, this is far from any conclusion that *Lopez* excludes entirely from Commerce Clause power the regulation of non-economic or non-commercial activity. The judges voting to reverse in *Kirk* recognized that regulation of non-economic activity would encounter problems satisfying Commerce Clause requirements "when such regulation is not essential to a broader regulation of commercial activity." *Id.* As one judge of the Sixth Circuit Court of Appeals has explained,

> As I understand it, then, Congress *can* regulate non-"commercial" or non-"economic" activity under the third category of its interstate commerce authority. But it can only do so where the non-"commercial" or non-"economic" regulation is, as *Lopez* explained, "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez,* [514] U.S. at [561], 115 S.Ct. at 1631.

*United States v. Chesney,* 86 F.3d 564, 575 n. 3 (6th Cir.1996) (Batchelder, J., concurring), *cert. denied,* —— U.S. ——, 117 S.Ct. 2470, 138 L.Ed.2d 225 (1997).

Similarly, this court reads *Lopez* to have invalidated the Gun Free School Zone Act, not because it regulated non-commercial or non-economic activity, but because the Court could not find that the non-commercial, non-economic activity regulated had the requisite substantial effect upon interstate commerce, since the regulation lacked either jurisdictional elements or supporting legislative findings demonstrating that the activity had the necessary substantial effect. *Lopez,* 514 U.S. at 561–63, 115 S.Ct. at 1630–32. This is certainly the understanding of *Lopez* held by the District of Columbia Circuit Court of Appeals in *Terry. Terry,* 101 F.3d at 1418. In *Terry,* the court wrote,

> *Lopez*'s fundamental proposition is that Congress must ensure that its Commerce Clause power to regulate noncommercial activities extends to only those activities that substantially affect interstate commerce.

*Terry,* 101 F.3d at 1418. Thus, the VAWA's regulation of gender-based violence is not beyond the reach of the Commerce Clause power simply because it involves regulation of non-economic or non-commercial activity.

The decision in *Brzonkala* raises one further issue regarding proof of a substantial effect on interstate commerce. That issue is whether "effects on the national economy" can be used interchangeably with "effects on interstate commerce." *Brzonkala,* 935 F.Supp. at 792. The court in *Brzonkala* conceded that "[a] reasonable inference from the congressional findings is that violence against women has its major effect on the national economy." *Id.* However, that court concluded that to use "effects on the national economy" interchangeably with "effects on interstate commerce" was "wrong":

> Undoubtedly effects on the national economy in turn affect interstate commerce. Such a chain of causation alone, however, is insufficient to bring an act within the purview of the commerce power. If such a chain of causation sufficed, Congress's power would extend to an unbounded extreme.

*Brzonkala,* 935 F.Supp. at 792–93. The court then compared the huge effect of gender-based violence on the national economy with the effect of insomnia, suggesting that it would be unreasonable to allow the exercise of Commerce Clause power in either case because a substantial effect on the national economy had some incidental effect on interstate commerce. *Id.* at 793.

Although this portion of the analysis in the *Brzonkala* decision is at best slight, it is not wholly without support in the Supreme Court's decision in *Lopez.* In *Lopez,* the Court rejected the government's arguments that *an inference* of an effect on the national economy establishing *an inference* of a substantial effect upon interstate commerce sufficed to draw regulation of guns in school zones within Commerce Clause authority. *Lopez,* 514 U.S. at 563–64, 115 S.Ct. at 1631–32. In *Lopez,* the government asserted, without supporting findings from Congress, "that possession of a firearm in a school zone *may* result in violent crime and that violent crime can be *expected* to affect the function-

ing of the national economy in two ways." *Id.* at 563, 115 S.Ct. at 1632 (emphasis added). Those two *expected* effects on the national economy that *might* result from violent crime that in turn *might* result from possession of a firearm in a school zone were costs of violent crime spread nationally by insurance and unwillingness of individuals to travel into areas of the country perceived to be unsafe. *Id.* at 563–64, 115 S.Ct. at 1631–32. Additionally, the government argued that guns in schools might ultimately affect the learning environment and thus produce less productive citizens. *Id.* at 564, 115 S.Ct. at 1632. The Supreme Court was unimpressed with this chain of inferences, concluding that the "costs of crime" reasoning would allow federal regulation of all violent crime, no matter how distantly related to interstate commerce, while the "national productivity" reasoning would lead to regulation of matters formerly regarded as within the sovereignty of the states, such as family law. *Id.*

However, the Supreme Court has long recognized that a substantial effect on the national economy validates the exercise of Commerce Clause power, even when the activity regulated pursuant to the Commerce Clause is purely intrastate. Reviewing the history of the Commerce Clause, the Supreme Court observed, "As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power." *New York v. United States,* 505 U.S. 144, 158, 112 S.Ct. 2408, 2419, 120 L.Ed.2d 120 (1992) (citing *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), and *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). Indeed, what *Lopez* rejects is not this premise, but the premise that a chain of inferences from the regulated activity to an effect on the national economy and a further chain of inferences from some effect on the national economy to an effect on interstate commerce could suffice to establish that the regulated activity had the requisite *substantial* effect on interstate commerce. *Lopez,* 514 U.S. at 567, 115 S.Ct. at 1633 ("To uphold the Government's contentions here, we would have to pile inference upon inference in a manner

that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States."); *Dinwiddie,* 76 F.3d at 921 (clarifying *Lopez* as rejecting the exercise of Commerce Clause power that requires the court to "pile inference upon inference" to conclude that the regulated activity has a substantial effect on interstate commerce, citing *Lopez,* 514 U.S. at 567, 115 S.Ct. at 1634). *Lopez* certainly does not bar the exercise of Commerce Clause power to regulate an activity that is shown by congressional findings to have a *direct* rather than merely inferential, effect on the national economy. Even the court in *Brzonkala* conceded that "[u]ndoubtedly effects on the national economy in turn affect interstate commerce." *Brzonkala,* 935 F.Supp. at 792. Plainly then, *Lopez* also does not bar the exercise of Commerce Clause power where the regulated activity's direct effect on the national economy is also shown by congressional findings to be coupled with a *substantial* direct effect on interstate commerce.

*ii. Deference to congressional findings.* The ground on which the champions of the constitutionality of the VAWA here take the *Brzonkala* decision most severely to task, however, is that the *Brzonkala* decision fails to demonstrate, indeed eschews, any deference to Congress's findings of an interstate nexus to gender-motivated violence. This court agrees that the analysis of the constitutionality of the VAWA in *Brzonkala* is fatally flawed in this respect.

The court is mindful that in *Lopez,* the Supreme Court wrote, "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." *Lopez,* 514 U.S. at 562, 115 S.Ct. at 1631 (citing *McClung,* 379 U.S. at 304, 85 S.Ct. at 383–84). However, that statement is no license to disregard congressional findings when they are present, nor is the Court's comment elsewhere in the *Lopez* decision that it is to decide whether there is a rational basis for Congress's conclusion that the activity in question has a substantial effect on interstate commerce. *Id.* at 557 & n. 2, 115 S.Ct. at 1628–29 & n. 2. Indeed, the Court in *Lopez* also wrote, "[A]s

part of our independent evaluation of constitutionality under the Commerce Clause we of course consider legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce." *Id.* at 562, 115 S.Ct. at 1631.

Decisions of several federal circuit courts of appeals post–*Lopez* confirm that deference to a congressional finding that a regulated activity has a substantial effect on interstate commerce is alive and well. The District of Columbia Circuit Court of Appeals reads *Lopez* to clarify that an activity must not only "affect" interstate commerce, but must "substantially affect" it. *Terry,* 101 F.3d at 1416. However, the court did not suggest that this clarification ended deference to Congressional findings, but instead simply required the court to review the legislative findings to see if a "substantial" effect was supported by those findings. *Id.* at 1416–17. Similarly, the Third Circuit Court of Appeals concluded in *Pic–A–State Pa., Inc. v. Reno,* 76 F.3d 1294 (3d Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996), that

> "[t]he task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow." *Hodel v. Virginia Surface Mining & Reclamation Assn.,* 452 U.S. at 276, 101 S.Ct. at 2360. "The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." *Id.*

*Pic-A-State Pa., Inc.,* 76 F.3d at 1301. Later in the opinion, that court also observed that deference to Congress extends to the congressional determination of the means used to effect the desired end:

> We do not substitute our judgment for that of Congress. "Where the legislative judgment is drawn in question," our inquiry "must be restricted to the issue of whether any state of facts either known or which could reasonably be assumed affords support for it." *United States v. Carolene Prod. Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938). The Supreme Court's recent decision in *United States v.*

*Lopez,* [514] U.S. [549], 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), does not change the nature of this inquiry. *Lopez* asks whether the activity at issue could rationally be understood to affect commerce. The Court did not reach the question of whether the legislation itself was rationally related to its announced goal.

*Id.* at 1301–02. Similarly, when considering the constitutionality of the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248, in light of *Lopez,* the Seventh Circuit Court of Appeals found that what *Lopez* added, or reiterated, was that congressional findings must not only show an effect on interstate commerce from the regulated activity, but a substantial effect. *United States v. Wilson,* 73 F.3d 675, 681 (7th Cir.1995). The court wrote,

> Thus courts must ask the additional question whether the relation to interstate commerce is substantial. *The district court erred further by giving no deference to Congress's findings.* Courts need only look for a rational basis. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360. The district court essentially converted the rational basis test into a less deferential standard. Here it is plainly rational that reproductive health facilities are engaged in interstate commerce and that obstruction of such facilities brings the commerce to a halt.

*Wilson,* 73 F.3d at 681. The court found that the proper counterweight to excessive expansion of Commerce Clause power was not institution of a non-deferential review of congressional findings, but the requirement that the effects Congress has found must be substantial. *Id.* ("If individuals travel interstate more often to seek and provide reproductive health services than to bowl or to camp, Congress's authority to regulate may very well reach health facilities but not bowling alleys or campgrounds: courts must apply the substantial effects test to draw the proper distinction."). The district court had therefore improperly dismissed out of hand Congress's findings of a substantial effect of the regulated activity upon interstate commerce. *Id.*[36]

---

**36.** Writing for four judges of an equally-divided

Fifth Circuit Court of Appeals *en banc,* Judge

***iii. Congressional findings.*** A brief review of Congress's findings in support of the substantial effect of gender-motivated violence upon interstate commerce, garnered in four years of hearings prior to enactment of the VAWA, clearly establishes Congress's rational basis for finding that the regulated activity had the necessary interstate nexus.[37] The congressional findings on the scope of the problem of gender-based violence are staggering:

- "Violence is the leading cause of injury to women ages 15–44." S.Rep. No. 103–138, at 38 (1993).

- "Every week, during 1991, more than 2,000 women were raped and more than 90 women were murdered—9 out of 10 by men." *Id.*

- "[W]omen in the United States are at least three times more likely to become rape victims than their European counterparts." *Violence Against Women: Hearing before the House Committee on the Judiciary, Subcommittee on Crime and Criminal Justice,* Serial No. 42, 102d Cong., 2d Sess., 62 (Feb. 6, 1992).

- "[F]or the past 4 years [prior to 1993], the U.S. Surgeons General have warned that family violence—not heart attacks or cancer or strokes—poses the single largest threat of injury to adult women in this country." S.Rep. No. 103–138, at 41–42 (1993).

- "An estimated 4 million American women are battered each year by their husbands or partners. Approximately 95%

of all domestic violence victims are women." H.R.Rep. No. 103–395, at 26 (1993).

- "Three out of four women will be victims of violent crimes sometime during their life." *Id.* at 25.

*See also Doe,* 929 F.Supp. at 611 (citing several of the same or similar findings). Yet, staggering as the scope of the problem may be, the activity regulated under the Commerce Clause must also have a substantial effect on interstate commerce. *Lopez,* 514 U.S. at 559, 115 S.Ct. at 1629. Congress certainly did not lack a rational basis for concluding that such a substantial effect from gender-based violence was apparent:

- "Gender-based violence bars its most likely targets—women—from full [participation] in the national economy." S.Rep. No. 103–138, at 54 (1993).

- Domestic violence costs employers an estimated $3 to $5 billion annually due to absenteeism from the workplace. *Women And Violence: Hearing before the Senate Committee on the Judiciary,* S. Hrg. 101–939, Pt. 1, 101st Cong., 2d Sess., 58 (June 20, 1990).

- "[W]e spend $5 to $10 billion a year on health care, criminal justice and other social costs of domestic violence." S.Rep. No. 103–138, at 41 (1993) (footnote omitted).

- "[A]s many as 50 percent of homeless women and children are fleeing domestic

---

*Lopez,* then, adhered to a rational basis standard of review. This deferential standard does not insist that Congress actually make factual findings. To the contrary, its tolerance of hypothetical, judicially supposed purposes and means gives the rational basis standard its deferential character. Courts can assume a more activist role in judicial review by refusing to look to a basis for legislation not identified by Congress. This elevates the standard of review, according significantly less deference to Congress. Giving weight to the absence of congressional findings lies in the middle ground between an intrusive absolute insistence upon legislative findings and traditional rational basis inquiry. Congressional findings are not merely playthings of formalism. They help define the respective roles of the courts

and the Congress and the federal and the state governments. So the role of findings demands our attention. But their absence does not end our inquiry.

*Kirk,* 105 F.3d at 999 (Higginbotham, J., writing for four judges who would vote to affirm the district court's determination that 18 U.S.C. § 922(*o*) was a constitutional exercise of Commerce Clause power). Although the judges joining in this opinion found that there were no legislative findings to support 18 U.S.C. § 922(*o*), copious findings support the VAWA.

**37.** The court finds that counsel for plaintiff/intervenor United States and *amici* thoroughly and effectively marshaled the pertinent portions of the legislative findings, providing the most effective form of advocacy, solid factual basis coupled with legally correct argument.

violence." S.Rep. No. 101–545, at 37 (1990).

- Fear of gender-based violence affects the economy and interstate travel by women, because "it deters women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence." S.Rep. No. 103–138, at 54 (1993).

- Women often refuse higher paying night jobs in service and retail industries because they fear attack. *Id.* at 54 n. 70; *see also Violence Against Women: Victims of the System: Hearing before the Senate Committee on the Judiciary*, S. Hrg. 102–369, 102d Cong., 1st Sess., 86 (April 9, 1991) (testimony of Burt Neuborne).

- "[A]lmost 50 percent of rape victims lose their jobs or are forced to quit in the aftermath of the crime." S.Rep. No. 103–138, at 54 (1993).

- Fear of gender-motivated crime deters use of public transportation, and thus "acts as a barrier to mobility, particularly for those women who have no alternative to public transportation because of economic constraints." S. Hrg. 101–939, Pt. 1, at 69 (testimony of Helen Neuborne); *see also* S. Hrg. 102–369 at 2 (statement of Sen. Biden).

- Fear of gender-based violence deters women's free movement interstate, and limits every economic choice, including education, employment, and travel. *Crimes of Violence Motivated by Gender: Hearing before House Subcomm. on Civil and Constitutional Rights, House Committee on the Judiciary*, 103d Cong., 1st Sess., at 5 (Nov. 16, 1993).

*See also Doe*, 929 F.Supp. at 611 (citing these or similar findings). These findings led Congress to the following conclusion:

[Gender-motivated violence has] a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce.

H.R.Rep. No. 103–711 at 385 (1994), U.S. Code Cong. & Admin. News at 1801, 1853. In light of its findings, Congress concluded that enactment of the civil remedies of the VAWA was "firmly based on the Commerce Clause." S.Rep. No. 103–138 at 54 (1993).

Also in light of these findings, giving them the deference they are properly due in a Commerce Clause analysis, this court finds that there was undeniably a rational basis for Congress's conclusions that gender-motivated violence has a substantial effect on interstate commerce. *See Lopez*, 514 U.S. at 557, 115 S.Ct. at 1628–29 (the first prong of the test for the proper exercise of Commerce Clause is whether Congress had a rational basis for concluding that the regulated activity had a substantial effect on interstate commerce); *Dinwiddie*, 76 F.3d at 920 (same). Unlike the situation presented in *Lopez*, no chain of inferences from the regulated activity to an effect on the national economy to an effect on interstate commerce is required. *See Lopez*, 514 U.S. at 567, 115 S.Ct. at 1634 ("To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States."); *Dinwiddie*, 76 F.3d at 921. Instead the congressional findings demonstrate not only a direct and substantial impact of gender-motivated violence on the national economy, *see, e.g., Women And Violence: Hearing before the Senate Committee on the Judiciary*, S. Hrg. 101–939, Pt. 1, 101st Cong., 2d Sess., 58 (June 20, 1990) (domestic violence costs employers an estimated $3 to $5 billion annually due to absenteeism from the workplace), but a direct and substantial effect on interstate commerce. *See, e.g., Crimes of Violence Motivated by Gender: Hearing before House Subcomm. on Civil and Constitutional Rights, House Committee on the Judiciary*, 103d Cong., 1st Sess., at 5 (Nov. 16, 1993) (fear of gender-based violence deters women's free movement interstate, and limits every economic choice, including education, employment, and travel). Furthermore, because the effects on interstate commerce reflected in Congress's

findings are so profound, the substantiality of the effects demonstrates that enactment of the VAWA was an exercise of Commerce Clause power in properly limited circumstances. *See Wilson,* 73 F.3d at 681 (substantiality of effect, not a lack of deference to congressional findings, is the proper limitation on Commerce Clause power).

***iv. Reasonable adaptation of means to goal.*** Having concluded that Congress did indeed have a rational basis for concluding that gender-motivated violence has a substantial effect on interstate commerce, the court next turns to the second part of the Commerce Clause analysis, which asks whether the means chosen by Congress are "reasonably adapted" to the asserted goals of the legislation. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360; *Heart of Atlanta Motel, Inc.,* 379 U.S. at 258, 85 S.Ct. at 358. On this prong of the analysis, this court can do little better than adopt the conclusion of a fellow district court judge in *Doe:*

> Given the important nature of the conduct sought to be prevented and the previously-approved private attorney general method of remedy, this court concludes that the statutory scheme which creates a federal civil rights remedy for gender-motivated violence is reasonably adapted to an end permitted by the Constitution. This conclusion is consistent with prior precedent related to other federal civil rights remedies enacted by Congress and upheld by courts as constitutional under the Commerce Clause.

*Doe,* 929 F.Supp. at 617.

The court would add only these points, often reiterated by the plaintiff, the plaintiff/intervenor, and *amici.* First, 42 U.S.C. § 13981 has been cast as a civil rights statute, not a criminal statute, and thus falls within the traditional purview of federal regulation. Just as importantly, the statute defers to state definitions of crimes and clearly supplements rather than supplants state regulation of criminal and family law matters. As such, the statute is not only reasonably adapted to serve the goals Congress had in

mind, but reasonably adapted to avoid the parlaying of Commerce Clause power into a general police power, leading to a completely centralized government that obliterates our dual system of government. *See Lopez,* 514 U.S. at 557, 115 S.Ct. at 1628–29 (stating these concerns). Thus, contrary to the view of the district court in *Brzonkala,* the concerns of the Supreme Court in *Lopez* simply are not present here.

In short, defendants' challenge to the civil remedies provision of the VAWA, 42 U.S.C. § 13981, on the ground that it exceeds Congress's power under the Commerce Clause is overruled, and their challenge to the court's subject matter jurisdiction pursuant to *Fed. R.Civ.P.* 12(b)(1) is denied.[38]

### C. Supplemental Jurisdiction

Defendants contend that, even if the court has subject matter jurisdiction over a federal VAWA claim and that claim is adequately pleaded, the court should decline to exercise supplemental jurisdiction over the plaintiff's many and varied state-law claims. Defendants contend that the state-law claims predominate over the single federal claim, both on the basis of mere numerosity and on the basis that the state-law claims are quantitatively different. They also contend that the court should decline to exercise supplemental jurisdiction over the state-law claims, because they involve novel and complex issues of state law. Plaintiff counters that her claims all arise from a common nucleus of operative fact, and thus can and should reasonably be tried together, and that her state-law claims are neither so complex, novel, or quantitatively different that this court should refrain from hearing them.

The statute defining the supplemental jurisdiction of the federal courts provides as follows:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of

---

**38.** Because the court finds that the civil remedies portion of the VAWA is constitutional under the Commerce Clause, the court does not reach de-

fendants' challenge to the constitutionality of the statute under section five of the Fourteenth Amendment.

the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). The Eighth Circuit Court of Appeals has observed that the word "shall" in the phrase "shall have supplemental jurisdiction" "is a mandatory command." *McLaurin v. Prater*, 30 F.3d 982, 984 (8th Cir.1994). The court pointed out further that

> Congress has directed that federal district courts 'shall' have jurisdiction in both 28 U.S.C. § 1331 (1988) (federal question jurisdiction) and 28 U.S.C. § 1332 (1988) (diversity jurisdiction), and the accepted import of the terms is that federal courts must accept and cannot reject jurisdiction in such cases.

*McLaurin*, 30 F.3d at 984–85 (citing *McCarthy v. Madigan*, 503 U.S. 140, 145–47, 112 S.Ct. 1081, 1087, 117 L.Ed.2d 291 (1992), and *Willcox v. Consolidated Gas Co.*, 212 U.S. 19, 40, 29 S.Ct. 192, 195, 53 L.Ed. 382 (1909)).

■ There are exceptions to this mandate, however, and some of those exceptions are cast in discretionary terms. *Id.* at 985 (citing 28 U.S.C. § 1367(b) and (c)).[39] A court "may decline to exercise supplemental jurisdiction" if

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). This subsection gives a court the discretion to reject jurisdiction over supplemental claims, "but only to a point." *McLaurin*, 30 F.3d at 985. "The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein." *Id.* Thus, where the case clearly fits within one of the subsections listed above, the court may decline to exercise supplemental jurisdiction. *Packett v. Stenberg*, 969 F.2d 721, 726–27 (8th Cir.1992); *see also O'Connor v. State of Nev.*, 27 F.3d 357, 362 (9th Cir.1994), *cert. denied*, 514 U.S. 1021, 115 S.Ct. 1367, 131 L.Ed.2d 223 (1995); *Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277, 1285 n. 14 (3d Cir.1993); *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 65–66, n. 3 (2d Cir.1991); *Carroll v. Borough of State College*, 854 F.Supp. 1184, 1200 (M.D.Pa.1994), *aff'd mem.*, 47 F.3d 1160 (3d Cir.1995). The Ninth Circuit Court of Appeals has counseled that, once one of the grounds listed in § 1367(c) is present, "the court should consider whether the exercise of jurisdiction advances 'the values of economy, convenience, fairness, and comity.'" *Allen v. City of Los Angeles*, 92 F.3d 842, 846 (9th Cir.1996) (quoting *Executive Software v. U.S. Dist. Court*, 24 F.3d 1545, 1557 (9th Cir.1994)), *overruled in part*, *Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir.1997) (*en banc*).[40] However, "in the absence of the circumstances described in subsections (b) and (c), § 1367(a) requires the district court to accept supplemental jurisdiction over the state-law claims [the plaintiff] has raised in [the] case." *McLaurin*, 30 F.3d at 985.

### 1. *Novelty and complexity*

■ The defendants here seek discretionary dismissal of the state-law claims on the

---

**39.** In *McLaurin*, the court observed that the exceptions are found in both subsection (b) and (c). *McLaurin*, 30 F.3d at 985. According to the court in *McLaurin*, subsection (b) *"prohibits* district courts from exercising supplemental jurisdiction in certain instances when the basis for original jurisdiction is premised on § 1332 (diversity of citizenship)," *id.* (emphasis added), and the court notes that this subsection contains the "mandatory," but negative, words *"shall not have supplemental jurisdiction."* 28 U.S.C. § 1367(b); *cf. McLaurin*, 30 F.3d at 984–85 ("shall" is mandatory). Thus, the court concludes that only subsection (c) provides discretionary grounds for declining to exercise supplemental jurisdiction.

**40.** In *Acri*, the *en banc* court overruled "suggestions" in *Allen* that either the district or appellate courts have an obligation, *sua sponte*, to ensure that the discretionary retention of supplemental jurisdiction under 28 U.S.C. § 1367(c) is prudent where no one has objected and supplemental jurisdiction was proper under § 1367(a). *Acri*, 114 F.3d at 1001–02.

grounds identified in 28 U.S.C. § 1367(c)(1) and (2). As to novelty, § 1367(c)(1), the District of Columbia Circuit Court of Appeals considered whether the claim asserted merely extended the common-law torts pleaded to new defendants, and looked at whether local courts had granted the relief sought by the plaintiffs on their tort claims—injunctive relief—and found that such relief was far from "unexceptional" for claims of the sort presented. *Women Prisoners of D.C. Dep't of Corrections v. District of Columbia*, 93 F.3d 910, 921–22 (D.C.Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1552, 137 L.Ed.2d 701 (1997). The court then observed that " 'the proper function of [a] federal court is to ascertain what the state law is, not what it ought to be,' " *id.* at 922 (quoting *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941)), and further that " 'a federal court should be reluctant to retain pendent jurisdiction over a question for which state jurisprudence gives inadequate guidance.' " *Id.* (quoting *Financial Gen. Bankshares, Inc. v. Metzger*, 680 F.2d 768, 776 (D.C.Cir.1982)). These considerations, the court found, meant that deference to the district court's decision to assert supplemental jurisdiction was "not boundless," and the district court had abused its discretion in asserting supplemental jurisdiction where no local court had granted the relief sought in the context of the claims asserted. *Id.* at 922–23.

By way of contrast, the Ninth Circuit Court of Appeals found that state-law indemnification claims "involve[d] novel issues of California law," but the court nonetheless found that "the values of economy, convenience, and fairness [would be] advanced by the district court's retention of jurisdiction over the [plaintiff's] state law claims." *Allen*, 92 F.3d at 846. The court found that the parties had already completed two trials and the judge who had presided over those trials was therefore intimately familiar with all of the facts and rulings. *Allen*, 92 F.3d at 846.

In this case, the court acknowledges that there may be novel and complex issues presented by some of the plaintiff's claims, including whether some of the claims and the relief sought on those claims can be asserted against particular defendants. *See Women Prisoners of D.C. Dept. of Corrections*, 93 F.3d at 921–22. However, even though proceedings are not very advanced, *cf. Allen*, 92 F.3d at 846, because the plaintiff's claims plainly arise from a common nucleus of operative fact, but have not yet been refined or even reassessed by plaintiff's counsel in light of discovery, "the values of economy, convenience, and fairness [may be] advanced by [this] court's retention of jurisdiction over the [plaintiff's] state law claims," *id.*, at least during a reasonable period of discovery.

### 2. Predomination

As to whether state-law claims "predominate" over federal claims such that denial of supplemental jurisdiction over the state-law claims is appropriate, 28 U.S.C. § 1367(c)(2), the Ninth Circuit Court of Appeals upheld the district court's dismissal of a state-law inverse condemnation claim even though it retained jurisdiction over several federal substantive and procedural due process claims and equal protection claims. *Patel v. Penman*, 103 F.3d 868, 877 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997). The district court had noted that the state-law claim relied on the California Constitution rather than the federal constitution, involved "a lot of different evidence," "a lot of different theories," and perhaps even a different trier of fact. *Id.* (quoting the court below). The appellate court noted that the only federal claim actually tried was a post-closure procedural due process claim, which the court described as "a slender federal reed on which to base jurisdiction over a state-law claim as substantial as inverse condemnation." *Id.*[41]

41. A judge on the Eleventh Circuit Court of Appeals, dissenting from the majority opinion, nonetheless provided useful insights on how the court is to determine whether state-law claims predominate over federal claims within the meaning of 28 U.S.C. § 1367(c)(2). The dissenting judge found that, "[b]ecause Congress did not explain explicitly how to determine when state law predominates over federal question jurisdiction where the pleadings invoke both state and federal law, 'a value judgment by the federal court' is required." *In re City of Mobile*, 75 F.3d 605, 613 (11th Cir.1996) (Birch, J., dissenting) (quoting *Martin v. Drummond Coal Co.*, 756

In this case, the federal claim is no such "slender reed," *id.*, nor, as has been suggested by the defendants, a case of the tail wagging the dog. Rather, the federal claim is clearly substantial, and clearly is really the plaintiff's main mission, not merely an incident or adjunct of the state claim. *Moore v. DeBiase,* 766 F.Supp. 1311, 1319 (D.N.J. 1991). The court concludes, in its discretion, that it need not decline to exercise supplemental jurisdiction over the state-law claims on the ground that they predominate over the federal claim.

### D. Challenges To State–Law Claims

The defendants have also moved to dismiss various of the state-law claims for failure to state a claim upon which relief can be granted pursuant to *Fed.R.Civ.P.* 12(b)(6). The counts in question are Count 3, which asserts fraud against Hartz and against defendants Church, Diocese, and Bishop; Count 4, which asserts breach of fiduciary duty against the Diocese and Bishop; Count 10, which asserts negligent hiring, training, and supervision against defendants Church, Diocese, and Bishop; Count 11, which asserts negligent breach of duty to protect against the Church and Diocese; Count 12, which asserts premises liability against the Church; and Count 13, which asserts respondeat superior liability of the Church. Of the challenges to these state-law claims, the court concludes that it need discuss in detail only the challenge to the negligent hiring, training, and supervision claim, as it involves both nonconstitutional and constitutional grounds for dismissal.

### 1. Negligent hiring, training, and supervision

Count 10 of Doe's complaint is a negligent hiring, training, and supervision claim directed against defendants Church, Diocese, and Bishop. In this count, Doe alleges that the named defendants failed to provide professional help to Father Hartz, an agent or employee, known or suspected to have tendencies toward sexual abuse and exploitation, and also failed to prevent, reprimand or punish, supervise or control Father Hartz's sexually abusive behavior or to respond to previous allegations of inappropriate behavior by Father Hartz. Defendants challenge the count on two grounds. First, they allege that Iowa has only recognized the tort of negligent supervision, hiring, or retention in limited circumstances not presented here. Second, they allege that recognition of such a claim against a religious institution concerning the conduct of a member of the clergy would violate the First Amendment to the United States Constitution. The plaintiff concedes that dismissal is appropriate as to her claim of negligent hiring of Father Hartz, because she agrees that such a claim trespasses on the Church's First Amendment protection from interference by secular courts on a "canonical act." However, she asserts the viability, the First Amendment notwithstanding, for her negligent retention and supervision claims, as these matters can be decided applying neutral principles of law that do not intrude upon religious matters.

F.Supp. 524, 527 (N.D.Ala.1991), and also citing *Moore v. DeBiase,* 766 F.Supp. 1311, 1319 (D.N.J.1991)).

> State law predominates " '[i]f the federal court finds that the federal claim, while plausible, is not really the plaintiff's main mission; that it is only an incident or adjunct of the state claim and that the state claim is the crux of the action....' " *Moore,* 766 F.Supp. at 1319 (quoting 28 U.S.C.A. § 1441 Commentary (West Supp.1991)); *see Burnett [v. Birmingham Bd. of Educ.],* 861 F.Supp. [1036,] 1038 [(N.D.Ala.1994)].... A district court decides whether state law predominates by examining the "nature of the claims as set forth in the pleading and by determining whether the state law claims are more complex or require more judicial resources to adjudicate or are more salient in the case as a whole than the federal

law claims." *Moore,* 766 F.Supp. at 1319 (footnote omitted). Thus, Congress accorded district courts *"broad discretion"* in determining whether to retain a removed case or to remand it **entirely** to state court. *Id.* (emphasis added).

*In re City of Mobile,* 75 F.3d at 613. Applying this test, the dissenter would have upheld the district court's refusal to exercise supplemental jurisdiction over state claims and its decision to remand the case following removal, where the matter had proceeded for two years in state court before a federal claim was added and the action was then removed to federal court. *Id.* at 614. The majority, however, reversed the district court's remand order, because the district court had improperly remanded the-entire case to state court, including the federal claim. *Id.* at 608 (majority opinion).

As with a challenge to a statutory cause of action, the court will begin its consideration of the defendants' challenge to this common-law cause of action by examining nonconstitutional arguments, and only if it is "unavoidable," will the court turn to constitutional challenges. *Jean*, 472 U.S. at 854, 105 S.Ct. at 2996–97.

### a. Recognition of the tort as alleged

 Defendants first challenge Doe's negligent retention and supervision claim on the ground that it does not fit within the narrow definition of the tort recognized by the Iowa Court of Appeals in *D.R.R. v. English Enters., CATV, Div. of Gator Transp., Inc.*, 356 N.W.2d 580 (Iowa.Ct.App.1984). Defendants read *D.R.R.* to acknowledge the availability of the tort only against common carriers and innkeepers or employers with an analogous "special duty" to the injured person. *See D.R.R.*, 356 N.W.2d at 584.

In *D.R.R.*, the Iowa Court of Appeals considered the arguments that a plaintiff who had been raped by a cable company employee could not hold the cable company liable for the employee's conduct under a tort defined by Restatement (Second) of Agency § 213. *D.R.R.*, 356 N.W.2d at 583. Restatement (Second) of Agency § 213 provides as follows:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

a. In giving improper or ambiguous orders or in failing to make proper regulation; or

b. In the employment of improper persons or instrumentalities in work involving risk of harm to others; or

c. In the supervision of the activity; or

d. In permitting, or failing to permit, negligent or other tortious conduct by per-. sons, whether or not his agents or servants, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency § 213; *D.R.R.*, 356 N.W.2d at 583. In *D.R.R.*, the court acknowledged decisions of other states that contained "language to similar effect,"

citing the following from a Michigan Supreme Court decision:

An employer who knew or should have known of his employee's propensities and criminal record before a commission of an intentional tort by an employee upon a customer who came to employer's place of business would be liable for damages to such customer.

*D.R.R.*, 356 N.W.2d at 583 (quoting *Hersh v. Kentfield Builders, Inc.*, 385 Mich. 410, 412, 189 N.W.2d 286, 288 (1971)). Finding no Iowa cases directly on point, the Iowa Court of Appeals nonetheless found that "a negligent hiring cause of action does exist under Iowa law when the employer owes a special duty to the injured party." *Id.* (citing *Nesbit v. Chicago, Rock Island & Pac. Ry.*, 163 Iowa 39, 143 N.W. 1114 (1913); *Fagg v. Minneapolis & St. Louis Ry.*, 175 Iowa 459, 462, 157 N.W. 148, 148–49 (1916); *Garvik v. Burlington, Cedar Rapids & Northern Ry.*, 131 Iowa 415, 418–19, 108 N.W. 327, 328 (1906); and *Giarratano v. Weitz Co.*, 259 Iowa 1292, 147 N.W.2d 824 (1967)). In *D.R.R.*, the court found that evidence, if true, that the employee who committed the tortious act had access to a master key to the victim's apartment through his employment would be sufficient to demonstrate a special duty on the part of the employer to the victim. *Id.* at 584. The court found that the employer before it was "analogous to the carrier because both operate pursuant to a public franchise," and the employer was also "analogous to an innkeeper because both have access to master keys to another person's living quarters." *Id.* The court found that summary judgment was improper on the claim in light of genuine issues of material fact as to whether the employer provided master keys to the employee and whether hiring the employee without checking his criminal background was a breach of the special duty that arose from the employer's provision of master keys. *Id.* Furthermore, the court held that the employee's wrongful conduct was not a superseding cause of the harm to the victim if the employment relationship was instrumental to the employee committing the crime. *Id.* at 585–86. Defendants contend that the church here simply is not analogous to an innkeeper or common

carrier, and therefore no "special duty" exists here that would satisfy the requirements of the tort as recognized by the Iowa Court of Appeals.

Notwithstanding defendants' objections, numerous courts have recognized the tort as defined by Restatement (Second) of Agency § 213 to be applicable to a church where a victim of sexual abuse by a member of the clergy asserted a cause of action against the church. Such courts have not found a "special duty" between the church and the victim to be the impediment, but whether the church had adequate notice of the clergy member's propensity to sexual abuse. For example, in *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 229 A.D.2d 159, 654 N.Y.S.2d 791 (N.Y.App.Div.1997), the New York court held that, although the church could not be held vicariously liable for a priest's sexual abuse of infants, the church "can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision," citing Restatement (Second) of Agency § 213. *Kenneth R.,* 654 N.Y.S.2d at 793. However, the court found that "a necessary element of such causes of action is that the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Id.* The court found that there were sufficient allegations in the complaint and bill of particulars to satisfy the notice requirement for purposes of a motion to dismiss. *Id.* at 795.

Most recently in *L.L.N. v. Clauder,* 209 Wis.2d 674, 563 N.W.2d 434 (1997), the Wisconsin Supreme Court held that, assuming such a claim would not violate the First Amendment to the United States Constitution, a claim pursuant to Restatement (Second) of Agency § 213 would lie against a church for conduct of a chaplain, but *only if* the church "knew or should have known that its employee would subject a third party to an unreasonable risk of harm." *L.L.N.,* 563 N.W.2d at 445 (citing Restatement (Second) of Agency § 213 cmt. d, and *Moses v. Diocese of Colo.,* 863 P.2d 310, 329 (Colo.1993) (*en banc*), *cert. denied,* 511 U.S. 1137, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994), and concluding that no genuine issue of material fact had been generated that the defendants did not have such notice).

Although a church is neither a common carrier nor an innkeeper, the question under the formulation of the negligent supervision tort, as recognized in *D.R.R.,* is not whether the employer fits in either category, nor even whether the employer has access to the victim's place of residence, but whether the party sought to be held liable "owes a special duty to the injured party." *D.R.R.,* 356 N.W.2d at 583. That duty, as defined in authorities upon which the court in *D.R.R.* relied, extends to " 'licensees, invitees, or customers of the employer.' " *Id.* (quoting Note, *The Responsibility of Employers for the Actions of Their Employees: The Negligent Hiring Theory of Liability,* 53 CHI.-KENT L. REV. 717, 721 (1979), and citing *Hersh,* 385 Mich. at 412, 189 N.W.2d at 288 (tort cause of action is available to "a customer who came to the employer's place of business")). Thus, the "special duty" requirement is not as exclusive as defendants would have it and certainly extends to a parishioner, as an invitee upon the premises of a church, even discounting any other special relationship and duties that might arise from the intimate and personal, rather than commercial, relationship between a church and a member. Under other decisions applying the tort to religious institutions, the further question is whether the institution had notice of the propensities of a clergy member to tortious conduct. *L.L.N.,* 563 N.W.2d at 445–46; *Kenneth R.,* 654 N.Y.S.2d at 793. Doe has adequately alleged that the institutional defendants she seeks to hold liable on her negligent supervision claim had such notice of Father Hartz's propensity to sexual abuse of women.

Therefore, the court concludes that Iowa courts have not only recognized a tort action for negligent supervision sufficiently broad to encompass the circumstances alleged, but that the elements of such a claim are adequately alleged. Defendants' motion to dismiss the negligent supervision claim on these grounds will be denied.

### b. Constitutionality of the tort as against religious institutions

***i. The "entanglement" test.*** Defendants also contend that a tort claim of negli-

gent retention and supervision against a religious institution arising from the conduct of a member of the clergy is barred by the First Amendment to the United States Constitution. The test the Eighth Circuit Court of Appeals has used to determine whether prosecution of a civil tort claim against a religious institution is barred by the Religion Clauses [42] of the First Amendment is whether consideration of the claim would risk "excessive entanglement" of the court in a religious matter. *See Roxas v. Presentation College,* 90 F.3d 310, 318 n. 6 (8th Cir.1996) (finding that consideration of Title VII and ADEA claims by a priest who left his employment with a private church-affiliated college would not risk such entanglement); *Drevlow v. Lutheran Church, Missouri Synod,* 991 F.2d 468, 472 (8th Cir.1993) ("The Synod has not offered any religious explanation for its actions which might entangle the court in a

religious controversy in violation of the First Amendment."); *see also Weissman v. Congregation Shaare Emeth,* 38 F.3d 1038, 1042 (8th Cir.1994) (framing the question of whether application of the ADEA to a religious institution would "present a significant risk of infringement upon the First Amendment," and concluding that the ADEA posed only a minimal intrusion upon religious beliefs or practices or the essentially religious relationship between a priest and the church).[43] In *Drevlow,* the court explained,

> It is a fundamental tenet of First Amendment jurisprudence that:
>
> > the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these mat-

**42.** The Eighth Circuit Court of Appeals has not made clear whether such claims are tested against the "establishment" clause or "free exercise" clause of the First Amendment. *See, e.g., Roxas v. Presentation College,* 90 F.3d 310 (8th Cir.1996) (referring to "entanglement" with religion in violation of the First Amendment, without explaining whether the entanglement is with free exercise or establishment); *Weissman v. Congregation Shaare Emeth,* 38 F.3d 1038, 1044 & nn. 5 & 7 (8th Cir.1994) (referring to "the Religion Clauses of the First Amendment," although citing cases referring to the free exercise clause); *Drevlow v. Lutheran Church, Missouri Synod,* 991 F.2d 468 (8th Cir.1993) (not explaining whether the clause of the First Amendment at issue is the establishment or free exercise clause). There appears to be some uncertainty or a split in authority in other jurisdictions as to which clause of the First Amendment is implicated by a claim against religious institutions or members of the clergy. *See, e.g., Isely v. Capuchin Province,* 880 F.Supp. 1138 (E.D.Mich.1995) (not clarifying whether the provision of the First Amendment at issue was the establishment or free exercise clause); *Schmidt v. Bishop,* 779 F.Supp. 321 (S.D.N.Y.1991) ("Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the *establishment clause.* U.S. Const. amend. I"; emphasis added); *L.L.N. v. Clauder,* 209 Wis.2d 674, 563 N.W.2d 434 (1997) ("The entanglement doctrine, which prohibits excessive governmental entanglement with religion, springs from the Establishment Clause.... It is well-settled that excessive governmental entanglement with religion will occur if a court is required to interpret church law, policies, or practices; therefore, the

First Amendment prohibits such an inquiry."); *Swanson v. Roman Catholic Bishop of Portland,* 692 A.2d 441 (Maine 1997) ("Courts, however, 'do not inhibit *free exercise* of religion merely by opening their doors to [civil] disputes [and] there are neutral principles of law ... which can be applied ...,'" emphasis added); *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 229 A.D.2d 159, 654 N.Y.S.2d 791 (N.Y.App.Div.1997) (viewing the question as whether tort suits burden the free exercise of religion or violate separation of church and state); *Bear Valley Church of Christ v. DeBose,* 928 P.2d 1315 (Colo.1996) (*en banc* ) (considering a priest's "free exercise" defense to tort liability); *Konkle v. Henson,* 672 N.E.2d 450 (Ind.Ct.App.1996) (using *Lemon* entanglement test, without explaining whether the question is one involving the free exercise or establishment clause).

**43.** A considerable portion of the defendants' brief devoted to a discussion of First Amendment impediments to a negligent supervision claim addressed cases in which courts had held that discrimination claims by members of the clergy against their churches could not be sustained, and offering these cases as analogous to the present case, even though the plaintiff here is a third party. Not only does the court find cases brought by members of the clergy to be largely inapposite to cases brought by third parties against churches for injuries inflicted by members of the clergy, but the court concludes that the holdings of the cases cited by defendants are contrary to the binding precedent of the Eighth Circuit Court of Appeals approving such causes of action as not barred by the First Amendment. *Roxas,* 90 F.3d at 318 n. 6; *Drevlow,* 991 F.2d at 472.

ters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them. *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 724–25, 96 S.Ct. 2372, 2387–88, 49 L.Ed.2d 151 (1976). The Constitution forbids secular courts from deciding whether religious doctrine or ecclesiastical law supports a particular decision made by church authorities. *Scharon v. St. Luke's Episcopal Presbyterian Hosps.,* 929 F.2d 360, 363 (8th Cir.1991).
\* \* \*

The First Amendment proscribes intervention by secular courts into many employment decisions made by religious organizations based on religious doctrine or beliefs. Personnel decisions are protected from civil court interference where review by civil courts would require the courts to interpret and apply religious doctrine or ecclesiastical law. [Citing cases omitted here.] The First Amendment does not shield employment decisions made by religious organizations from civil court review, however, where the employment decisions do not implicate religious beliefs, procedures, or law. [Citation omitted.]

*Drevlow,* 991 F.2d at 470–71 (footnote omitted).

In *Drevlow,* the court concluded that it was unable, at the motion to dismiss stage of the proceedings, "to predict that the evidence offered at trial will definitely involve the district court in an impermissible inquiry into the Synod's bylaws or religious beliefs" to decide the plaintiff's claims of libel, negligence, and intentional interference with his legitimate expectancy of employment arising from placement of false information in his personal file. *Id.* at 471. The court therefore reversed the district court's dismissal of the complaint and remanded for further proceedings. *Id.* at 472. However, the court

cautioned that, "if further proceedings reveal that this matter cannot be resolved without interpreting religious procedures or beliefs, the district court should reconsider the Synod's motion to dismiss." *Id.*

**ii. Federal decisions.** Surprisingly few federal courts have considered the question of a First Amendment bar to a negligent hiring and retention claim brought against a church institution arising from wrongful conduct of a member of the clergy. One such decision is that of the United States District Court for the Eastern District of Michigan in *Isely v. Capuchin Province,* 880 F.Supp. 1138, 1151 (E.D.Mich.1995). Applying the "excessive entanglement" test, the court found that claims based on a "negligent hiring" theory could not be sustained, as such claims would involve an inquiry into who should be permitted to become or remain a priest and such an inquiry would in turn necessarily involve the court in interpretation of church canons and internal church policies and practices. *Isely,* 880 F.Supp. at 1150–51. The plaintiff here has conceded as much, and this court need not consider further the negligent hiring portion of her claim.

However, the court in *Isely* found that, unlike hiring decisions, supervisory decisions could be examined in light of neutral principles of law without determining questions of church law and policies. *Id.* at 1151. The court concluded that "no First Amendment issues are implicated which would mandate dismissal of the negligent supervision claims." *Id.* (but finding that the Wisconsin Supreme Court had not recognized the tort of negligent supervision, and therefore dismissing such claims).[44]

The United States District Court for the Southern District of New York reached the opposite conclusion in *Schmidt v. Bishop,* 779 F.Supp. 321 (S.D.N.Y.1991). The court first concluded that negligent supervision and retention claims, as well as negligent hiring claims, against a church for the conduct of a

---

**44.** However sound the reasoning of the court in *Isely* on the First Amendment issue, this court believes that the issues of recognition and constitutionality of the claims should be addressed in that order, and that the court should only reach the constitutionality of such a claim if it is recog-

nized under state law and adequately pleaded. *Cf. Jean,* 472 U.S. at 854, 105 S.Ct. at 2996–97 (directing courts to examine nonconstitutional questions before constitutional questions, and to reach the constitutional questions only if it is "unavoidable").

pastor were time-barred. *Schmidt,* 779 F.Supp. at 332. In the alternative, the court found that "any inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises ... First Amendment problems of entanglement ...," which might involve the Court in making sensitive judgments about the propriety of the Church Defendants' supervision in light of their religious beliefs." *Id.* The court observed that a pastor of the Presbyterian Church "is not analogous to a common law employee," because he may not be removed without action by the presbytery "functioning essentially as an ecclesiastical court." *Id.* Because the ecclesiastical tribunals were more learned in ecclesiastical law than the federal courts, the court determined that it would be

> inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently supervised or retained the defendant Bishop Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the establishment clause. U.S. Const. amend. I.

*Schmidt,* 779 F.Supp. at 332.

Thus, on the one hand, the federal district court in *Isely* upheld the negligent supervision claim over First Amendment objections, because only application of "neutral" principles of law, rather than examination of church doctrine or policies, was required, and hence "no First Amendment issues are implicated which would mandate dismissal of the negligent supervision claims." *Isely,* 880 F.Supp. at 1151. However, for the federal district court in *Schmidt,* the mere possibility that the inquiry "might involve the Court in making sensitive judgments about the propriety of the Church Defendants' supervision in light of their religious beliefs" was sufficient to dismiss a negligent supervision claim on First Amendment grounds, at least where an ecclesiastic tribunal or something analogous to it was perceived to be required to make decisions to remove a cleric. *Schmidt,* 779 F.Supp. at 332. This court concludes that the court in *Isely* was nearer the mark,

because, while who may become or remain a priest must, almost inevitably involve an inquiry into church doctrine or policies, barring a negligent hiring or retention claim on First Amendment grounds, negligent supervision can probably be determined applying only neutral principles of law and an inquiry that does not intrude upon church doctrine or policy. *Isely,* 880 F.Supp. at 1150–51.

In addition, however, this court has the further guidance of the decision of the Eighth Circuit Court of Appeals in *Drevlow.* That decision would suggest that dismissal is inappropriate, on the record at the Rule 12(b) stage of the proceedings, because the court is unable "to predict that the evidence offered at trial will *definitely* involve the district court in an impermissible inquiry into the [church's] religious beliefs." *Drevlow,* 991 F.2d at 471 (emphasis added). This court would add that it might be possible for a showing of excessive entanglement to be made at the summary judgment stage of the proceedings, but the court cannot say that such entanglement is definitely involved upon the pleadings.

***iii. State court decisions.*** Numerous state court decisions also reflect a split in authority on whether negligent supervision claims against churches, arising from tortious conduct of members of the clergy, can be sustained on First Amendment grounds. *Compare, e.g., L.L.N. v. Clauder,* 209 Wis.2d 674, 563 N.W.2d 434 (1997) (on a motion for summary judgment, the court concluded that undisputed facts established that a negligent supervision claim, arising from improper sexual relations between a hospital chaplain and a patient, necessarily required examination of church law, policies, and practices, including the vow of celibacy and whether a person with notice of a truant priest's conduct was an agent of the church, and thus such a claim was barred by the First Amendment, reaffirming *Pritzlaff v. Archdiocese of Milwaukee,* 194 Wis.2d 302, 533 N.W.2d 780 (1995)); *Swanson v. Roman Catholic Bishop of Portland,* 692 A.2d 441 (Maine 1997) (in a case in which the superior court had granted a motion to dismiss as to negligent selection and training claims against a church arising from a priest's sexual relations with a woman who

came to him for marriage counseling, the supreme court held that the negligent supervision claim must also be dismissed as barred by the First Amendment); *with, e.g., Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 229 A.D.2d 159, 654 N.Y.S.2d 791 (N.Y.App.Div.1997) (on a motion to dismiss claims arising from a priest's alleged sexual abuse of infants, negligent supervision and retention claims were not barred by the First Amendment, but negligent hiring claim was properly dismissed); *Bear Valley Church of Christ v. DeBose,* 928 P.2d 1315 (Colo.1996) (*en banc* ) (after trial on the merits of claims brought on behalf of a child alleging improper touching by a minister during counseling sessions, the court sustained verdicts in favor of the child against the church, holding that courts may review an injured third party's claim that a religious institution negligently hired, supervised, or failed to discharge one of its employees without implicating or running afoul of the First Amendment, and citing in support *Van Osdol v. Vogt,* 908 P.2d 1122 (Colo.1996), and *Moses v. Diocese of Colo.,* 863 P.2d 310 (Colo.1993) (*en banc* ), *cert. denied,* 511 U.S. 1137, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994)), *cert. denied,* —— U.S. ——, 117 S.Ct. 1862, 137 L.Ed.2d 1062 (1997); *Doe v. Dorsey,* 683 So.2d 614 (Fla. Dist.Ct.App.1996) (affirming dismissal as time-barred a claim of negligent hiring and supervision based on sexual molestation of an altar boy by a priest, but observing in dicta that the First Amendment would not protect a church from negligent supervision claims based on criminal conduct); *Konkle v. Henson,* 672 N.E.2d 450 (Ind.Ct.App.1996) (First Amendment did not bar claims for negligent hiring and retention based on minister's sexual molestation of plaintiff, and therefore grant of church's summary judgment motion was reversed).

This split in authority, which may in part depend upon the stage of proceedings at which the court assessed the entanglement issue, suggests the propriety of this court's conclusion that, at least at the motion to dismiss stage, the First Amendment does not necessarily bar a claim of negligent supervi-

sion against a religious institution for the tortious conduct of a member of the clergy. The *Drevlow* decision of the Eighth Circuit Court of Appeals further supports this court's denial of the defendants' motion to dismiss the negligent supervision claim on First Amendment grounds at this stage of the proceedings when the extent of any entanglement that may be required by adjudication of that claim cannot yet be determined. *Drevlow,* 991 F.2d at 471.

Defendants' motion to dismiss the negligent retention and supervision portions of her claim in Count 10 will therefore be denied.[45]

### 2. Other state-law claims

The court has considered the defendants' challenges to the adequacy of the pleading of the other state-law claims presently at issue, Counts 3, 4, 11, 12, and 13, as well as the defendants' assertions of other "insuperable bars" to these claims, and finds that the relief of dismissal is not required. Assuming that all of the facts alleged in the plaintiff's complaint are true, and liberally construing those allegations, *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *Doe,* 107 F.3d at 1303–04; *WMX Techs., Inc.,* 105 F.3d at 1198; *First Commercial Trust,* 77 F.3d at 1083, it is not clear that no relief could be granted under any set of facts that could be proved consistent with Doe's allegations. *Handeen,* 112 F.3d at 1347–48; *accord Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *WMX Techs., Inc.,* 105 F.3d at 1198. A record amplified and clarified by discovery may demonstrate that some of the claims are not viable, in which case the court will no doubt be called upon to revisit the merits of those claims, on either factual or legal grounds.

The portion of defendants' motion seeking dismissal of various state law claims will therefore be denied. Similarly, the court concludes that the portions of the motion asking that the court abstain or certify questions to the Iowa Supreme Court are premature, as attempting to answer certified ques-

---

**45.** Again, the plaintiff has conceded that dismissal of the negligent hiring portion of this claim is appropriate on "entanglement" grounds.

tions in the absence of a more complete record may be difficult, impossible, or merely unproductive.

### E. Certification For Interlocutory Appeal

 The court finds that this matter should be certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). That statute provides, in pertinent part, as follows:

> (b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b). As the Eighth Circuit Court of Appeals has observed, the statute provides for certification of controlling questions of law by the district court for interlocutory appeal in circumstances where an appeal is otherwise unavailable. *City of Fort Madison, Iowa v. Emerald Lady,* 990 F.2d 1086, 1088 n. 4 (8th Cir.1993). However, the appellate court must, upon certification, decide, in its discretion, whether to permit the appeal on the question certified. *Id.*[46]

In a recent decision, the Eighth Circuit Court of Appeals considered the standards applicable to an interlocutory appeal pursuant to § 1292(b). *See White v. Nix,* 43 F.3d 374 (8th Cir.1994). The court held that "[t]he requirements of § 1292(b) are jurisdictional," and the statute should be used with care to avoid piece-meal appeals. *White,* 43 F.3d at 376. Thus, the court stated that § 1292(b) "'should and will be used only in exceptional cases where a decision on appeal may avoid protracted and expensive litigation, as in antitrust and similar protracted cases.'" *Id.* (quoting S.Rep. No. 2434, 85th Cong., 2d Sess. (1958), reprinted in 1958 U.S.C.C.A.N. 5255, 5260). Thus, the statute should be used "sparingly" and the burden, on the movant, is a heavy one to show that the case is an "exceptional" one in which immediate appeal is warranted. *Id.* Nonetheless, the court's grant of interlocutory appeal is reviewed for abuse of discretion. *Id.* (finding abuse of discretion in that case in failure to consider whether the appeal involved a controlling question of law). The court therefore reiterated that § 1292(b) establishes three criteria that must be met for certification by the court: "the district court must be 'of the opinion that' (1) the order 'involves a controlling question of law'; (2) 'there is substantial ground for difference of opinion'; and (3) certification will 'materially advance the ultimate termination of the litigation.'" *Id.* at 377.

 The court is of the opinion that this decision presents an "exceptional case" in which immediate interlocutory appeal should be permitted. *Id.* The court finds that this order involves a controlling question of law, specifically, the constitutionality of the civil

---

46. Because § 1292(b) provides for appeal of orders otherwise unappealable, and thus provides an avenue for resolving disputed and controlling questions of law, the resolution of which will materially further the litigation, the appellate court reviews *de novo* the questions of law certified by the district court. *Simon v. G.D. Searle & Co.,* 816 F.2d 397, 400 (8th Cir.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987). The nature and scope of the appellate court's review is not rigidly determined by the certified questions, however. *Id.* (citing *In re Oil Spill by the Amoco Cadiz,* 659 F.2d 789, 793 n. 5 (7th Cir.1981)). The appellate court

remain[s] free to consider "'"such questions as are basic to and underlie"'" the questions certified by the district court. [*In re Oil Spill by the Amoco Cadiz,* 659 F.2d at 793 n. 5] (quoting *Helene Curtis Indus., Inc. v. Church & Dwight Co.,* 560 F.2d 1325, 1335 (7th Cir.1977) (quoting 9 J. Moore, *Moore's Federal Practice* ¶ 110.25[1], at 270)); *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 962 n. 7 (3d Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir. 1983), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). *Simon,* 816 F.2d at 400.

remedies provision of the VAWA and the elements of a VAWA claim in this case. *Id.* If the VAWA is unconstitutional as an exercise of Commerce Clause power, then this court will lack jurisdiction over the federal claim, and consequently will lack supplemental jurisdiction over the various state-law claims. It is also clear to the court that "there is substantial ground for difference of opinion," *id.,* since the only two courts to consider the constitutionality of this portion of the VAWA have split upon the appropriate outcome of a Commerce Clause analysis. Furthermore, there is an absence of precedent on the precise elements of a civil VAWA claim or the requirements of a predicate offense. Also, the court has identified the split in authority as to whether the First Amendment bars a negligent supervision claim against a religious institution based on the tortious conduct of a member of the clergy. Finally, certification will "materially advance the ultimate termination of the litigation," *id.,* because, if this court is incorrect in its conclusion that the VAWA is constitutional, or in its identification of the elements of such a claim, the defendants are entitled to dismissal of the complaint for lack of a federal question. This matter will therefore be certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on the questions of the constitutionality of the civil remedies provision of the VAWA, the elements of such a claim in this case, and whether the First Amendment bars Doe's negligent supervision claim. However, this court will not enter any stay of the proceedings in this case while such an interlocutory appeal is pending. 28 U.S.C. § 1292(b).

### *III. CONCLUSION*

Deprived of the use of a sword to loosen the complex knot of legal issues presented here, the court has instead painstakingly attempted to untangle the various strands in its analysis. Taking the defendants' nonconstitutional challenge to the plaintiff's VAWA claim first, the court has extracted from the federal statute and the state statute identified as defining a predicate offense the elements of Doe's VAWA claim. The court

concludes that Doe has adequately pleaded, although just barely, each of the essential elements of such a claim. Thus, the defendants are not entitled to dismissal of the VAWA claim on Rule 12(b)(6) grounds for failure to state a claim, nor are they entitled to dismissal of that claim or the entire action pursuant to Rule 12(b)(1) on the ground that Doe has failed to allege an essential element of the federal claim upon which the court's subject matter jurisdiction depends.

Turning to the question at the focus of the attention of the parties and *amici,* the court next considered whether it lacked subject matter jurisdiction over the complaint, because the civil remedies provision of the VAWA is unconstitutional as beyond Congress's Commerce Clause power. Applying the standards for such an analysis stated by the United States Supreme Court in *Lopez,* as clarified by various circuit courts of appeals post–*Lopez,* the court concludes that the lack of jurisdictional elements is not fatal to the constitutionality of the statute, nor is the fact that the statute regulates non-commercial or non-economic activity. Giving congressional findings the deference they continue to be due post–*Lopez,* the court concludes instead that Congress had a rational basis for finding that gender-motivated violence has a substantial effect on interstate commerce. Furthermore, the means Congress adopted in the civil remedies provision of the VAWA to combat gender-motivated violence were reasonably adapted to that goal. The civil remedies provision of the VAWA mirrors other statutory mechanisms for private enforcement of civil rights. Furthermore, the civil remedies provision of the VAWA avoids the concern of the Supreme Court in *Lopez* that the Commerce Clause would become a vehicle for establishment of a centralized government exercising plenary police powers, because the statute is plainly constructed to supplement rather than supplant state criminal laws pertaining to gender-motivated violence. The court concludes that the VAWA is a valid exercise of Congress's authority under the Commerce Clause to address conduct with a substantial effect on interstate commerce.[47]

---

**47.** The court therefore did not reach the defen- dants' challenge to the VAWA as an exercise of

The court's analysis was not finished there, however, as the court was still required to consider the defendants' challenges to the plaintiff's state-law claims. The court rejects the defendants' arguments that the exercise of supplemental jurisdiction over the plaintiff's state-law claims is inappropriate, because the court finds that it need not dismiss the state claims on the grounds of novelty or complexity, or on the ground that those claims predominate over the federal claim. The novelty and complexity arguments may be better addressed on a more complete record, and, as to predomination, the court finds that the federal claim is the central claim of plaintiff's complaint, not merely an add-on to establish federal jurisdiction.

Of the defendants' other challenges to the plaintiff's state-law claims, the court has considered in detail only the defendants' challenge to the negligent supervision and retention claim. The court finds that the other state-law claims have been adequately pleaded. As to the negligent supervision and retention claim,[48] the court finds that the claim is, first, permitted under the existing formulation of the tort in Iowa, and not barred at this stage of the proceedings by the First Amendment. The court finds that it is not definitely apparent that consideration of a claim of negligent retention and supervision against a religious institution arising from allegedly tortious conduct of a member of the clergy will involve an unwarranted entanglement with religion. However, if a more complete record establishes that such entanglement in this case is inevitable, the defendants may still be entitled to summary judgment on or dismissal of the negligent retention and supervision claim.

The court finds that there is no need, at this point in the proceedings, either to abstain or to certify questions to the Iowa Supreme Court, because only a fuller record would make such a course productive. Finally, the court certifies this matter for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), because the court is of the opinion that this order involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.

The defendants' motion to dismiss, abstain, or certify questions is therefore **denied** except to the extent that the plaintiff has conceded certain claims cannot properly be asserted. This order is **certified for interlocutory appeal,** but this matter is *not* stayed while any such interlocutory appeal is pending. 28 U.S.C. § 1292(b). The stay on discovery imposed by a magistrate judge of this court on November 20, 1996, is hereby **lifted.** The parties shall file a proposed scheduling order and discovery plan in compliance with N.D. Ia. LR 16(a)(1) within **thirty (30) days** of the date of this order.

**IT IS SO ORDERED.**

## APPENDIX
### A. Amici Appearing Through
### NOW Legal Defense And Education Fund

NOW Legal Defense And Education Fund (NOW LDEF)

Anti–Defamation League (ADL)

Ayuda, Inc.

Center For Women Policy Studies

Equal Rights Advocates (ERA)

Iowa Coalition Against Sexual Assault (Iowa CASA)

---

congressional authority under section five of the Fourteenth Amendment.

48. The plaintiff conceded that the negligent hiring portion of this claim could not be sustained over a First Amendment bar.

Jewish Women International

National Alliance of Sexual Assault Coalitions (NASAC)

National Coalition Against Domestic Violence

National Network To End Domestic Violence (NNEDV)

National Women's Law Center (NWLC)

Northwest Women's Law Center

Women's Law Project (WLP)

Women's Legal Defense Fund (WLDF)

### B. Amici "Law Professors"[49]

Professor Kathryn Abrams
 Northwestern University School of Law

Professor Bruce Ackerman
 Sterling Professor of Law and Political Science
 Yale Law School

Professor Anthony G. Amsterdam
 Judge Edward Weinfeld Professor of Law
 New York University School of Law

Professor Jack M. Balkin
 Lafayette S. Foster Professor
 Yale Law School

Professor Katharine T. Bartlett
 Professor of Law
 Duke University School of Law

Professor Mary Becker
 Arnold I. Schure Professor of Law
 University of Chicago School of Law

Professor Derrick A. Bell, Jr.
 Visiting Professor of Law
 New York University School of Law

Professor Cynthia Grant Bowman
 Professor of Law
 Northwestern University School of Law

Professor Sarah E. Burns
 New York University School of Law

Professor Patricia A. Cain
 Professor of Law
 University of Iowa College of Law

Professor Enrique Carrasco
 Professor of Law

**49.** Affiliations are listed for identification pur- poses only.

Professor Erwin Chemerinsky
 Legion Lex Professor of Law
 University of Southern California Law School

Professor Drucilla Cornell
 Professor of Law
 State University of New Jersey, Rutgers School of Law—Newark

Professor Jan C. Costello
 Professor of Law
 Loyola Law School, Los Angeles

Professor Clare Dalton
 Professor of Law
 Northeastern University School of Law

Professor Harlon L. Dalton
 Professor of Law
 Yale Law School

Professor Marcella David
 Associate Professor of Law
 University of Iowa College of Law

Professor Norman Dorsen
 Frederick I. & Grace A. Stokes Professor of Law
 New York University School of Law

Professor Mary L. Dudziak
 Professor of Law
 University of Iowa College of Law

Professor Martha Albertson Fineman
 Maurice T. Moore Professor of Law
 Columbia University School of Law

Professor Catherine L. Fisk
 Professor of Law
 Loyola Law School, Los Angeles

Professor Katherine Franke
 Associate Professor of Law
 University of Arizona College of Law

Professor Linda S. Greene
 Professor of Law
 University of Wisconsin Law School

Professor Phoebe A. Hadden
 Charles Klein Professor of Law and Government
 Temple University School of Law

Professor Angela P. Harris
 Professor of Law
 University of California at Berkeley School of Law
 Boalt Hall

Professor Randy A. Hertz
 Professor of Clinical Law
 New York University School of Law

Professor Joan W. Howarth
 Professor of Law
 Golden State University School of Law

Professor Lisa C. Ikemoto
 Professor of Law
 Loyola Law School, Los Angeles

Professor Jane E. Larson
 Professor
 University of Wisconsin Law School

Professor Sylvia A. Law
 Elizabeth K. Dollard Professor of Law, Medicine & Psychiatry
 New York University School of Law

Professor Jean C. Love
 Martha Ellen Tye Distinguished Professor of Law
 University of Iowa College of Law

Professor Holly Maguigan
 Professor of Clinical Law
 New York University School of Law

Professor Karl Manheim
 Professor of Law
 Loyola Law School, Los Angeles

Professor Burke Marshall
 Professor of Law, Yale Law School

Professor Mari Matsuda
 Professor of Law
 Georgetown University Law Center

Professor Linda A. McGuire
 Assistant Dean for Student Affairs and Instructor of Law
 University of Iowa College of Law

Professor Frank I. Michelman
 Robert Walmsley University Professor
 Harvard Law School

Professor Martha L. Minow
 Professor of Law
 Harvard Law School

Professor Nancy Morawetz
 Professor of Clinical Law
 New York University School of Law

Professor Burt Neuborne
 John Norton Pomeroy Professor of Law
 New York University School of Law

Professor Reta Noblett–Feld
 Clinical Law Professor
 University of Iowa College of Law

Professor Victoria Nourse

Assistant Professor of Law
University of Wisconsin

Professor Sande Buhao Pond
Clinical Professor of Law
Loyola Law School, Los Angeles

Professor Margaret Raymond
Associate Professor of Law
University of Iowa College of Law

Professor Judith Resnik
Orrin B. Evans, Professor of Law
University of Southern California Law School
Visiting Professor of Law
New York University School of Law

Professor A.J. Richards
Edwin D. Webb Professor of Law
New York University School of Law

Professor Laura Sager
Professor of Clinical Law

New York University School of Law
Professor Elizabeth M. Schneider
Professor of Law
Brooklyn Law School

Professor Vicki Schultz
Professor of Law
Yale Law School

Professor Barbara Schwartz
Clinical Law Professor
University of Iowa College of Law

Professor Marjorie A. Silver
Professor of Law
Touro College of Law

Professor Jonathan Simon
Professor of Law
University of Miami School of Law

Professor Aviam Soifer
Dean and Professor of Law
Boston College Law School

Professor Carol Steiker
Assistant Professor of Law
Harvard Law School

Professor Susan Sturm
Professor of Law
University of Pennsylvania Law School

Professor Anthony Thompson
Assistant Professor of Clinical Law
New York University School of Law

Professor Gerald Torres
H.O. Head Professor of Real Property Law
University of Texas School of Law

Professor Lea VanderVelde
Professor of Law
University of Iowa College of Law

Professor Merle H. Weiner
Associate Professor of Law
University of Iowa College of Law

Professor Robin West
Professor of Law
Georgetown University Law Center

Professor Lucie White
Professor of Law
Harvard Law School

Professor Stephanie M. Wildman
Professor of Law
University of San Francisco School of Law

Professor Diane Leenheer Zimmerman
Professor of Law
New York University School of Law